1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  SEMYON (SAM) KISLIN,

4              Plaintiff,

5          v.                          14 CV 237(PGG)

6  SIMON DIKKER,

7              Defendant.

8  ------------------------------x

9                                      April 5, 2016

10                                     9:37 a.m.

11

   Before:
12
                      HON. PAUL G. GARDEPHE,
13
                                       District Judge
14
                          APPEARANCES
15
   KESTENBAUM, DANNENBERG & KLEIN, LLP
16      Attorneys for Plaintiff
   BY:  JEFFREY CRAIG DANNENBERG
17
   ALEXANDER BERKOVICH, ESQ
18      Attorney for Defendant

19

20

21

22

23

24

25

1              9:37.(In open court)

2              THE COURT:  This action originally had filed claims

3    for relief.  My notes indicate that the second and third claims

4    were voluntarily dismissed.

5              I understand, Mr. Dannenberg, you're consenting to the

6    dismissal of the first claim for relief of conversion, is that

7    correct?

8              MR. DANNENBERG:  Yes, your Honor.

9              THE COURT:  And that claim is dismissed.

10             What that leaves for trial is the fourth claim for

11   relief, the breach of contract; and the fifth claim for relief

12   for fraudulent misrepresentation.

13             A couple preliminary issues.  Having read the parties'

14   submissions, I'm concerned about the issue of what law applies

15   to this.  Plaintiff pretty clearly argues that New York law

16   governs.  It's unclear to me what the defendant's position is.

17             So, Mr. Berkovich, what is your position on the

18   threshold issue of what law governs the parties' dispute?

19             MR. BERKOVICH:  If I may, your Honor.  As you know,

20   our position in our previous submissions to the Court is that

21   the Russian law should govern the parties' dispute.  We had

22   opportunities to present an expert in Russian law.  We had

23   Regrettably, because lack of the substantial evidence, meaning

24   the other witnesses and documents in this case, and a cost of

25   bringing Russian law expert to this proceeding in New York, we

G45EKIST                    Trial

1    decided not to present such an expert.

2            So effectively, for the purpose of this proceeding, we

3    waive the issue of Russian law as for the reasons I just

4    explained to your Honor.

5            THE COURT:  All right.  So just so the record is

6    clear, you are consenting to my application of New York law in

7    this proceeding?

8            MR. BERKOVICH:  That's correct, your Honor.

9            THE COURT:  Mr. Dannenberg, that is your position as

10   well, correct?

11           MR. DANNENBERG:  Yes, it is.

12           THE COURT:  Then New York law will govern the dispute.

13           Second issue, I want to understand the parties'

14   capacity for the use of English.  Now, Mr. Dannenberg, in

15   reviewing Mr. Kislin's deposition, it seemed to me he testified

16   in English.  Did I miss something?

17           MR. DANNENBERG:  Yes, your Honor, you did miss

18   something.  He testified at his deposition in Russian through

19   the same translator we have here today.

20           THE COURT:  Okay.

21           MR. DANNENBERG:  Both parties also gave jurisdictional

22   depositions early on in the case which were short and limited

23   in scope.  At that deposition Mr. Kislin did testify in

24   English.  But at his main deposition he testified in Russian,

25   as did the defendant.

1      THE COURT:  All right.  So is it both parties' wish

2  that we proceed through the use of a Russian interpreter?

3      MR. DANNENBERG:  Yes.  And we have jointly engaged

4  Mr. Roman Sannikov, who is sitting to your left, as the

5  translator for both witnesses' testimony.

6      THE COURT:  The other reason I had a question about

7  that is I believe I read in the declaration -- I think it was

8  Mr. Kislin's -- that both he and Mr. Dikker are fluent in

9  English.  Did I read that?

10      MR. DANNENBERG:  Yes.  They both speak English

11  conversationally very well.

12      THE COURT:  Well, the word used was "fluent," that

13  both were fluent in English.  But I gather you don't believe

14  that they're fluent in English for purposes of testifying?

15      MR. DANNENBERG:  Well, my use of the word fluent, your

16  Honor, is that I can converse -- and I don't speak Russian, at

17  least not very well.  I can speak with both of them, and I have

18  spoken with both of them over the years in English.  And they

19  both are able to communicate with me and understand what I'm

20  saying very well.

21      However, I've had many discussions with Mr. Berkovich

22  on this subject.  And in the context of formal testimony in

23  which they're being interrogated, particularly with the use of

24  leading questions, they're both, each one of them, far more

25  comfortable in testifying in their native languages.  And based

1    on what I saw at the depositions, their answers are much

2    clearer by testifying in their native languages.

3            THE COURT:  All right.  Obviously my preference would

4    be that they speak in English, in particular because I'm

5    required to make credibility findings.  And I was concerned

6    about whether a Russian interpreter was necessary, given the

7    representation that both men were fluent in English.

8            But based on what Mr. Dannenberg has said, I will

9    allow both the plaintiff and the defendant to give their

10   testimony in Russian, with the assistance of a Russian

11   interpreter.

12           Before we proceed, let me ask some preliminary

13   questions, really to just confirm what I've read, what I think

14   I've read, to make sure I understand it.

15           First of all, is it true that there is no written

16   agreement reflecting Mr. Dikker's alleged agreement to pay

17   Mr. Kislin $20 million for his interest in the company which

18   you referred to as TRI?  Is that true, Mr. Dannenberg?

19           MR. DANNENBERG:  Yes.

20           THE COURT:  Secondly, is it true that there are no

21   documents or that -- let me amend that.

22           There are no documents before the Court that reflect

23   the source of the $16 million Mr. Kislin received for his

24   interest ins TRI; is that true?

25           MR. DANNENBERG:  That is true, no documents.

1          MR. BERKOVICH:  Your Honor, may I just address this

2     issue for one second, if you don't mind.

3          THE COURT:  Go ahead.

4          MR. BERKOVICH:  Your first question, you asked the

5     question whether it's true that there is no document.

6          THE COURT:  No written agreement.

7          MR. BERKOVICH:  No written agreement regarding

8     $20 million transaction.  But my client's position is it's not

9     true.  There is such a written agreement, but there is no

10    written agreement before your Honor with respect to this.

11         THE COURT:  Let me make sure that you understand my

12    question so that I understand your answer.

13         My question is:  Is it true that there is no written

14    agreement reflecting Mr. Dikker's alleged agreement to pay

15    Mr. Kislin $20 million for his interest in TRI?  Do you agree

16    or disagree as to the existence of a written agreement?

17    Mr. Dannenberg has told me there is no such written agreement.

18    Do you believe there is a written agreement?

19         MR. BERKOVICH:  The way you ask the question now, my

20    client's position --

21         THE COURT:  It's the same question, Mr. Berkovich.  I

22    read exactly the same question.

23         MR. BERKOVICH:  There is no such agreement with

24    respect to Mr. Dikker, but there is an agreement of corporate

25    parties.

1    THE COURT:  I wasn't asking of anyone else.  Just

2    asking about Mr. Dikker.

3    MR. BERKOVICH:  That's right, your Honor.

4    THE COURT:  But let me make sure I understand what you

5    just said.  And I thought this was implicit in my question, but

6    maybe it wasn't.

7    When I say Mr. Dikker and Mr. Kislin, I am including

8    within the reference to their names the corporate entities that

9    they control, because I understand both men here acted through

10   corporate nominees.  So maybe that wasn't clear from my

11   question.

12   Mr. Dannenberg, you understood it that way, didn't

13   you?

14   MR. DANNENBERG:  I did, your Honor.

15   THE COURT:  So then, Mr. Berkovich, understanding my

16   question to include both corporate nominees, do you agree that

17   there is no agreement that reflects -- no written agreement

18   that I will see today that shows Mr. Dikker's and his corporate

19   nominees' agreement to pay Mr. Kislin $20 million for his

20   interest?

21   MR. BERKOVICH:  There's no agreement that you will see

22   today, your Honor.

23   THE COURT:  Okay.  Then the next step is to find out

24   how the parties wish to proceed.

25   I've read your papers.  If anyone wants to make

1    opening statements, I'm happy to hear them.  But I also want

2    you to know that I've read the papers and I think I'm familiar

3    with the issues.  But tell me what you wish.

4           Mr. Dannenberg, do you wish to make some preliminary

5    remarks?

6           MR. DANNENBERG:  I would, your Honor, if you don't

7    mind.

8           THE COURT:  Okay.  Mr. Berkovich, you, too?

9           MR. BERKOVICH:  Well, if Mr. Dannenberg does, so would

10   I.

11          THE COURT:  All right.  So in just a minute I'll hear

12   opening statements from you.

13          Before we get to that, let me ask you how you wish to

14   proceed and how many witnesses I'm going to be hearing from.

15          I have read the affidavits.  My rules provide that for

16   purposes of direct examination in a bench trial, I rely on

17   affidavits.  However, if somebody wishes to put their client on

18   and elicit their direct testimony, and they feel there's a

19   reason for doing that, I'm happy to hear what you have to say

20   on that subject.

21          Mr. Dannenberg, your thoughts?  Are you content to

22   rely on your client's affidavit, or do you wish to put him on?

23          MR. DANNENBERG:  No.  I think that we've both agreed

24   in the pretrial order that we would each have one witness who

25   are parties in the case, and that their direct examination

1    would be through affidavits.

2              THE COURT:  Mr. Berkovich, you're content?

3              MR. BERKOVICH:  The same, your Honor.  Yes.

4              THE COURT:  So the only witnesses I'm going to hear

5    from in this proceeding are Mr. Kislin and Mr. Dikker?

6              MR. DANNENBERG:  Yes, that's true.

7              MR. BERKOVICH:  That's right, your Honor.

8              THE COURT:  Mr. Dannenberg, I'll hear from you.

9              MR. DANNENBERG:  May it please the Court, your Honor,

10   as you just said, you have both sides' pretrial submissions

11   which summarize the legal and factual arguments.  And perhaps

12   there's a risk in reading them.  And that's why I wanted to

13   take advantage of this opportunity to make an opening

14   statement, to get the impression that there are some convoluted

15   facts here.  And, in fact, some of the background information

16   submitted by both sides is clearly irreconcilable.

17             Also, as your Honor alluded to, there's not a lot of

18   documentary evidence.  I think that defendant's counsel and I

19   would both have an easier time at the trial if there were, but

20   the evidence will show that that's just not the way these two

21   individuals did business.

22             However, at least partly because of the lack of

23   documentary evidence, both sides made an effort in the pretrial

24   order to stipulate to some key facts.  And that's in Section 8

25   of the pretrial order.  And I'll be asking that those

G45EKIST                    Trial

 1  stipulated facts be deemed part of the record as party

 2  admissions.

 3          And just for the purposes of this opening statement,

 4  I'd like to in particular reference the last four paragraphs of

 5  that Section 8 of the pretrial order, which is paragraphs E, F,

 6  G and H, because I think that they explain or demonstrate that

 7  the facts are not, in fact, all that convoluted; in fact,

 8  they're pretty straightforward.  Section E reads, beginning in

 9  about 2007 and ending in 2008 --

10          THE COURT:  And not to interrupt, but just so the

11  record is clear, this is paragraph 8E we're talking about,

12  right?

13          MR. DANNENBERG:  Yes, on page five of the pretrial

14  order.

15          THE COURT:  Go ahead.

16          MR. DANNENBERG:  Quote, beginning in about 2007 and

17  ending in 2008, Mr. Kislin and Mr. Dikker engaged in

18  discussions for a buyout of Mr. Kislin's ownership interest in

19  TRI.  Following negotiation over the valuation of that

20  interest, Kislin and Dikker ultimately settled on a figure of

21  $20 million.  Kislin and Dikker agreed that the sum would be

22  paid through TRI's sale of an interest that TRI owned in a

23  Russian real estate fund known as, quote, Solid, closed quote,

24  operated by a Russian joint stock company named JSC Solid

25  Management.

1          And then paragraph F reads, quote, at some point

2     Mr. Kislin, either directly or through a company that he

3     controlled, received at least $16 million out of the

4     $20 million buyout price.

5          And then Section G, paragraph G, reads, quote, the

6     parties entered into a document that they both executed

7     entitled agreement, number 12-11/1, dated 12 November, 2009,

8     with supplementary agreement number one to agreement number

9     12-11/1 also executed by the parties and dated 12 November,

10     2009.  And a copy of that document has been stipulated as

11     admissible in evidence as Plaintiff's Exhibit 3.

12          And then Section H -- paragraph H, I mean, reads,

13     quote, the parties entered into a document that they both

14     executed entitled agreement number 01-1809, dated 18 September,

15     2012, which the parties also have stipulated could be entered

16     into evidence.  And it's marked as Plaintiff's Exhibit 4.

17          There's one bit of language in those paragraphs, your

18     Honor, that was compromise between defendants' counsel and me,

19     and that's the amount that Mr. Kislin received.  It says was,

20     quote, at least $12 million out of the $20 million buyout

21     price, closed quote.  The evidence will show that the "at

22     least" language was really unnecessary.  It was $16 million.

23          So the arithmetic is really pretty straightforward.

24     Mr. Kislin was promised $20 million.  He received $16 million.

25     So he's still owed $4 million.

1        Those two agreements, Plaintiff's Exhibits 3 and 4,

2   represented promises made by the defendant, Mr. Dikker, to get

3   Mr. Kislin that $4 million balance through a series of

4   corporate and real estate transactions, but that never

5   happened.

6        THE COURT:  What was the consideration for those

7   agreements?

8        MR. DANNENBERG:  Those agreements, your Honor,

9   confirmed the balance that was due.  The consideration for

10  going forward was Mr. Kislin's forbearance, taking immediate

11  collection actions, which he could have done.  And early on in

12  this action --

13       THE COURT:  Let me make some preliminary comments, not

14  to interrupt.  And obviously I want to hear everything that you

15  have to say.  But I also want to alert the lawyers to what I'm

16  interested in, at least at this point.

17       So what you're saying to me -- the reason why I asked

18  about consideration is I expected that what you would say was

19  that Mr. Kislin agreed not to pursue a lawsuit.  And subject to

20  briefing on the issue, which I have not received, I'll assume

21  for purposes of this discussion that an agreement not to

22  proceed with a lawsuit can constitute sufficient consideration

23  to provide a basis for contract.

24       But there's a foundational issue, or there could be a

25  foundational issue, which is:  Was there an enforceable

1    contract in the first place?  In other words, was there an

2    enforceable agreement between Mr. Dikker and Mr. Kislin

3    pursuant to which Mr. Dikker agreed to pay Mr. Kislin

4    $20 million for his interest in the company TRI?  And there is

5    a fundamental factual dispute on that subject, with Mr. Kislin

6    saying there was such an agreement; and not only was there such

7    an agreement, but he received $16 million of the agreed-upon

8    $20 million.  That's his side of it.

9         Mr. Dikker says, I actually never agreed to pay

10   Mr. Kislin anything.  And, in fact, the $16 million he did

11   receive didn't come from Mr. Dikker; it came from a Russian

12   pension fund, which I will refer to as Blago, B-L-A-G-O.  It's

13   a much longer name, but I'm going to stick with Blago.  And

14   that's why I began today's proceedings by just confirming my

15   understanding that there is no written agreement between

16   Mr. Kislin and Mr. Dikker setting forth the $20 million

17   agreement I've been discussing, nor are there any documents

18   that show the source of the $16 million that Mr. Kislin

19   received for his interest in TRI.

20        And so the reason why I'm mentioning this is I'm

21   concerned about whether the proof will demonstrate that there

22   was a contract between Mr. Kislin and Mr. Dikker as to the

23   $20 million.  And I'm concerned about whether there's going to

24   be proof that the $16 million that Mr. Kislin received was

25   actually the product of such an agreement.

1          To the extent that plaintiff is relying on notions of

2     oral contract, which has to be the theory, because there is no

3     written agreement, I'm going to need to see briefing on the

4     enforceability of an oral agreement of this sort under New York

5     law.

6          So that's why I'm asking the question.  I'm sure

7     there's going to be evidence that's going to go to these

8     issues, but I just wanted to highlight it for counsel right at

9     the outset, that I have these concerns.  And they're concerns

10    that bear on the question of whether these other agreements,

11    the ones that Mr. Dannenberg just alluded to, whether they are

12    in a sense bolstering the notion that there was a contract in

13    the first place or whether they constitute enforceable

14    agreements on their own.

15         And there's a dispute about that, too, whether they

16    were enforceable agreements or not.  And obviously one aspect

17    of whether they would be enforceable or not, the later

18    agreements, would be whether consideration was offered.  And

19    Mr. Dannenberg just said, well, the consideration was agreeing

20    not to file a lawsuit.

21         And then the question that emerges from that is:  Does

22    that constitute meaningful consideration in the context of this

23    case if there wasn't any enforceable contract between

24    Mr. Kislin and Mr. Dikker in the first place?

25         So these issues are related.  And that's why I raise

G45EKIST                    Trial

1    them now.

2                Go ahead, Mr. Dannenberg.

3                MR. DANNENBERG:  Those are fair questions, your Honor.

4    And it was in anticipation of the fact that the Court would

5    logically have those questions that I referenced at the outset

6    the provisions of the stipulated facts in the pretrial order.

7    And in particular, paragraph E, which answers the question you

8    just asked, was there an agreement on the 20 million?  There

9    was.  Both sides acknowledge that.

10               The factual issue is whether that agreement was made

11   by Mr. Dikker to pay that 20 million or by some other entity.

12   Mr. Dikker said it was -- claims in the case, it's his position

13   that it was some other entity.  Mr. Kislin says that it was

14   Mr. Dikker.  So I suggest that's the real factual issue.

15               On the subject of where the $16 million came from --

16   that's the second time you raised the issue -- I respectfully

17   submit that it doesn't matter.  We don't contend that it came

18   out of Mr. Dikker's pocket.  In fact, the whole reason why what

19   you'll hear about has some combined corporate and real estate

20   function was put together by Mr. Dikker in order to fund that

21   was because he didn't have the money.  So the fact that he was

22   able to arrange, through the sale of some real estate

23   investment, fund shares that you'll hear about to this company

24   Blagosostoyaniye, that's how we funded it, what we claim to be

25   his obligation.  So it doesn't matter where the money came

from.  But both sides do agree that Mr. Kislin got money, but

not everything that he was entitled to.  And it's not just in

the pretrial order but in the evidence that you'll hear, too.

So those two documents that you do have will be part

of the evidence.  Exhibits 3 and 4 really serve dual purposes.

Number one, they are standalone contracts; but number two, they

confirm the earlier contract for which there was no

documentation.

The other thing I wanted to mention, your Honor, is

that earlier in the case defendants' counsel made a motion to

dismiss on forum non conveniens grounds, which your Honor

denied in January of 2015 following a report and recommendation

by Magistrate Judge Francis.  That decision from the Court was

not made without prejudice to the motion being renewed at

trial.  And yet with no new factual or legal arguments being

made, there's an effort in both the declaration of Mr. Dikker

in lieu of direct examination and in the defendant's trial

memorandum to relitigate that motion for reasons that I don't

really understand.

THE COURT:  Well, that's why I began by asking

whether -- I read that as well, and I was concerned about it

because, to me, it suggested that Mr. Dikker was going to be

arguing that Russian law governed here.  And given that neither

side has made any presentation of how the issues here would be

dealt with in Russian, that concerned me.

1          But I just heard Mr. Berkovich say that he's content

2     with the application of New York law.  So that's not an issue.

3     To the extent you read his papers as an attempt to relitigate

4     whether the case should be in Russia or New York, I didn't.  I

5     didn't understand it that way.  But let's just -- well, you

6     raised the issue.  Let's hear from Mr. Berkovich.

7          Mr. Berkovich, there weren't any subsequent papers

8     filed that I'm aware of after Magistrate Judge Francis issued

9     his recommendation.  I don't think there are any objections or

10    any additional briefing.  Is Mr. Dannenberg right that you were

11    intending to raise that issue again about whether this is a

12    proper forum?

13          MR. BERKOVICH:  Let me phrase it the best I can so the

14    language is appropriate.  It was raised in my papers to your

15    Honor in connection with the trial memorandum of law as an

16    alternative remedy.

17          There are two additional issues I think that may --

18    your Honor may consider in considering that alternative remedy.

19    One of them is the initial motion was made before full

20    discovery.  And there has been full discovery.  And I think

21    it's been admitted by Mr. Dannenberg, and it will be clear from

22    submissions to the Court, that there are many potentially

23    relevant and substantial documents and witnesses who are not

24    available to us in this proceeding.  So that's one issue that

25    is somewhat new, comparing what happened a year ago when your

1    Honor ruled the motion.

2           The second issue is that one of the cases that I have

3    learned about since then is a case that's cited in my

4    memorandum of law, which is a case of *Rigroup, LLC v.*

5    *Trefonisco Management*.  It's 949 F.Supp. 2d 546.  And it may be

6    my being remiss of not finding this case in time when I made a

7    motion, the case from 2013, but the case is very much directly

8    on point, which is a case we cited in our papers.

9           So the combination of this case and combination of the

10   discovery, which I think was not theoretical anymore but

11   practical in terms of demonstrating insufficiency of evidence,

12   both in terms of documents and witnesses, commission of that,

13   this is our alternative remedy.  Obviously we are not objecting

14   to your Honor holding these proceedings if your Honor decides

15   to decide this case on merits.  But as an alternative remedy we

16   are considering, we would like your Honor to consider the issue

17   of dismissal on the forum non conveniens for the reasons I just

18   described.

19          THE COURT:  Mr. Dannenberg?

20          MR. DANNENBERG:  There is no contention that there are

21   new witnesses.  I think the second-to-last paragraph of

22   Mr. Dikker's declaration lists the witnesses that he claims

23   would support a forum non conveniens claim.  So those are the

24   same witnesses they listed in their motion.

25          But there's a procedure for trying to relitigate a

1    motion like that.  They have to make a new motion.  We're here

2    for a trial of the plaintiff's claims.  And I don't appreciate

3    the effort to ambush us with a motion that's not even called a

4    motion in a trial memorandum.

5          I respectfully submit that at the end of the case, the

6    evidence will show that Mr. Kislin was shorted $4 million on an

7    agreement that had been made by Mr. Dikker to pay him

8    $20 million, and that he's entitled to a judgment for that

9    $4 million plus interest from approximately April of 2008 when

10   the agreement was made and the payment of $16 million was made.

11         Thank you, your Honor.

12         THE COURT:  Mr. Berkovich?

13         MR. BERKOVICH:  May it please the Court, I would like

14   to be brief and address the consideration issue that your Honor

15   was asking during Mr. Dannenberg's presentation.

16         It seems to me that Mr. Dannenberg's consideration

17   issue is reliance on the two documents which he is basing his

18   lawsuit on in this case, which is Plaintiff's Exhibit 3 and 4,

19   particularly Exhibit 4, because it's the latest version of it.

20   I think the evidence will demonstrate in this case that with

21   respect to Exhibit 4, which is the last document in time, there

22   are several things that the Court will need to consider in

23   determining whether, in fact, the plaintiff's claim has any

24   merits or whether there's any consideration for all its

25   promises.

1        The first issue is that, as your Honor -- on, your

2   Honor, examining Exhibit 4 and Exhibit 3, but Exhibit 4 is I

3   think the latest one so I'll focus on that, will demonstrate

4   that there's actually no promise by Mr. Dikker to pay any money

5   to Mr. Kislin.  Contrary to many statements Mr. Kislin makes in

6   his affidavit of law and previous testimony and previous in

7   deposition, etc., there's no such promise.  There's no such

8   promise in 2009, and there's no such a promise two years later.

9   So that's one issue.  So there the issue of consideration is I

10  think affected by the fact that there's no such promise.

11       I think the evidence will also show that these

12  exhibits, as well as previous -- previous similar or somewhat

13  similar documents which were prepared in connection with

14  matters related to this case, which we don't have but have been

15  admitted I think by plaintiff that there were some, its

16  evidence will show that these documents are really not binding

17  agreements but, rather, the Russian term is *Ponyateika*, which

18  is a -- translation in English is --

19       THE COURT:  Spell that for the court reporter.  The

20  Russian word that you just used, could you spell that?

21       MR. BERKOVICH:  Yes, I will do it, your Honor.  I'll

22  make sure that I spell it the same way we spelled it in our

23  papers.  Just if you bear with me for a second.  We use it in

24  quotation mark.  It's capital P, then O-N-Y-A-T-E-I-K-A, which

25  the best way to translate it is understanding or agreement

G45EKIST                    Trial

understanding.

          And the evidence will show that parties frequently

used this same type of documents in their business relationship

as opposed to full-fledged agreements, even though they operate

to the corporate parties.  And at some point in some of this

previous relationship, these understandings were converted in

full-time agreements or performance full-time agreements, which

didn't happen in this case.

          So the evidence will show that, first of all, these

are not binding agreements.  And as I've already described, the

evidence will show just from the face of the agreements that

there is no -- contrary to the verbal statements by Mr. Kislin,

that these agreements are not -- do not provide from any

payments to Mr. Kislin -- for Mr. Dannenberg -- for Mr. Dikker

to Mr. Kislin.

          And in this case, in this vein, I would like to bring

the Court's attention -- I'm looking at Exhibit 4, Plaintiff's

Exhibit 4.  If you look at the second page of Exhibit 4, there

are English translations, of course.

          THE COURT:  So when you said the second page, you mean

the signature page?

          MR. BERKOVICH:  The signature page, yes.  There's a

paragraph ten, Exhibit 4, that says that the parties agree that

this agreement, once it is executed, shall supersede all

previous verbal or written agreements, including loan

1    agreements, regarding the sale of the equity units in

2    Solid-Podmoskovny private investment fund, and the parties

3    shall be guided by this agreement.

4           So any claims of plaintiff of any prior oral

5    agreements, oral promises, as Mr. Kislin states numerously in

6    his affidavit submitted in lieu of the direct statement, I

7    think any of these promises, even if they existed, would be

8    superseded by this language.

9           So your Honor understands, the paragraph ten in

10   Exhibit 4, there is the same paragraph, paragraph ten, I

11   believe -- just give me a second -- the same paragraph ten,

12   yes, in Exhibit 3, which is 2009 document.  So to the extent

13   that even if we assume for the purpose of argument -- we're not

14   conceding that, but if we were to assume that this was a

15   binding agreement, Exhibit 4 is a binding agreement, Exhibit 4

16   provides for no -- first of all, it's a final document.

17   There's no other -- they cannot use oral -- any kind of oral

18   agreements to bolster their case or base their -- I think

19   they're bound, if the agreement, in fact, existed, bound by its

20   terms.  And the terms included an incorporation clause.  It

21   incorporates every other agreement and supersedes it.

22          And the agreement -- the point of the 2012 Exhibit 4

23   does not provide for any compensation.  So the only issue

24   remaining is certain -- the evidence will show that the only

25   remaining issue under this agreement, even if they're

1    enforceable, Exhibit 3 and 4, would be shares in Russian real

2    estate investment fund called Russkoye Polye.  Would you like

3    me to spell it for you?

4              THE COURT:  You gave me a sheet of names.  The court

5    reporter has it, too.

6              MR. DANNENBERG:  That was on our -- we gave you a list

7    of names.

8              THE COURT:  The court reporter has that?

9              MR. DANNENBERG:  Yes.

10             THE COURT:  Great.

11             MR. BERKOVICH:  So Russkoye Polye, which the

12   interpreter can confirm, it means Russian field, but that's not

13   the point.  The point is it's a Russian real estate point,

14   shares of Russkoye Polye.  There's no evidence in this case,

15   contrary to the verbal statements by -- numerous statements and

16   fleeting statements by plaintiff that Mr. Dikker himself held

17   any shares in that investment fund.  Rather, the shares were

18   held by a corporation, by either the joint corporation, the

19   Transregion Invest or some other information.  There's no

20   evidence that Mr. Dikker actually, contrary to Mr. Kislin's

21   assertion, ever holding any of the shares.

22             And the evidence will show that both sides understood,

23   both in 2009 and 2012, that these shares may not be sellable

24   out of control of Mr. Kislin.  Mr. Kislin would try, if he

25   could, to sell the shares, but he didn't have control of the

1    shares.

2         THE COURT:  I think you just said Mr. Kislin.  You

3    meant Mr. Dikker?

4         MR. BERKOVICH:  I'm sorry.  I apologize.  Mr. Dikker.

5    I misspoke.

6         Mr. Dikker did not have control of the shares.  And

7    there's no evidence that he personally either owned or had

8    control over them; but, rather, they were controlled by the

9    management company of the fund.  And its outlined in our

10   papers.  I will not belabor you with the complicated Russian

11   names.

12        So that's what evidence will show.

13        And finally, finally, again, assuming that Exhibit 3

14   and 4, particularly latest version of it, Exhibit 4 from 2012

15   is a binding agreement.  And while it doesn't provide for any

16   payments from Mr. Dikker to Mr. Kislin, it refers to the

17   shares, which Mr. Dikker does not control and never controlled.

18   Even if Mr. Dikker did control the shares -- let's assume the

19   worst, again, for the sake of argument.  And if Mr. Dikker, in

20   fact, did not breach the agreement -- which we don't believe it

21   is -- by not providing the shares to Mr. Kislin, there's no

22   evidence in this case, and Mr. Kislin presented none, that will

23   demonstrate any value of the shares.  Mr. Dikker's position is

24   the shares are worthless, for the reasons of the sharp decline

25   and the crisis in Russian real estate market.  And there is no

contrary evidence.  There's no economic evidence.  There's no

expert evidence that demonstrates, as normally would be done in

a breach of contract case, that will demonstrate any value of

the shares.

So even if my client -- again, we're not conceding

that, but even if my client, in fact, were obligated to provide

some shares which he didn't control in investment fund, which

he didn't control, to Mr. Dikker, and that's failing to provide

is a breach of contract, assuming for argument, there's no

evidence of any loss suffered by Mr. Kislin, there's no

evidence of any value of the shares.

Thank you, your Honor.

THE COURT:  All right.

MR. BERKOVICH:  May I step down?

THE COURT:  Yes.  Mr. Dannenberg, do you want to

introduce the stipulated facts and documents that you made

reference to at this point?

MR. DANNENBERG:  I do, your Honor.  Based on the

parties' stipulation in the pretrial order, I would like to

deem admitted into evidence paragraphs A through H --

THE COURT:  That's paragraph 8, right, paragraph 8?

MR. DANNENBERG:  A, as in apple, through H, as in

Harry.

-- of Section 8 of the pretrial order, which was on

pages 4 and 5.

1        THE COURT:  All right.  Any objection, Mr. Berkovich?

2        MR. BERKOVICH:  No objection, your Honor.

3        THE COURT:  So paragraph 8A through H, those

4   paragraphs are received.

5        (Paragraph 8A through H received in evidence)

6        MR. DANNENBERG:  Thank you.

7        And I would also like to move into evidence

8   Plaintiff's Exhibits 1, 2, 3 and 4.  And defendants' counsel in

9   the pretrial order has stipulated that there is no objection to

10  admissibility.

11       THE COURT:  Any objection that Plaintiff's Exhibits 1,

12  2, 3 and 4, Mr. Berkovich?

13       MR. BERKOVICH:  No objection, your Honor.

14       THE COURT:  Those exhibits are received.

15       (Plaintiff's Exhibits 1, 2, 3 and 4 received in

16  evidence)

17       MR. DANNENBERG:  Thank you, your Honor.

18       THE COURT:  So, Mr. Dannenberg, you're content to rely

19  on Mr. Kislin's affidavit for purposes of your direct case?

20       MR. DANNENBERG:  Yes.

21       THE COURT:  And so it would seem at this point that we

22  hear the cross-examination of Mr. Kislin by Mr. Berkovich.  So,

23  Mr. Kislin, would you please take the stand.

24       MR. BERKOVICH:  Your Honor, I have one issue regarding

25  the affidavit, if I may raise it very briefly.

G45EKIST                    Trial

1          THE COURT:  Okay.

2          MR. BERKOVICH:  Before we start, if I may.

3          THE COURT:  Okay.

4          MR. BERKOVICH:  The issue, it's regarding that since

5    the affidavit was obviously prepared not in live testimony, so

6    I didn't have a chance to object to certain questions and

7    responses, I have five hearsay objections with respect to the

8    affidavit.  If I may address them, your Honor, before the

9    witness takes the stand.

10          THE COURT:  Let me just get the affidavit in front of

11   me here for just a second.

12          All right.  I have it, Mr. Berkovich.

13          MR. BERKOVICH:  My first hearsay objection is with

14   respect to certain statement, and I'll address it specifically,

15   in paragraph 24 of Mr. Kislin's affidavit.

16          THE COURT:  All right.  I'm there.

17          MR. BERKOVICH:  It's the last three lines.  It's

18   regarding communications between Mr. Kislin and Mr. Sachkov.

19   Mr. Sachkov, as your Honor probably knows from the submissions,

20   was a manager or chief executive officer of one of the real

21   estate investment funds in Moscow that dealt with the parties

22   here.  And he is not obviously here to testify.

23          So it says here in the last three lines that

24   Mr. Sachkov was first person I contacted.  And then there's

25   objectional language.  And he confirmed to me that in the rest

1    of the sentence.  So I believe that he confirmed to me through

2    the rest of that sentence is a hearsay that should not be

3    admitted for the purpose of determining the issues in this

4    case.

5               THE COURT:  All right.  What's your position,

6    Mr. Dannenberg?

7               MR. DANNENBERG:  That the statements that are

8    reflected there as having come from Mr. Sachkov are not being

9    introduced for their truth.  They're being offered to explain

10   what motivated Mr. Kislin to act the way he did in entering

11   into this transaction.  Therefore, they're, by definition, not

12   hearsay.

13              THE COURT:  Just give me a moment.  (Pause)

14              So if I understand what you're saying, Mr. Dannenberg,

15   you're not offering those clauses at the end of paragraph 24 to

16   establish that there was, in fact, a market for the fund

17   shares, the Solid fund shares, or that the proceeds from the

18   sale of the Solid fund shares could be provided to Mr. Kislin;

19   you're not offering that language for purposes of its truth.

20   You're offering it for purposes of explaining why Mr. Kislin

21   agreed to proceed in the fashion that he did?

22              MR. DANNENBERG:  Yes, including by entering into a

23   contract that wasn't reflected in a writing.  As he explains in

24   the affidavit, he had confidence that this would go forward and

25   that he would be paid.  So that's why he acted the way he did.

1          THE COURT:  All right.  So, Mr. Berkovich, anything

2     you want to say before I rule on it?

3          MR. BERKOVICH:  All I want to say, your Honor, to the

4     extent that your Honor will not be considering the statements

5     referred to being made by Mr. Sachkov for the truth of them,

6     that's fine.  Absolutely, your Honor.  You are both the judge

7     and the jury.  So if you only consider that part, I have no

8     objection, as long as you're not considering that, for the

9     record, not for the merits of the case.

10          THE COURT:  All right.  So I will only consider the

11     clauses that Mr. Berkovich raised an objection regarding in

12     paragraph 24, I will only consider them to the extent they shed

13     light on Mr. Kislin's state of mind, and not for purposes of

14     the truth of the statements contained in those clauses.

15          Go ahead, Mr. Berkovich.

16          MR. BERKOVICH:  Then the next objection is in

17     paragraph 26.  And actually, two objections.  One of them, if

18     you look at that very top of the paragraph, refers to what has

19     been told by Mr. Sachkov to Mr. Kislin.  And that obviously in

20     our view is a hearsay issue not to be admitted.

21          But the second objection to paragraph 26 as drawn is

22     objection to form, because it's unclear -- let's assume that

23     your Honor will agree with me and remove Mr. Sachkov's name

24     from consideration in this paragraph.  It's not clear from the

25     paragraph itself whether it all applies to Mr. Dikker, who's

1    the remaining person to make a statement, or it applies to both

2    of them or only some of it applies to Mr. Dikker.  So I object

3    both to form, as well as to any statements made by Mr. Sachkov.

4              THE COURT:  Give me a moment.

5              What do you want to say, Mr. Dannenberg?

6              MR. DANNENBERG:  Just addressing the second issue

7    first, the form objection, the statement is clear that both

8    Mr. Dikker and Mr. Sachkov made this statement to Mr. Kislin

9    that the buyout -- that the Solid shares have been sold and

10   that $20 million was being transferred to the Kominelli

11   account.  So it is being offered for its truth, but Mr. Dikker

12   made the statement.  It's clear that he said that.  So it

13   doesn't matter as far as the truth is concerned whether the

14   statement came from a second source as well.

15             Secondly, this is, as I think Mr. Berkovich knows, a

16   key element of what I think is a legitimate question that the

17   Court could be asking, which is:  Why did Mr. Kislin give up

18   his 51 percent ownership of TRI if he had not been paid in

19   full?  That's an important thing that he did.  He gave up

20   something valuable.  Why did he do it?  Well, he did it because

21   he had been told that the money was being transferred to his

22   account.  So that explains, again, Mr. Kislin's motivation in

23   doing what he did.

24             He probably now regrets doing it, but he did act on

25   information that he was being given.  And whether it was true

1   or not, it turns out it wasn't true.  So obviously it's not

2   being offered for it's truth.  But that's exactly what

3   motivated Mr. Kislin to give up his shares.  So obviously it

4   can't be offered for its truth, because it was a false

5   statement.

6            THE COURT:  Is that the end of the issue,

7   Mr. Berkovich?

8            MR. BERKOVICH:  Again, to the extent -- I understand

9   Mr. Dannenberg's position as he just testified that allegations

10  of paragraph 26 in terms of who made a statement, that

11  Mr. Dikker made all the statements provided for --

12           THE COURT:  No.  Mr. Dannenberg, did I mishear you?  I

13  thought you said both Mr. Dikker and Mr. Sachkov told

14  Mr. Kislin that the $20 million had been transferred.  Did I

15  hear you wrong?

16           MR. DANNENBERG:  They each made the same

17  representation.

18           THE COURT:  He's saying that both said it, but he's

19  saying those statements are not being offered for the truth

20  because, actually, he's contending they were false statements.

21  That's his position.

22           And my question to you is, given that those statements

23  are not being offered for their truth, what's the hearsay

24  problem?

25           MR. BERKOVICH:  I will withdraw my objection, your

1    Honor.

2           THE COURT:  All right.  What's next?

3           MR. BERKOVICH:  The next one is paragraph 27.  There

4    are actually two statements in paragraph 27.  I will start with

5    the second one.  It's on page 12, the end of paragraph 27.

6    It's the last sentence.

7           In response, Mr. Sachkov also acknowledges that

8    there's the rest of the sentence.  So I believe that last

9    sentence in paragraph 27 is a hearsay, should not be admitted

10   in considering the merits of this case.

11          THE COURT:  What's your position, Mr. Dannenberg?

12          MR. DANNENBERG:  All that Mr. Kislin is saying here is

13   that Sachkov confirmed what Mr. Kislin had been told by

14   Mr. Dikker earlier.

15          THE COURT:  Well, I understand that.  But that seems

16   like it's being offered for its truth.

17          Just to be clear, the statement reads, in response,

18   Mr. Sachkov also acknowledged the diversion of funds to one of

19   Mr. Dikker's creditors, Semernin, S-E-M-E-R-N-I-N.  And he had

20   no good explanation for why he had allowed it to happen.

21          So, first of all, with respect to the diversion of

22   funds to Mr. Dikker's creditor, Semernin, that would seem like

23   it's being offered for the truth that actually happened.

24          MR. DANNENBERG:  I think that the pronunciation is

25   Semernin.

1          THE COURT:  I'm sure I'm mispronouncing it, but I'm

2   more interested in the legal point as to whether it's being

3   offered for its truth or not.

4          MR. DANNENBERG:  What's being offered there in that

5   statement is two separate things.

6          THE COURT:  And I'm focused on the first thing right

7   now.

8          MR. DANNENBERG:  The out-of-court statement was made

9   by Dikker that there was a diversion of funds.  What --

10          THE COURT:  No, not in this sentence.  The

11   out-of-court statement was by Sachkov.  It says Mr. Sachkov

12   also acknowledged the diversion of funds to one of Mr. Dikker's

13   creditors.

14          So that's what we're focused on.  My question to you

15   is:  Why isn't that hearsay?

16          MR. DANNENBERG:  Because -- I misspoke, your Honor.

17   Earlier in the paragraph it says that Dikker said that there

18   had been a diversion of funds.  What's stated in the first half

19   of that last sentence is not Sachkov saying there was a

20   diversion of funds.  It's Sachkov having acknowledged what

21   Dikker had earlier said.  So Sachkov acknowledged it.  That's

22   number one.

23          Number two, it's not an out-of-court statement, the

24   second half of the sentence.  All that says is that Mr. Kislin

25   asked Mr. Sachkov for an explanation, and he had no good

1    explanation.  There's no out-of-court statement there.

2              THE COURT:  I don't agree with your interpretation of

3    the first clause.  It doesn't say that Mr. Sachkov acknowledged

4    that Mr. Dikker had said.  That's not what it says.  It says

5    Mr. Sachkov also acknowledged the diversion of funds to one of

6    Mr. Dikker's creditors.  So he is confirming that that

7    happened; that those funds were diverted to Dikker's creditors.

8    And that seems to me that it's being offered for the truth

9    that that actually happened.  I haven't heard a contrary

10   argument.

11             So because it's being offered for its truth, that

12   clause will be excluded as hearsay.

13             The second clause reads, in reference to Mr. Sachkov,

14   quote, he had no good explanation for why he had allowed it to

15   happen.

16             That is just an argument by Mr. Kislin.  I suppose

17   that you can regard it as a factual statement if it said that

18   he had no explanation.  That, I suppose, could be viewed as a

19   statement of fact.  But he says he had no good explanation.

20   That's different.  That's an evaluation.  That's an argument.

21   That's a position.  That's not a statement of fact.

22             MR. DANNENBERG:  It's not an out-of-court statement.

23   It's Mr. Kislin's subjective analysis of what he had heard.

24             THE COURT:  It's an opinion.  I'm excluding it.  I'm

25   excluding it as opinion.  It's not a fact at all.  So that

G45EKIST                    Trial

1    entire clause will be excluded.  When I say "that entire

2    clause," I mean the last sentence in paragraph 27.

3                All right, Mr. Berkovich.

4                MR. BERKOVICH:  28, your Honor, there are two actually

5    statements in paragraph 28 we'd like to address.  The first one

6    is a sentence in a paragraph -- I think second sentence starts

7    with however.  After however, I did thereafter contact

8    Mr. Semernin directly, and that's where I think hearsay comes

9    in.  He confirmed to me that he had received the funds to which

10   he believed he was entitled because of some outstanding

11   personal debt to him by Mr. Dikker.

12               So this is one -- this one sentence that starts, he

13   confirmed, to the end of it I believe is a hearsay.  And do you

14   want me to address the second one --

15               THE COURT:  We'll take them one at a time.

16               MR. BERKOVICH:  So this sentence for obvious reasons,

17   we believe it's a hearsay sentence.

18               THE COURT:  So second sentence, Mr. Dannenberg, in

19   paragraph 28, I guess more accurately second clause in the

20   second sentence.

21               MR. DANNENBERG:  Well, there are two, your Honor.  It

22   explains later actions by Mr. Kislin.  When Mr. Kislin and

23   Mr. Dikker got around to saying, how are we going to get

24   Mr. Kislin the $4 million balance, they ultimately entered into

25   written agreements, Plaintiff's Exhibits 3 in 2009 and 4 in

1    2012.  What motivated Mr. Kislin to ask for the written

2    agreements was the fact that it had been confirmed to him by

3    Mr. Semernin that this was Mr. Dikker that had created this

4    problem because of actions taken by Semernin to divert these

5    funds as a result of some pre-existing personal debt by

6    Mr. Dikker.  So that's what motivated Mr. Kislin to insist on

7    writings a second time around.

8         THE COURT:  But in the prior paragraph Mr. Kislin has

9    already laid out what he heard directly from Mr. Dikker

10    about -- what he says he heard from Mr. Dikker as to the

11    $4 million.  That's already explained in the prior paragraph.

12    Presumably there will be examination of both Mr. Kislin and

13    Mr. Dikker on that conversation.

14         But my point is that's already in the record, at least

15    from your client.  I suspect the other side will dispute it,

16    but regardless, it's in the record.  Your client is saying that

17    he contacted Mr. Dikker to ask where the $4 million was.  And

18    according to your client, Mr. Dannenberg, Mr. Dikker explained

19    that he had sent 4 million of the 20 million he had provided to

20    a fellow named Vladimir Semernin.

21         Now, I understand that paragraph 28, you want to

22    establish that Mr. Semernin, when he was contacted by

23    Mr. Kislin, confirmed that he got the money.  But to the extent

24    that you want to introduce something that Mr. Semernin said to

25    Mr. Kislin for its truth, that would be hearsay.  If you are

1    offering it for some other reason, I'm happy to hear what that

2    reason is.

3            MR. DANNENBERG:  In the prior paragraph the statement

4    that's attributed to Mr. Dikker is that $4 million had been

5    diverted to Vladimir Semernin.  And then Mr. Kislin says, to

6    whom Mr. Dikker apparently owed a significant amount of funds.

7    Didn't say that that representation or statement came from

8    Mr. Dikker.

9            So it's what is in paragraph 28 in which that

10   statement is made that the reason for the diversion was that

11   Semernin had been owed funds personally by Mr. Dikker.  And

12   that's what I'm suggesting is important to help explain why

13   Mr. Kislin insisted on --

14           THE COURT:  But, I mean, I can't accept that for its

15   truth.  Just to make it absolutely clear, I cannot accept for

16   its truth the statement that Semernin was owed money by Dikker.

17   I can't do that.  That's hearsay.

18           So, if that's why you're offering that statement, it

19   will be excluded, because I can't accept as proof of the debt

20   Mr. Kislin's statement about what Mr. Semernin told him.  That,

21   I cannot do.

22           MR. DANNENBERG:  I understand that, your Honor.  But I

23   do respectfully suggest that the statement should nevertheless

24   come into evidence to explain, help explain why Mr. Kislin,

25   when they got around to agreeing on how the $4 million should

1    be paid, insisted on written contracts.

2              MR. BERKOVICH:  Your Honor, if I may.  Of course I

3    agree with your Honor that for the purpose of merits, this

4    statement may not be admissible into evidence for the truth of

5    it.

6              My concern also is I think I see the pattern of

7    Mr. Dannenberg using out-of-court statements which are

8    hearsay -- and your Honor agreed with them being hearsay -- but

9    always referring to them in some motivating factor in

10   Mr. Dikker's actions.  I don't think it's a correct way --

11             THE COURT:  You keep on confusing the two.  It would

12   be motivation of Mr. Kislin.

13             MR. BERKOVICH:  I apologize, your Honor.  I'm a bit

14   nervous.  Mr. Kislin's actions.  Yes.  So that's number one.

15             So there's injury of prejudice by having the

16   statements, on its face inadmissible hearsay, but then using

17   them because Mr. Kislin heard something from somebody and it's

18   not admissible because the person is not in court, somehow it

19   motivated him to take action.  Everything we hear from him is

20   motivation for taking statements.  It's not the reason for

21   out-of-court statements to sort of get around the hearsay rule

22   and be admitted.

23             So in addition to not being admitted for the truth of

24   the statements, I don't think these statements should be

25   admitted for any other reason, your Honor, in our view.

1          THE COURT:  Let me say, we don't have a jury here.

2    This is a bench trial.  So if we had a jury here, I may very

3    well be concerned about the jury's ability to appreciate the

4    fine distinctions between receiving something for its truth and

5    receiving something for purposes of explaining in this case

6    Mr. Kislin's state of mind.

7          We don't have a jury.  I understand the distinction

8    and I'm going to apply it.  So just to be clear with respect to

9    paragraph 28, I will not rely on the assertion in paragraph 28

10   that Semernin confirmed that Dikker owed him $4 million as a

11   personal debt.  I won't accept that for its truth.

12         To the extent it sheds light on Mr. Kislin's state of

13   mind and what he did thereafter, I will consider it for that

14   limited purpose.

15         What's next, Mr. Berkovich?

16         MR. BERKOVICH:  The next one is actually the next

17   sentence in paragraph 28.  We have two more objections, your

18   Honor, so we're going to get through it quickly.

19         The last sentence in paragraph 28, particularly it

20   starts, but he essentially told me that there was a problem,

21   etc., etc.  So this refers -- I believe it refers here first to

22   Mr. Semernin.  So to the extent here first, Mr. Semernin, this

23   is, again, out-of-court statement by Mr. Semernin which should

24   not be admitted as a hearsay.

25         THE COURT:  Anything you want to say on the second or

1    the last statement of paragraph 28, Mr. Dannenberg?

2            MR. DANNENBERG:  I don't think that defendant's

3    counsel can have it both ways, your Honor.  Without regard to

4    the effort to relitigate the forum non conveniens argument, he

5    is claiming that Mr. Kislin somehow should have taken action

6    against Semernin if this is what he believed to be true.

7            And this statement, I mean, we don't contest the fact

8    that it was an out-of-court statement by Semernin.  But this

9    explains why Mr. Kislin did not take any legal action against

10   Semernin in Russia or anywhere else.

11           THE COURT:  Well, I mean, from my point of view, I

12   don't think it's relevant whether or not Mr. Kislin sued

13   Mr. Semernin in Russia.  The ruling will be the same; which is

14   to say, I will not consider the last clause in paragraph 28 for

15   its truth as to whether there was, in fact, a problem between

16   Mr. Dikker and Mr. Semernin.  Instead, to the extent it sheds

17   light on Mr. Kislin's state of mind and his actions thereafter,

18   I will consider it for that purpose.

19           MR. BERKOVICH:  I have a last objection, your Honor.

20           THE COURT:  Yes.

21           MR. BERKOVICH:  It's somewhat complicated, but we'll

22   try to get through it.  It's in paragraph 35, it's complicated

23   because there's several hearsay statements.  In paragraph 35,

24   number one, there is a statement that says because Sachkov

25   convinced me and the rest of it.  And I think that's -- the

rest of that sentence is, to me, to the extent and it refers to

anything that Mr. Sachkov communicated to Mr. Dikker to be

hearsay.

          In addition, the last sentence, which says, in

addition, by the way, it also refers bill of communication

between Mr. Kislin and Mr. Sachkov.  Again, it refers to the

last line, first two, that the communication was then

explaining transaction and confirming his acknowledgment of

personal debt to me.  Again, it refers to Mr. -- my

understanding is Mr. Sachkov confirming that Mr. Dikker

personally owed money to Mr. Kislin.  To the extent that's what

the second says, I believe that is -- and his communications by

Mr. Sachkov, I believe this sentence, as well as previous ones,

are hearsay and, therefore, should not be admitted.

          MR. DANNENBERG:  I don't see a single statement by

Sachkov in any portion of that, your Honor.  The only thing

that comes close to Sachkov is the very first line that says

that something that Sachkov said to Mr. Kislin convinced

Mr. Kislin -- in other words, explains why he took certain

action.

          The rest of the paragraph is all about exchange

between Dikker and Mr. Kislin.  And in particular, the last

sentence where it says, in addition, I asked him to put his

plan in the form of writing.  First of all, that's an

out-of-court statement by Mr. Kislin, but also, the "him" is

G45EKIST                    Trial

1   Mr. Dikker, not Mr. Sachkov.  So there's no hearsay there.

2              THE COURT:  Give me a moment.

3              MR. BERKOVICH:  Your Honor, may I say something here

4   to simplify your Honor's job.  With respect to the last

5   sentence which says, "in addition," I agree now in retrospect,

6   then, after hearing Mr. Dannenberg, that there is nothing

7   inappropriate or -- there's no hearsay objections to that

8   statement.  So I withdraw that.

9              So my only hearsay objection is with respect to the

10  previous sentence that says, Mr. Sachkov convinced me.  So

11  that's all we want.  And only to the extent that it refers to

12  communications -- it's convoluted as drafted.  That's why we

13  have to deal with it this way.

14             But to the extent it refers to communication between

15  Mr. Sachkov and Mr. Kislin, we object to admissibility of those

16  communications.

17             THE COURT:  It seems to me that the excerpt that

18  begins, because Mr. Sachkov convinced me, that is being offered

19  not for the truth of anything that Mr. Sachkov said to

20  Mr. Kislin, but, rather, for purposes of explaining why

21  Mr. Kislin did what he did, which in this case is that he

22  agreed, according to the affidavit, to not initiate a lawsuit.

23             So I don't see anything in that segment, that sentence

24  that's being offered for its truth.  It's being offered to

25  explain Mr. Kislin's conduct and decision-making process.  And

1    so I'll overrule that, the objection to that sentence.

2              Anything else as to the affidavit, Mr. Berkovich?

3              MR. BERKOVICH:  No, your Honor.

4              THE COURT:  All right.  Then I'd like to receive the

5    affidavit, consistent with my rulings on it.

6              I'd like to have a separate exhibit number for the

7    affidavit, plaintiff's exhibit number?  Can you give me an

8    exhibit number, Mr. Dannenberg?

9              MR. DANNENBERG:  Yes.  I have marked a number of other

10   documents for identification.  So I don't want to reuse a

11   number that I'm meaning to use during trial.  So it would be

12   Plaintiff's Exhibit 11.

13             THE COURT:  All right.  So, Mr. Berkovich, other than

14   the rulings that I've just discussed, you don't have any

15   objection to Plaintiff's Exhibit 11, Mr. Kislin's affidavit?

16             MR. BERKOVICH:  No, your Honor.

17             THE COURT:  Then Plaintiff's Exhibit 11, subject to my

18   rulings, is received.

19             (Plaintiff's Exhibit 11received in evidence)

20             MR. BERKOVICH:  May I ask, your Honor, should we deal

21   at this point regarding my client's affidavit, or this will

22   be -- take at a later time.

23             THE COURT:  No, because we'll do that on your case.

24             Did you have any other proof, Mr. Dannenberg, at this

25   point --

1          MR. DANNENBERG:  Well --

2          THE COURT:  -- that you want to introduce, or should

3     we proceed with the cross-examination of your client?

4          MR. DANNENBERG:  I suggest that we proceed with the

5     cross-examination.  I will have some deposition testimony that

6     I want to read in, but there's no need, as far as I'm

7     concerned, to do it beforehand.

8          THE COURT:  All right.  Then let's proceed with

9     Mr. Kislin's cross-examination testimony.

10         MR. DANNENBERG:  Your Honor, may I make one request.

11         THE COURT:  Sure.

12         MR. DANNENBERG:  Two of the documents now in evidence,

13    Plaintiff's Exhibits 3 and 4, are certified copies both in

14    Russian and in English of those two agreements.  May I hand a

15    copy to the translator, so that he has the Russian versions in

16    front of him, as well as the English versions?

17         THE COURT:  You don't have any objection to that, do

18    you, Mr. Berkovich?

19         MR. BERKOVICH:  I assume it's identical document which

20    have already been submitted in the pretrial order, correct?

21         MR. DANNENBERG:  The exhibits.

22         MR. BERKOVICH:  Sure.  No objection, your Honor.

23    That's fine.

24         THE COURT:  All right.

25                              - - - - -

1    SEMYON KISLIN,

2         called as a witness by the Plaintiff,

3         having been duly sworn, testified through the interpreter

4         as follows:

5    CROSS EXAMINATION

6    BY MR. BERKOVICH:

7    Q.  Good morning, Mr. Kislin.

8    A.  Good morning.

9    Q.  My name is Alexander Berkovich.  I think we've met already

10   previously.

11   A.  Yes.

12   Q.  As you know, instead of giving oral direct testimony, you

13   have provided affidavit that represents your direct testimony.

14   You understand that?

15   A.  Yes.

16   Q.  So I will be asking you some questions regarding that

17   affidavit.

18   A.  All right.

19   Q.  Do you have a copy of that affidavit in front of you?

20   A.  No, I don't have it with me.

21         MR. BERKOVICH:  May I hand a copy to the witness, his

22   own affidavit, Mr. Dannenberg?

23         MR. DANNENBERG:  Could he be handed the document we

24   just had marked as an exhibit?

25         THE COURT:  That's in English, right?

1          MR. DANNENBERG:  That's the English version.

2          THE COURT:  Yes.

3          MR. DANNENBERG:  There's only one.

4          THE COURT:  The whole point of this is he doesn't

5   understand English, right?  That's why we have a translator?

6          MR. DANNENBERG:  Well, no, that's not the point, your

7   Honor.  It's Mr. Berkovich's cross-examination.  He can do what

8   he wants.  But both the plaintiff and defendant have submitted

9   affidavits in lieu of direct testimony in English.

10  Notwithstanding that, they're going to be testifying in

11  Russian.  So the only version of each one's affidavit is the

12  English version.

13         If Mr. Berkovich wants to have a copy of it in front

14  of him, you've already admitted it into evidence as Plaintiff's

15  Exhibit 11.

16         THE COURT:  All right.  Do you have a copy of it?

17         MR. BERKOVICH:  Absolutely, your Honor.

18         Your Honor, I would like the witness, if it could be

19  handed to him.

20         THE COURT:  Yes.  The witness is being handed

21  Plaintiff's Exhibit 11.  All right, Mr. Berkovich.

22  BY MR. BERKOVICH:

23  Q.  With respect to Exhibit -- with respect to paragraph 12, I

24  would like to bring your attention to paragraph 12 of

25  Exhibit 11.

 1    A.  That one?

 2              INTERPRETER:  Indicating paragraph 11.

 3              THE COURT:  Paragraph 12.

 4    Q.  Paragraph 12, Exhibit 11.  It's on page six.  I will have

 5    some questions about this paragraph.

 6    A.  Okay.  Please, go ahead.

 7    Q.  The first one is -- am I correct to understand that you --

 8    that Mr. Dannenberg had been representing you for many years?

 9    A.  Yes.

10    Q.  Is it also correct to say that Mr. Dannenberg represented

11    to you -- started to represent you prior to this issue of 20 or

12    $4 million with Mr. Dikker?

13    A.  Yes.

14    Q.  Is it also correct to say that with respect to receiving

15    potentially $20 million, you did not have Mr. Dannenberg to

16    draft any agreements to that effect?

17    A.  No, I did not ask him to.

18    Q.  But is it also true that in connection with your

19    relationship with Mr. Dikker and his partner, Mr. Parilis,

20    outside of the issue of this case, you have used Mr. Dannenberg

21    to draft agreements, is it correct?

22    A.   In certain instances with Mr. Dikker, with Mr. Parilis, I

23    never had any kind of interaction.

24    Q.  But is it also true that there was some agreements

25    unrelated to this case that have been drafted by Mr. Dannenberg

1   in connection with the company, Transregion Invest, is that

2   correct?

3   A.  Yes.

4   Q.  And some of these agreements, if you recall, also is one of

5   the parties of this agreement would be one of the company that

6   would represent interests of Mr. Parilis, am I correct?

7   A.  I don't know that Parilis.

8               MR. BERKOVICH:  One second, your Honor.

9               Your Honor, may I approach.

10              THE COURT:  Yes.

11              MR. BERKOVICH:  I would like to provide to the witness

12  for review Plaintiff's Exhibit 1.

13              THE COURT:  All right.

14              THE WITNESS:  That's me.  That's Dikker.

15  BY MR. BERKOVICH:

16  Q.  Is it -- no.  My question is, if you look at the top of the

17  first page.  Is it correct to say that Mr. Parilis's company is

18  also a part of this agreement?

19  A.  I did not participate in this agreement with Mr. Parilis.

20  In this agreement I only participated with Mr. Dikker.

21  Mr. Dikker wrote in this company Interprogress.  I don't know

22  this company.  I never had any relationship with it.

23  Q.  Mr. Kislin, maybe you misunderstood my question.  If you

24  look at the top page of this agreement, could you list us the

25  parties to this agreement as identified on the top of the first

1    page.

2    A.   The company Brunlow has 51 percent.  The company

3    OptTorgLider has 24-and-a-half percent.  And the company

4    progress, Interprogress, has 24-and-a-half percent.  I think

5    that both of those companies belong to Mr. Dikker.

6    Q.   May I have it back.  I will give it back to you so there is

7    no game playing of any sorts.

8          But if you look at the top of the page one, with

9    respect to each company, there's also reference to the

10   principal.  So with respect to Brunlow, Inc. -- I'm going to

11   give it back to you -- it says, presented by its principal

12   Simeon Kislin.

13         With respect to the company JSC OptTorgLider, it says

14   presented by its principal Simon Dikker.  And with respect to

15   Interprogress Limited, it says presented by its principal

16   Sergey Parilis.

17         Would you look at this again and see if it helps you

18   understand.

19   A.   I just want to repeat again that the company Brunlow

20   belongs to me.  99 percent of it belongs to me personally.  And

21   the other two companies, my impression is that they belong to

22   Mr. Dikker.

23   Q.   Mr. Kislin, to the best of your understanding, was this

24   document in front of you, which is Plaintiff's Exhibit 1, was

25   this drafted by Mr. Dannenberg?

1    A.  I don't remember.

2    Q.  You just said about your impressions with respect to the

3    two companies listed in the agreement.  Your impressions aside,

4    if you look at the face of the agreement, does it say that one

5    of the companies was represented by Mr. Sergey Parilis?

6    A.  One company belongs to me.  The other two companies belong

7    to Dikker.  Who he gave the company to, I can't say.  Maybe he

8    gave it to Sergey Parilis.  Maybe he gave it to somebody else.

9    I don't know.

10   Q.  I don't want to get your Honor to be involved and compel a

11   witness to respond to my question, but my questions were very

12   simple, whether indeed Mr. Parilis is listed and his company

13   are listed as one of the parties to this contract, as you see

14   it in front of you.

15   A.  As far as I understand, one document for 24-and-a-half

16   percent is signed by Mr. Dikker.  The other document,

17   24-and-a-half percent, doesn't have any signature at all.

18            MR. BERKOVICH:  I have no further questions to the

19   witness regarding this document.

20   Q.  Mr. Kislin, are you familiar with the two documents that

21   have been marked in this case by your attorney as trial

22   Exhibits 3 and 4?  Are you familiar with these two documents?

23            MR. DANNENBERG:  Objection.  Unless he's going to show

24   him the documents.

25            THE COURT:  The documents are up there,

1   Mr. Dannenberg.

2            MR. DANNENBERG:  I have the documents here.  Maybe --

3            THE COURT:  Are the documents not up here?

4            MR. DANNENBERG:  The translator has his own copies?

5            MR. BERKOVICH:  I don't believe, your Honor.

6            THE COURT:  You need to show him documents you're

7   going to ask him about.

8            MR. BERKOVICH:  Yes, absolutely.

9            THE COURT:  What are the documents the interpreter is

10  holding now, can somebody tell me that?

11           MR. DANNENBERG:  I gave the interpreter copies of

12  those two Russian contracts to facilitate his efforts.

13           THE COURT:  Are those Plaintiff's Exhibits 3 and 4?

14           MR. BERKOVICH:  Yes.

15           MR. DANNENBERG:  I gave him copies of those two.  The

16  actual exhibits are the ones I just handed to Mr. Berkovich.

17           THE COURT:  All right.

18           MR. DANNENBERG:  And just so it's clear, your Honor,

19  those are copies of certified translations.  I have the

20  originals with me, if the Court would like.  But both

21  Mr. Dikker and I have accepted them as a package, the first

22  page of which --

23           THE COURT:  Both you and Mr. Dikker?

24           MR. DANNENBERG:  Mr. Berkovich and I have accepted

25  them as part of the package.  The first page --

1           THE COURT:  You guys are doing your best to confuse us

2     as much as you possibly can.  If you could both focus on using

3     the right names, that would be very helpful.

4           MR. DANNENBERG:  I apologize.

5           The first page is the translator's affidavit.  The

6     second page is the English translation ending on the third

7     page.  And the fourth page of the exhibit -- this is

8     Exhibit 4 -- is the actual document that was signed by the

9     parties, the Russian document.

10          With Exhibit 3, same thing.  The first page is the

11    translator's affidavit.  The second and third pages are the

12    English translations.  The third -- the fourth page is what was

13    called -- English translation of what was called a supplemental

14    agreement.  And the fifth and sixth pages are the actual

15    Russian versions of the agreement and supplemental agreement.

16          THE COURT:  All right.  And you're content with using

17    these documents, Plaintiff's Exhibits 3 and 4, in the form

18    they're in, is that correct, Mr. Berkovich?

19          MR. BERKOVICH:  Yes, your Honor.

20          THE COURT:  All right.  Then please proceed.

21    BY MR. BERKOVICH:

22    Q.  Mr. Kislin, with respect to Plaintiff's Exhibit 3, I'd like

23    to bring your attention to paragraph 2 of that exhibit, which

24    says that party number two shall exchange the equity units of

25    Solid-Podmoskovny for the new equity units before December 31,

1    2009.  Do you see that?

2            MR. BERKOVICH:  Your Honor, may I address one

3    translation issue I think for the Court and everybody else's

4    benefit.

5            I personally have no objection when I ask questions

6    about a particular paragraph of the exhibit, which is

7    originally Russian document.  Obviously we're discussing the

8    English version of it.  I have no objection if the translator

9    just shows the witness the Russian version of a particular

10   paragraph, as opposed to doing the verbal translation.  It may

11   speed up the process.  But it's obviously up to your Honor and

12   Mr. Dannenberg, if he has any objection to it.

13           THE COURT:  What is your preference, Mr. Dannenberg,

14   in terms of whether the witness looks at the Russian or looks

15   at the English?

16           MR. DANNENBERG:  It's not that I have a preference.

17   It's just that logic I think dictates if he's testifying in

18   Russian, he should be looking at the Russian version.

19           THE COURT:  I'm content with that.  I've tried to

20   point out the fiction in all of this, which is we have an

21   affidavit.  We have affidavits from both individuals written

22   solely in English but no translation, no Russian, no nothing.

23   The prior testimony in English.  So there's a fictional aspect

24   to whether the people understand English or not.  They clearly

25   do.

1       But I have no objection to the parties looking at the

2  original Russian.  Certainly if that will facilitate things,

3  that's fine with me.  So when the lawyers are questioning the

4  witnesses, both Mr. Dikker and Mr. Kislin, about documents that

5  are in Russian, they're welcome to direct their attention to

6  the original Russian, rather than the English translation.

7       MR. BERKOVICH:  Your Honor, if I may briefly address,

8  because I didn't previously, very brief, about this Russian

9  language issue.

10      I agree with Mr. Dannenberg that witnesses have some

11  command over passive English.  But when they're required to

12  testify at trial, it's my view, and has been and continues to

13  be, and with the depositions I think demonstrated that, that

14  their command of fluency in English, in active English in

15  testifying, I think, is limited.  So for that reason I think

16  the interpreter will be appropriate.

17      In terms of my client's affidavit, I'd just like to

18  note for the record that I am originally a native Russian

19  speaker.  So I discussed this affidavit with my client in both

20  English and Russian languages.  So he fully understood what

21  was, in fact, submitted to the Court.  I don't know how

22  Mr. Dannenberg did it, but I am fluent in Russian, and we

23  discussed with my client in Russian every provision of the

24  affidavit that has been submitted.

25      May I proceed, your Honor.

1          THE COURT:  Please.

2    BY MR. BERKOVICH:

3    Q.  Now, the paragraph two asks you if -- just to -- I just

4    read you the paragraph two of the Exhibit 1 -- Exhibit 3.  I

5    apologize.

6          Is it your contention -- I just want to make clear --

7    that there was no written agreement between you and Mr. Dikker

8    that -- regarding any shares of any equity funds relevant to

9    this case prior to this date?  Were there any other written

10   agreements prior to this date?  Your contention is there were

11   none?

12         MR. DANNENBERG:  Objection to the form.

13         THE COURT:  Sustained.  Just try to ask him more

14   simply.  Go ahead.

15         MR. BERKOVICH:  Yes, absolutely.

16   BY MR. BERKOVICH:

17   Q.  Is it true, as far as you were concerned, that prior to

18   Exhibit 3, which is November 9, 2009, there were no other

19   agreements between you and Mr. Dikker regarding shares in any

20   Russian real estate funds?

21   A.  I don't remember, but we mostly just had verbal handshake

22   agreements.

23   Q.  And I will be more specific.  Specifically, did you have

24   any agreements with Mr. Dikker regarding what is described as

25   equity units in Solid-Podmoskovny real estate fund?

1   A.  There may have been.  I don't remember.

2   Q.  On June 26, 2015 -- 23rd, I'm sorry, 23rd, 2015, you gave a

3   deposition testimony.  Do you recall that?

4   A.  Yes.

5            MR. BERKOVICH:  Your Honor, if I have a question

6   regarding the deposition testimony, should I give the witness a

7   transcript of that testimony?

8            THE COURT:  Yes.

9            MR. BERKOVICH:  May I hand the witness a deposition

10  transcript?

11           THE COURT:  It's going to be marked as an exhibit.

12  Just assign an exhibit number to it.  It would be a defense

13  exhibit number.

14           MR. BERKOVICH:  With a defense exhibit number -- not a

15  number, would be a letter.  Will be Defense Exhibit E.

16           THE COURT:  All right.  Defense Exhibit E will be the

17  June 23rd, 2015, Kislin deposition.

18           Is there a particular page you want to direct the

19  witness' attention to?

20           MR. BERKOVICH:  Yes, your Honor.  I'd like the witness

21  to look at page 91.

22           THE COURT:  Any particular line?

23           MR. BERKOVICH:  It's lines 8 through lines 18.

24           THE COURT:  Well, it's 19, right?

25           MR. BERKOVICH:  19, yes, your Honor.  Yes.  19.  I

1    have a question.

2    BY MR. BERKOVICH:

3    Q.  If you finish reading it, tell me, Mr. Kislin, and I will

4    have a question.

5    A.  Yes.

6    Q.  On June 23, 2015, I asked you whether there were any other

7    agreements in writing regarding $4,000.

8              THE COURT:  No.  It's not 4,000.  It's 4 million.

9              MR. BERKOVICH:  Four million, your Honor.  Sorry.

10   We're both a little bit nervous, me and Mr. Dannenberg, of

11   course.

12             MR. DANNENBERG:  I'm not nervous.

13             MR. BERKOVICH:  I am nervous.

14   BY MR. BERKOVICH:

15   Q.  And you said no.

16             And then I ask you again similar question, whether

17   there were any agreements prior to November 12, 2009, which is

18   the date of the Defendant's Exhibit 3.  And you said --

19             THE COURT:  It's actually Plaintiff's Exhibit 3.

20             MR. BERKOVICH:  Plaintiff's Exhibit 3, yes.

21   Q.  And you said there weren't.  Now, today you just testified

22   that you don't remember?

23             THE COURT:  Sustained.  You have to ask questions,

24   Mr. Berkovich.  You can't sort of just make statements.  Just

25   ask questions.

1   Q.  Is there a reason --

2               THE COURT:  Pose a question to Mr. Kislin.

3   Q.  Is there a reason, Mr. Kislin, why while at your deposition

4   a year ago you said --

5               THE COURT:  Sustained.  Just ask a question.  Don't

6   make an argument.

7   Q.  Why your response to my question at your deposition is

8   different from your response today?

9               THE COURT:  Sustained.  You've just got to ask

10  questions.

11              You can ask him whether it refreshes his memory.  You

12  can ask whether he recalls this testimony.  And we'll see where

13  it goes from there.  But what you will not do is ask him to

14  explain why he testified as he did on June 23rd and why his

15  testimony is as it is today.  That, you will not be permitted

16  to do.

17  Q.  Just refreshing your recollection that on June 23, 2015, in

18  response to my question regarding any prior agreements prior to

19  November 12, 2009, you said that there weren't; does that

20  refresh your recollection?

21              MR. DANNENBERG:  Objection.  If you'd like, I'll state

22  the grounds, your Honor.

23              THE COURT:  Just give me a minute.

24              Sustained.

25  Q.  Mr. Kislin, I'd like to bring your attention to your

1    affidavit; specifically, paragraphs 15 through 17 that you

2    submitted in this case.

3    A.  I'm ready to respond.

4    Q.  Is it fair to summarize your assertions made in this

5    portion of the affidavit that you wanted to separate yourself

6    from Transregion Invest because you became suspicious of the

7    way Mr. Dikker was handling the company's finances?  Is that a

8    fair summary of your position?

9    A.  Yes.

10   Q.  Let me bring your attention to page 46 and 47 of your

11   deposition marked as Defendant's Exhibit E in this case;

12   specifically, page 46, line 24, through page 47, line 14.  I

13   would like you to read this portion so I can ask him a

14   question.

15   A.  Okay.

16   Q.  Does this reading of this portion of the transcript refresh

17   your recollection that at the time you gave your deposition,

18   you did not remember what were the reasons of your dispute with

19   Mr. Dikker?  Is that correct?

20          MR. DANNENBERG:  Objection.

21          THE COURT:  Overruled.  You may answer the question.

22   A.  I don't remember the details.

23   Q.  I also would like to bring your attention to page 55 and

24   56, pages 5 and 56 of your deposition testimony, which is

25   Defendant's Exhibit E.  Specifically, page 55 starting with

 1  line 16 through page 56, to the line 9.  Please read it and

 2  I'll ask you a question.

 3      THE COURT:  I don't have those pages.  Is there a

 4  complete version of the deposition?  Both sides need to, if

 5  you're going to be referring to a deposition, they need to have

 6  the complete deposition so that I can look at the pages that

 7  the witness is being asked about.

 8      MR. BERKOVICH:  I e-mailed the entire transcript to

 9  the Court -- not e-mailed, provided in the form of a disk.  I

10  have my version, original here.  And I also gave the original

11  to the witness.  But I don't have another copy of his

12  deposition.  Maybe Mr. Dikker -- Mr. Dannenberg will have it.

13      MR. DANNENBERG:  I have my own copy, but I think what

14  Mr. Berkovich is referring to is the submission that both sides

15  were asked to make in your Honor's rules for copies of the

16  excerpted pages that we intend to read in.  This is not part of

17  what Mr. Berkovich had designated as read-in, so that's why you

18  don't have a copy.

19      MR. BERKOVICH:  But I, in fact, provided on a disk or

20  CD, provided the entire deposition transcript.  Maybe not

21  accessible to your Honor at this point, but maybe

22  Mr. Dannenberg will be kind enough to have a copy of the

23  deposition transcript for you.

24      THE COURT:  My clerk can print out the whole

25  deposition, if we have it, so --

G45EKIST                    Kislin - cross

1          MR. BERKOVICH:  Both transcripts.  He was deposed

2     twice, and I have both transcripts on the CD ROM.  I wish I

3     brought another set.  I brought original and my working copy.

4          THE COURT:  If you provided it, Mr. Berkovich, we'll

5     print it out now.

6          Go ahead.

7     BY MR. BERKOVICH:

8     Q.  So did you get a chance to review the excerpt that I was

9     referring to?

10    A.  Yes.

11    Q.  So would it refresh your recollection that, again, that at

12    the time when you were deposed on the 23rd of June, 2015, with

13    respect to this specific excerpt of your deposition, that you

14    did not -- you did not remember the reason why you had a

15    disagreement with Mr. Dikker?

16         MR. DANNENBERG:  Objection, your Honor.  I'd like to

17    state the grounds.

18         THE COURT:  Go ahead.

19         MR. DANNENBERG:  Similar to the last effort that

20    Mr. Berkovich made to purportedly refresh the witness'

21    recollection, he's mixing apples and oranges.

22         Prior to asking about deposition testimony, the

23    question that Mr. Berkovich asked was whether the witness

24    wanted to separate himself from TRI because of suspicions on

25    his part regarding Mr. Dikker's handling of the company's

1    financing.  These last two portions of the witness' deposition

2    related to general disagreements that they were having; not to

3    that specific motivation for why Mr. Kislin wanted to separate

4    himself from the company.  So it's not appropriate for

5    impeachment, nor for refreshing his recollection.

6            MR. BERKOVICH:  Your Honor, if you require, I'll

7    address this.

8            THE COURT:  Well, let me make a comment.  No one here

9    disputes that Mr. Kislin and Mr. Dikker reached a point where

10   they wanted to separate.  That is undisputed.  It's undisputed

11   that Mr. Kislin reached a point where he wanted to be bought

12   out.  And I don't think there is any dispute that Mr. Dikker

13   wanted to facilitate that.

14           There is a dispute about who was going to pay the

15   money but --

16           MR. BERKOVICH:  Your Honor, if I may address the last

17   point.

18           THE COURT:  No.  Let me finish.

19           MR. BERKOVICH:  Sure.  Absolutely, your Honor.

20           THE COURT:  Given that there's no dispute that Kislin

21   wanted out, and that Dikker wanted him out, the reasons why

22   Mr. Kislin wanted out are not particularly pertinent to me.  I

23   don't care, because it's not an issue that's in dispute.

24   Everybody agrees on it.

25           So what I'm suggesting, Mr. Berkovich, it might be

 1  more worthwhile to focus on the issues that are in dispute and

 2  spend less time on what's not in dispute.  Here, it's

 3  undisputed, Mr. Kislin wanted out and Mr. Dikker was happy for

 4  him to get out.  So you want to conduct an examination of the

 5  reasons why Mr. Kislin wanted out.  And I don't understand the

 6  relevance of that.

 7          Now, if you want to tell me what the relevance is, I'm

 8  happy to hear it.

 9          MR. BERKOVICH:  Two points, very quickly.  First, I

10  will address your previous point.

11          There is some dispute with respect to this issue,

12  before I address your specific question.  There's no dispute

13  that Mr. Kislin wanted out.  There is definitely a dispute

14  whether Mr. Dikker wanted Mr. Kislin out.  I think Mr. Dikker's

15  position as presented in the papers, in his submissions, is

16  that he was essentially blackmailed by Mr. Kislin to get him

17  out, to fire him, because Mr. Kislin prevented the company from

18  functioning for the purpose of forcing Mr. Dikker finding money

19  from somewhere to get him out.  So there's a dispute on that

20  issue.

21          With respect to specific point that you're asking,

22  your Honor, here, the reason is very simple.  To the extent

23  your Honor doesn't care the reasons, you know, that may be the

24  end of the story.

25          Mr. Kislin presented in his affidavit, in his direct

testimony, that essentially Mr. Dikker was engaged in some sort

of financial impropriety.  There's implication of that.  My

point that ergo will ask about the reasons there was a

disagreement and a split, that he didn't remember that those

were the reasons, that's the reason I'm asking those questions.

THE COURT:  What I'm trying to communicate to you, and

actually, what I tried to communicate to the lawyers at the

outset of today's proceeding, is what I'm interested in is

trying to figure out:  Was there an agreement pursuant to which

Mr. Dikker agreed to provide $20 million to Mr. Kislin for his

interest in TRI?  If so, what was that agreement?  Was it in

writing?  Was it oral?  And was there an understanding or

agreement, either written or oral, as to where the money was

supposed to come from, the $20 million?  What proof exists as

to the portion that both sides appear to agree on was provided,

which was $16 million -- what proof is there as to where that

money came from; what Mr. Dikker had to do with it?

That's what I'm interested in.  I'm not interested in

the reasons why Mr. Kislin wanted out.  And I do understand

that Mr. Kislin gave Mr. Dikker, allegedly gave Mr. Dikker a

motivation to buy him out by allegedly refusing to cooperate in

the function of the enterprise.  I understand that.  I'm not

sure black mail is the right word.  But we're in a context here

where both sides agree that Mr. Kislin wanted out.

And what I'm struggling with is understanding why it

1    matters why he wanted out.  I agree with you that Mr. Kislin

2    asserts that he wanted out because he was suspicious of

3    Mr. Dikker's operation of the company.  I agree with you, that

4    assertion is made.  But what I'm telling you is I don't care

5    what Mr. Kislin's reasons were.  I really don't.  And I want

6    you to understand that, because if we're going to spend time on

7    understanding why Mr. Kislin wanted out, I'm just not sure it's

8    a good use of time.

9            There are issues here.  I've directed your attention

10   to them.  Those are the ones that matter to me.  And what I'm

11   telling you is Mr. Kislin's reasons why he wanted out, those

12   don't matter to me, because it's not disputed that he wanted

13   out.  I take your point that there may be a dispute about -- I

14   don't know whether it's in dispute or not about whether

15   Mr. Dikker wanted him out.  Actually, my reading of the papers

16   indicated there wasn't a dispute about that.  You say there is.

17   Fine.  We'll hear evidence on that.  But what is not in dispute

18   is that Mr. Kislin wanted out.  His reasons for why he wanted

19   out, I don't see how they're pertinent to the issues here that

20   I will have to decide.

21           MR. BERKOVICH:  Your Honor, I understand you

22   perfectly.  And I didn't know in advance.  And obviously maybe

23   it's my misreading that this is a bench trial rather than a

24   jury trial.

25           So the extent that your Honor explained your Honor's

1    view on this subject, I will not ask any more questions

2    regarding his motivations.  I understand perfectly.  And thank

3    you, your Honor, for letting me know so we can proceed more

4    efficiently.

5    BY MR. BERKOVICH:

6    Q.  Now, Mr. Kislin, is it correct to say that -- I'm sorry.

7         It is my understanding your position in this case,

8    including as outlined in your affidavit, that you indeed

9    received $16 million.  Is that correct?

10   A.  Yes.

11   Q.  Is it also correct to say that you did not provide any

12   documents that demonstrate your receiving $16 million or any

13   other amount in connection with this case?

14             MR. DANNENBERG:  Objection.

15             THE COURT:  Grounds?

16             MR. DANNENBERG:  Did not provide when?  To who?  Is he

17   talking about whether I provided documents on Mr. Kislin's

18   behalf during pretrial discovery?  That's not a subject of

19   dispute.  I provided what I provided.  He can ask whether

20   Mr. Kislin had a set of documents.

21             THE COURT:  Why don't you rephrase your question,

22   Mr. Berkovich.

23        And the other thing is we're talking about the

24   $16 million in the abstract.  It's $16 million that relates to

25   Mr. Kislin's interest in TRI.  That's what we're talking about,

G45EKIST                    Kislin - cross

1    right?

2              MR. BERKOVICH:  Yes.

3              THE COURT:  So you need to ask your question that way:

4    Are you aware your attorney provided to defendants any

5    documents regarding your receiving $16 million or that amount

6    in connection with buyout of Brunlow, Inc. interest in TRI?

7              MR. DANNENBERG:  Objection.  And for the purposes of

8    trial, your Honor, I'll stipulate that we did not provide any

9    such documents.

10             THE COURT:  Okay.  Are you content with his

11   stipulation, Mr. Berkovich?  I mean, I asked this at the

12   outset.  I don't think it's in dispute, but are you content

13   with Mr. Dannenberg's stipulation that plaintiff has no

14   documents which would reflect the $16 million payment he

15   received from TRI?

16             MR. BERKOVICH:  I'm not content that plaintiff has no

17   documents.  I'm content they have not provided to us.

18             THE COURT:  If you're not content with a stipulation,

19   ask your next question.

20             And I would suggest you focus not on what

21   Mr. Dannenberg provided, because of course the client has no

22   idea what Mr. Dannenberg provided.  Instead, you will ask the

23   client whether he has any documents that reflect the

24   $16 million that he received for his interest in TRI.

25                           - - - - -

1    BY MR. BERKOVICH:

2    Q.  Mr. Kislin, how did you receive $16 million or similar

3    amount, or any other amount, in connection with buyout of

4    Brunlow Inc. interest in Transregion Invest?

5           MR. DANNENBERG:  I'm objecting to the form, your

6    Honor.

7           THE COURT:  Because there is no foundation, is that

8    your objection?

9           MR. DANNENBERG:  I honestly don't understand the

10   question the way it's phrased.

11          THE COURT:  You need to lay a foundation.

12          So what do I mean by this, Mr. Berkovich?  You need to

13   ask the witness:  Did there come a time where he received

14   $16 million or his company, Brunlow, whether Brunlow received

15   $16 million for its interest in TRI?  That's the foundation

16   question.  And then we'll take it from there.

17          So please ask that question.

18   BY MR. BERKOVICH:

19   Q.  Did you or any of your companies receive any money in

20   connection with buyout of Brunlow, Inc. interest in TRI?

21   A.  Yes.

22   Q.  In what -- how did you receive the money?  How did it come

23   to you?

24   A.  It was a transfer of funds from Russia to the company

25   Kominelli.

1    Q.  Was it one transfer or more than one transfer?

2    A.  Several.

3    Q.  And what was the total of the amount that you received --

4    that Kominelli received?  I'm sorry.

5    A.  Sixteen million US dollars.

6    Q.  Do you recall the time frame during which these several

7    payments were made?

8    A.  It was within two or three months.

9    Q.  What year, please?

10   A.  I don't remember.

11   Q.  What was the relationship between you personally with your

12   companies and this company, Kominelli?

13   A.  Could you repeat that, please.

14          MR. BERKOVICH:  Can you read it to the witness?

15          THE COURT:  What was the relationship between your

16   companies and Kominelli?

17          THE WITNESS:  Because of the funds that Dikker was

18   getting, I suspect were either coming to Cyprus or -- or were

19   in Cyprus already at the recommendation of Dikker and Sachkov,

20   I opened a company, Kominelli.

21   Q.  Did the company have a bank account?  Did Kominelli have a

22   bank account?

23   A.  Of course there was.

24   Q.  And did you have control of the bank account?

25   A.  Yes.

Q.  And do you recall what country, where were the bank that

Kominelli had a bank account?

A.  Cyprus.

Q.  Was it just one bank account with Cyprus with respect to

this company?

A.  Yes.

Q.  Did you request any documents from the bank, Kominelli's

bank, regarding Kominelli receiving $16 million or any other

amount in connection with sale of Brunlow interest in TRI?

A.  I don't remember at this point.

          MR. BERKOVICH:  I'm not sure, because I speak Russian,

so I'm not sure the witness was correct.

Q.  My question is whether you're requesting documents from

Kominelli's bank specifically in connection with any transfer

that they may receive with respect to your buying out of

Brunlow from TRI.

A.  As I already said, I don't remember whether I requested

that or not.  I just don't recall.

Q.  But whether you requested it or not, it's your contention

that you don't have any documents that I referred to earlier?

A.  Yes.

Q.  So it's fair to say that we, in this lawsuit, we do not

have any documentary proof of your receiving any specific

amount?

          MR. DANNENBERG:  Objection.

1          THE COURT:  Sustained.

2          What is your understanding of who transferred the

3   money to you?

4          THE WITNESS:  Mr. Dikker.

5          THE COURT:  And what is that understanding based on?

6          THE WITNESS:  Because I had a contract with him for

7   the $20 million, and he gave me a schedule of when he was

8   transferring the funds.  And he told me every time how much

9   funds was being transferred.

10         THE COURT:  Do you know from what accounts the money

11  came from?

12         THE WITNESS:  Approximately, yes.  There was a company

13  named Blagosostoyaniye.  I don't remember the exact name of it

14  now, but it was a company that was buying up the shares from --

15  the real estate shares from TRI.

16         MR. BERKOVICH:  May I continue, your Honor.

17         THE COURT:  Yes.

18  BY MR. BERKOVICH:

19  Q.  The company that you referred to, Blagosostoyaniye, to your

20  understanding Mr. Dikker was in no way involved with that

21  company, is that correct?

22  A.  Of course there was.

23  Q.  Did he have any ownership interest in that company, as far

24  as you know?

25  A.  I don't know.  I don't know that.

 1  Q.  Do you know the company being a pension fund?

 2  A.  I think that it wasn't a pension fund.  I think it was a

 3  hedge, a type of hedge fund.

 4  Q.  Let me bring your attention, turning back to your direct

 5  testimony, which is in your affidavit, paragraphs 27 to 28.

 6  When you review that, I will ask you some questions.  Tell me

 7  when you get a chance to review it.

 8  A.  I'm done.

 9  Q.  Both paragraph 27 and 28 refer to somebody named Vladimir

10  Semernin.  Is that correct?

11  A.  Yes.

12  Q.  It also says, if you look at the middle of paragraph 27,

13  that Mr. Dikker apparently owed a significant amount of funds

14  to Mr. Semernin.  Do you see that?

15  A.  Yes.

16  Q.  To the best of your recollection who was Mr. Semernin?

17  A.  I can't say specifically what his profession was or what

18  his position was, but I know that he had some sort of a fund.

19  Q.  Would it refresh your recollection if I tell you that he

20  was a principal of the management company that managed Solid

21  fund?

22  A.  That's not the case.

23  Q.  Is it your contention that Mr. Dikker personally owed

24  $4 million to Mr. Semernin?

25  A.  That's what I found out later.

1    Q.  Later.  Give us a time frame.  When did you find it out

2    that Mr. Dikker personally owed $4 million to Mr. Semernin?

3    A.  When I started my investigation, I realized that it really

4    was the case that Mr. Dikker either borrowed or gave or sold

5    $4 million of assets to Mr. Semernin.

6    Q.  Was it as far as Mr. Dikker's personal assets?

7    A.  I don't know.  I don't remember.  I couldn't say.

8    Q.  Could it be assets of Transregion Invest?

9    A.  It's possible.

10   Q.  Was it also possible that Transregion Invest had certain

11   obligations to Mr. Semernin on his company?

12   A.  Not as far as I know.

13   Q.  Specifically any obligation in the sum of $4 million?

14   A.  Not as far as I know.

15   Q.  I would like to bring your attention to your deposition

16   that was taken on 23rd of June, 2015.  I think you have it

17   there.  Specifically, pages 83 and 84.  Specifically, with

18   respect to page 83, I would like to bring your attention to

19   lines 2 through lines 19.  Tell me when you've had a chance to

20   review it so I can ask a question.

21   A.  Okay.

22   Q.  Now, does this portion of your transcript refresh your

23   recollection that you don't know whether the debt owed to

24   Mr. Semernin was personal with respect to Mr. Dikker or

25   corporate, is that correct?

1          MR. DANNENBERG:  Objection.

2          THE COURT:  Grounds?  The question is whether it

3     refreshes his recollection.  That's either a yes or a no.

4          MR. DANNENBERG:  Right.

5          THE COURT:  You can refresh recollection with

6     anything.  He could show him the phone book and ask him whether

7     it refreshes his recollection.

8          MR. DANNENBERG:  No question, your Honor.  But he's

9     asking about the last question and answer that was given by the

10    witness.  Now he's asking whether this refreshes his

11    recollection about something else.

12         MR. BERKOVICH:  It's not something else, your Honor.

13    Exactly on the same subject.

14         MR. DANNENBERG:  He was asked, the last question

15    was -- last two questions, to put it into context, was it

16    possible that TRI had obligations --

17         THE COURT:  Sustained.  Sustained.

18         The last question was, does he know whether TRI owed

19    money or not?

20         The answer was, not as far as I know.

21         So how does your question bear on that?

22         MR. BERKOVICH:  His previous question, not last one,

23    previous was that he -- his submission in his direct testimony

24    is that Mr. Dikker personally owed money to Mr. Semernin.

25         THE COURT:  I just told you what the last question

1   was.  The last question was, does TRI owe $4 million to

2   Semernin?

3           The answer was, quote, not as far as I know, closed

4   quote.

5           That was the last question and answer before you

6   showed him the deposition.  And my question to you, sir, is:

7   How does your question directing him to these deposition lines

8   bear on that answer?

9           MR. BERKOVICH:  It does not bear on the last answer.

10          THE COURT:  Okay.

11          MR. BERKOVICH:  So may I ask a different question.

12          THE COURT:  Absolutely.

13  BY MR. BERKOVICH:

14  Q.  Mr. Kislin, is it your contention that Mr. Dikker

15  personally owed $4 million to Mr. Semernin?

16  A.  I can't state yes or no.

17  Q.  So is it your response that you don't know?

18  A.  I found out later that he owed that money, but whether he

19  took that money for himself or the company, I don't know.

20  Q.  When you say he took the money, are you referring to

21  Mr. Semernin?

22  A.  No.  I mean Mr. Dikker.

23  Q.  I don't know, maybe I didn't phrase my question correctly.

24          My question is whether, in light of what your previous

25  response was, whether it's fair to say that you do not know

1    whether Mr. Dikker owed money to Mr. Semernin personally or

2    not.

3    A.  I couldn't assert that.

4             THE COURT:  So just to be clear, you don't know

5    whether Dikker owed money to Semernin or not?

6             THE WITNESS:  I can't assert that.

7             THE COURT:  Did TRI owe money to Semernin?

8             THE WITNESS:  I also can't assert that.  I don't

9    remember.  I don't know.

10            THE COURT:  All right.  The deposition excerpt that

11   Mr. Berkovich directed your attention to -- specifically, page

12   83, lines 12 through 19 -- have you read that?

13            THE WITNESS:  Yes.

14            THE COURT:  Okay.  That's your testimony about money

15   that was owed to Semernin, right?  That's what the subject of

16   that testimony is, right?

17            THE WITNESS:  Yes.  Exactly.

18            THE COURT:  And in that testimony you said that you

19   signed some sort of document reflecting the fact that the money

20   was owed to Semernin?

21            THE WITNESS:  This document was signed in 2005.  I

22   left the business in the beginning of 2008.

23            THE COURT:  Okay.  But my question is, in your

24   testimony here, are you indicating that you signed a document

25   indicating that Semernin was owed money?

1          THE WITNESS:  Yes, there was.  That instance happened.

2          THE COURT:  Okay.  And was that a debt that TRI owed

3     to Semernin?

4          THE WITNESS:  This was back in 2005.  And I don't

5     recall exactly how, whether there was a loan taken from him or

6     whether we sold something.  This was back when we were still

7     working together.  But we resolved that issue, settled that at

8     that time.

9          THE COURT:  At what time?

10         THE WITNESS:  In 2005.

11         THE COURT:  And was that money that TRI owed to

12    Semernin?

13         THE WITNESS:  Yes.

14         THE COURT:  But you're saying that that debt, that was

15    resolved sometime in 2005?

16         THE WITNESS:  Yes.

17         THE COURT:  The reason why I ask you is in your

18    testimony you say as follows:  "When I agreed to leave, I

19    agreed to leave for 20 million, and to not be on the hook for

20    any debt."

21         So that testimony suggests that at the time that you

22    left in 2008, there was still an outstanding debt running from

23    TRI to Semernin.

24         THE WITNESS:  It's possible that there were, but I was

25    not aware of those debts.

G45EKIST                    Kislin - cross

1          THE COURT:  Okay.  Go ahead, Mr. Berkovich.

2     BY MR. BERKOVICH:

3     Q.  Now, Mr. Kislin, in paragraphs 43 through 45 of your

4     declaration, you refer -- I'll just summarize it.  You tell me

5     if I'm correct.

6          You state that there was a criminal investigation of

7     Mr. Dikker in Russia.  Is that a correct way to summarize your

8     testimony in these paragraphs?

9     A.  That's exactly correct.  Mr. Dikker was -- how would I put

10    it?  Under investigation.

11    Q.  Are you aware of any criminal charges actually brought

12    against him; not investigation, but criminal charges brought

13    against Mr. Dikker in Russia?

14    A.  Yes.

15    Q.  What kind of charges are you talking about?

16         You must understand the difference between an

17    investigation and criminal charges, do you?

18         MR. DANNENBERG:  Objection, second question.

19         MR. BERKOVICH:  I withdraw the first one.  Withdrawn.

20    Q.  Do you understand the difference between criminal charges

21    and criminal investigations?

22    A.  I think that there was investigation.  He was not indicted,

23    as far as I know.

24    Q.  Let me bring your attention to paragraphs 39 and 41 of your

25    affidavit.  Tell me when you're ready.  I'll ask you a few

1    questions about this and other paragraphs in your affidavit.

2    A.  Yes.

3    Q.  Would you look at the very end of paragraph 41 that will be

4    on page 18.  Is it your contention in this case and in this

5    affidavit that Mr. Dikker personally owes you $4 million?

6    A.  Yes, that's what I assert.

7    Q.  Is it your contention that that $4 million Mr. Dikker owes

8    you under the terms of the document -- I believe you have it in

9    front of you, which is known as Plaintiff's Exhibit 4 --

10              MR. DANNENBERG:  Objection.

11   A.  This one here?

12              THE COURT:  Plaintiff's Exhibit 4.

13              THE WITNESS:  Yes.

14              THE COURT:  What's your objection?

15              MR. DANNENBERG:  He's calling for a legal conclusion

16   on the witness' part.

17              THE COURT:  Overruled.

18   Q.  Let's look at Plaintiff's Exhibit 4, which I think you have

19   in front of you.  Before we get to that, I will just name

20   paragraphs.  I want you to read it because it's all related.

21   Paragraph 31 -- 30, 31, 35 and 36.  If you look at those

22   paragraphs and tell me that in these paragraphs you also

23   contend that Mr. Dikker personally owes you $4 million.

24              INTERPRETER:  He hasn't gotten to 35, 36 yet.  You

25   asked when he was done with all of those, and he hasn't gotten

1   to 35, 36 yet.

2              THE COURT:  So take the time to read.

3              MR. BERKOVICH:  Sure.  I thought he said yes, but

4   absolutely.  He should take his time.  (Pause)

5              THE WITNESS:  Yes.

6   BY MR. BERKOVICH:

7   Q.  Now I'd like to bring your attention to the document dated

8   September 18, 2012, marked as Plaintiff's Exhibit 4, I believe.

9   I'm going to ask a question, not the whole thing, very

10  specific.  If you look at paragraph one of that exhibit.  Look

11  at the Russian version, I think, which the Court allowed you to

12  look at.

13             THE COURT:  That's what he's looking at.

14  Q.  With respect to paragraph one of that exhibit, is it your

15  contention that Mr. Dikker personally owed 254,556 units in

16  investment fund Russkoye Polye?  Is that your contention?

17  A.  My answer, because he had already control over my shares,

18  he had reregistered my shares.  He had full control over all of

19  the shares.

20  Q.  When you say "registered shares," which shares are you

21  talking about?

22  A.  The 51 percent.

23  Q.  Are you speaking of your shares -- I just want to make sure

24  I understand what you're talking about.  Are you speaking of

25  Brunlow shares in TRI?  Is that what you're talking about?

1    A.   Yes.

2    Q.   Was there ever a written agreement specifically regarding

3    your relinquishing or Brunlow relinquishing its 51 percent

4    ownership interest in TRI?

5    A.   I don't have any documents here, but we did all of this

6    under a verbal agreement, a handshake.

7    Q.   So if I understand, is it your contention that Mr. Dikker

8    and Mr. Parilis agreed that you would just shake the hand and

9    give up your interest in TRI without any paper?

10   A.   I had no business dealings with Mr. Parilis, but with

11   Mr. Dikker, yes.

12   Q.   So there were no papers signed or filed which shows that

13   Brunlow's interest in TRI was converted to somebody else,

14   transferred to somebody else?

15   A.   I don't have any documents like that.

16   Q.   So now, going back to this paragraph one of Plaintiff's

17   Exhibit 3, if I understand your response to my previous

18   question regarding this, is it fair to say that what you're

19   saying is that your understanding is that Dikker's control of

20   TRI gave him control of the shares of Russkoye Polye?  Is that

21   your understanding?

22   A.   Yes.

23        THE COURT:  We're going to have to leave it there.  I

24   have another matter.  We'll resume at 2:00.

25        (Luncheon adjournment)

1                        AFTERNOON SESSION

2                            2:13 p.m.

3            THE COURT:  Mr. Kislin, you remain under oath.

4            Mr. Berkovich, you may proceed.

5            MR. BERKOVICH:  Your Honor, we finished abruptly.

6    Could I ask the court reporter to read my last question and

7    answer so I can -- if you don't mind.

8            THE COURT:  All right.  Just for future purposes, I'm

9    not a big fan of having readbacks because it forces the court

10   reporter to find the prior question.  So try to keep in mind

11   your question so we don't have to ask the court reporter.

12           MR. BERKOVICH:  Only the last one, your Honor, the

13   last question.

14           THE COURT:  All right.

15           (Record read)

16   BY MR. BERKOVICH:

17   Q.  I think you've previously stated on different occasions

18   that you go to Russia on average about one week a month, is

19   that correct?

20           MR. DANNENBERG:  Objection.

21           THE COURT:  Sustained.  Just ask a question,

22   Mr. Berkovich.  You don't have to get into prior history.  Just

23   ask a question.

24   Q.  Do you go to Russia -- how often did you go to Russia on

25   business?

1    A.  On average once every two months.

2    Q.  And how long is your average trip?

3    A.  A week.

4    Q.  And in terms of these trips that you just described, what

5    time period, between which year and which year, have you been

6    taking average one-week/two-month trips to Russia?

7    A.  Since 1987 to today.

8    Q.  And if you go back to this paragraph one of Exhibit 4.  Do

9    you see in paragraph one there's a reference that the fund

10   equity investment fund Russkoye Polye is registered with a

11   Russian Federal Commission for Securities Market on August 8,

12   2009?  Do you see that?  It's last two to three lines of

13   Exhibit 1 -- of paragraph one.

14   A.  Yes.

15   Q.  And there's also a number which appears to be a

16   registration number.  Do you see that after the date of

17   August 8, 2009?

18   A.  Yes.

19   Q.  During your trips to Russia that you described you were

20   taking one week, two months since '87, particularly since

21   obviously the issues in this case came up, have you made any

22   inquiry to the Russian Federal Commission on Securities Market

23   with respect to this registration number, any inquiries with

24   respect to who was a holder of the shares in this fund, fund

25   Russkoye Polye?

G45EKIST                    Kislin - cross

A.  My understanding was after I sold my shares to Mr. Dikker,

that the 100 percent owner of this was Mr. Dikker.

            THE COURT:  His question was a little bit different.

            MR. BERKOVICH:  My question is different.  My question

is about --

            THE COURT:  His question was different.

            MR. BERKOVICH:  About the shares, yes, who was the

holder of the shares.

            THE COURT:  His question -- try to listen to his

question and answer his question.

BY MR. BERKOVICH:

Q.  I'll rephrase it, though.  I'll make it shorter possibly to

make it clear.

            My question is very simple:  Did you inquire with the

Russian Federal Commission for Securities Market with respect

to this number that listed in paragraph one as to who is a

holder of these equity units in amount listed in paragraph one,

who is the holder of these units?  Did you make this inquiry of

Russian commission?

A.  I never went to the commission to find out what -- who the

holder was or who the owner was of the shares.  But I know that

TRI is the one who created this company, this fund.

Q.  Have you seen any documents that show that TRI organizes,

as you said, this fund, the Russkoye Polye?

A.  I don't remember seeing those documents.

Q.  In going back to your affidavit, particularly paragraphs

40 -- again, review that -- as well as 47.  Is it fair -- I'll

ask a question, but then you review that so you be able to

understand why you're reading it.  So it will be better this

way.

          With respect to paragraph 40 and paragraph 47, after

you review it, tell me if it's my correct understanding that

you threatened Mr. Dikker with litigation in Russia in

connection with the shares in Russia real estate investment

funds.

A.  Yes, I did try to scare him with saying that I was going to

sue him, but I never said where -- I didn't tell him that I was

going to do it in Moscow or in New York or somewhere specific.

Q.  Were those threats that you described in paragraph 40 to

47, were any of them made in writing?

A.  No, only verbal.

Q.  Did your attorney, Mr. Dannenberg, to the best of your

knowledge, make any threats regarding the lawsuit that you

described in paragraph 40 and 47?

A.  I know one document that Mr. Dannenberg wrote to Mr. Dikker

and to Mr. Levkovsky, the chief accountant, stating that if

they proceeded -- did not follow their legal obligations, that

they would be held liable.

Q.  The first question is:  Is this document, as best of your

knowledge, is it part of the documents in this case?

1          MR. DANNENBERG:  Objection.

2          THE COURT:  Sustained.  Sustained.  We don't know what

3     part of this case means.

4          MR. BERKOVICH:  What I meant is in this litigation, if

5     he's seen this document in connection with this litigation.

6          MR. DANNENBERG:  I'm saying objection.

7          THE COURT:  That's overruled.  If he's ever seen the

8     document in connection with this case, that's overruled.

9          THE WITNESS:  No.  I don't think this was part of this

10    case.  We were just scaring Mr. Dikker that we would sue him if

11    he acted illegally.

12    BY MR. BERKOVICH:

13    Q.  Was that threat as you described or document drafted by

14    Mr. Dannenberg, was it related to any of the shares in any of

15    the Russian real estate investment funds?

16    A.  No.  I just discovered that Mr. Dikker was stealing money.

17    And I warned him that -- not to do that anymore.

18    Q.  To give a show as to my question, this document that you

19    described was not related to the shares of the real estate

20    investment funds, is that correct?

21         MR. DANNENBERG:  Objection.  He just said no.

22         THE COURT:  Overruled.

23    A.  No.

24    Q.  I bring your attention to your affidavit, paragraph 25.

25    When you finish reading it, I'll ask you a question.

1  A.  Yes.

2  Q.  In this paragraph you state, and I'll summarize briefly,

3  that you and Mr. Dikker had no reason to put your agreement --

4  again, a buyout of TRI shares -- in writing.  And you give a

5  reason why not.

6         But aside of that, not having a reason, was this

7  agreement between Mr. Dikker or his company and you or your

8  company, was it, in fact, ever put in writing?

9  A.  When we came to the decision that he was going to give me

10  $20 million for my shares, and then when he only gave me

11  16 million and 4 million remained owed to me, I decided that I

12  wasn't going to give him the shares until he paid me in full.

13  However, he tricked me.  And he got my shares anyway prior to

14  paying me the rest of the money.

15  Q.  When you say he tricked you in taking your shares, is it

16  true, am I correct to recall that, in fact, there was no

17  agreement with respect to which your company, Brunlow, gave up

18  its shares representing 51 percent interest in TRI?  There's no

19  agreement here, am I correct?

20         No written agreement.  I apologize.

21  A.  No, there wasn't.  There was a personal agreement between

22  us and a handshake.  But he managed to convince me to give him

23  the shares because he kept promising that two, three, five days

24  later that he would give me the rest of the money.  But he

25  never did.  And he managed to transfer the shares to himself.

G45EKIST                    Kislin - cross

1    Q.  What's the reason why you didn't mention this signing of

2    the shares in any of the papers you submitted in this case?

3                MR. DANNENBERG:  Objection.

4                THE COURT:  Sustained.

5    Q.  Is it correct that you did not mention this signing of the

6    shares in your affidavit that you submitted in this case?

7                MR. DANNENBERG:  Objection.

8                THE COURT:  I don't know what you mean by the signing

9    of the shares.  I don't know what you're talking about.

10               MR. DANNENBERG:  I think he was just testifying, in my

11   understanding, that shares of Brunlow in TRI were somehow

12   signed off, signed over.

13               THE COURT:  I didn't hear that.  So if you want to

14   elicit that, go ahead.  I didn't hear it.

15               MR. BERKOVICH:  Maybe I misheard it.  Maybe I was

16   listening in Russian.

17               THE COURT:  You're welcome to pursue it.

18               MR. BERKOVICH:  I apologize, your Honor, if I

19   misunderstood.

20               THE COURT:  I wouldn't listen to the Russian.  I'd

21   listen to the translation.  That's the whole reason we have the

22   translator.

23               MR. BERKOVICH:  Unfortunately, Russian is better --

24               THE COURT:  I just comment that the problem with

25   translation, no translator, no matter how good they are, can

1   communicate 100 percent of what the person is saying.  So it is

2   very dangerous for you to listen to the Russian, because that's

3   not what's going to be reflected in the transcript.  What's

4   going to be reflected in the transcript is the English.  And

5   the English may not reflect 100 percent of what the Russian is.

6   That's an inevitable consequence of choosing to proceed with

7   your translation.  You're not going to get 100 percent.

8          So, please, listen to the English, and then base your

9   questions on the English.

10          MR. BERKOVICH:  Yes, your Honor.  It was inadvertent

11   on my part.

12   BY MR. BERKOVICH:

13   Q.  So I want to go back to this paragraph 46 of your

14   affidavit.

15          THE COURT:  It's 26, isn't it?

16          MR. BERKOVICH:  46.

17   Q.  Now, you testified just a few minutes ago that there was no

18   agreement under which -- between Mr. Dikker or his company and

19   you and your company under which Brunlow, which is your

20   company, relinquished its 51 percent interest in TRI, am I

21   correct?

22          MR. DANNENBERG:  Objection.  Do you mean no written

23   agreement?

24          MR. BERKOVICH:  No written agreement.  I'm sorry.  I

25   meant written agreement.

G45EKIST                    Kislin - cross

1          MR. DANNENBERG:  Could I ask that the question be

2     reasked.

3          THE COURT:  Please ask it again.

4     BY MR. BERKOVICH:

5     Q.  So if I understand your testimony correctly in your

6     affidavit, that there was no written agreement involving you or

7     your company, Brunlow, and Mr. Dikker and his company in

8     connection with your company, Brunlow, relinquishing 51 percent

9     interest in TRI; is that correct?

10    A.  There was an agreement, a verbal agreement, a handshake.

11    Or I would just say that we agreed to me giving him the

12    51 percent of the shares and him giving me $20 million.

13    Q.  So when you testified that Mr. Dikker tricked you in

14    relinquishing Brunlow's ownership interest in TRI, there was

15    nothing in writing by you or Brunlow to confirm that; is that

16    correct?

17    A.  I want to repeat my answer that we had an agreement, came

18    to an agreement that he was going to give me $20 million, and I

19    was going to give him my shares.  He got my shares, but he did

20    not give me the full $20 million.  That's why I feel that he

21    cheated me.

22         THE COURT:  The question was whether there was

23    anything in writing.  That was the question.

24         So, again, try to listen to the question.  Try to

25    answer the question.

1      THE WITNESS:  No, there was nothing written, nothing

2   signed, nothing.

3   BY MR. BERKOVICH:

4   Q.  Mr. Kislin, in your affidavit -- and I'll just summarize it

5   generally, and you tell me if you agree with it.  It appears

6   that you're asserting that Mr. Dikker agreed personally to owe

7   you $4 million.  Is that correct?

8   A.  Yes.

9      MR. BERKOVICH:  One second, your Honor.  (Pause)

10  Q.  Do you have Exhibit 3 as well there?  Let me ask the

11  questions, and then you can review the exhibit.

12      With respect to Plaintiff's Exhibit 3, the document

13  dated November 12, 2009, is there anything in this document

14  that requires Mr. Dikker to pay you $4 million?

15  A.  I don't see what he wrote here, but I see that he signed

16  this document where he personally promised me to either pay me

17  $4 million or to transfer to me 258,000 shares that at that

18  time were worth money and could have been sold at that time.

19  Q.  What provision, what paragraph or provision of this

20  document states in your view that Mr. Dikker personally owes

21  you $4 million?

22  A.  Mr. Dikker controlled this whole business, and he could

23  have resolved this issue within one or two days.

24      MR. BERKOVICH:  Your Honor, I will request the Court's

25  assistance because the witness is not responding to my

G45EKIST                    Kislin - cross

question.  My question is very simple.  It's whether there's

any provisions in this agreement, which he says there is, under

which Mr. Dikker personally owes him $4 million.

            THE COURT:  You have to listen to the question.

Listen to the question, make sure your answer responds to the

question.

            So the question here is quite clear.  It asks you what

provision in Plaintiff's Exhibit 3 do you contend obligated

Dikker to pay you $4 million?

            THE WITNESS:  So in paragraph one of this agreement it

says that I am side one or party one, and that Mr. Dikker over

there are accusing of not paying me $4 million is a party to.

And it's signed by both of us, so it's right there.

            THE COURT:  Let me try one more time.  The question

is:  What provision in this agreement, Plaintiff's Exhibit 3,

obligates Dikker to pay you $4 million?

            THE WITNESS:  I think what obligates him is the fact

that we're identified at the top of this document, myself as

party one and him as party two.  And that obligates him to

fulfill this document and to pay me the $4 million that's in

this document.

            THE COURT:  You're not understanding the question.

The paragraph that you're talking about doesn't say anything

about $4 million.  The term $4 million doesn't appear in the

paragraph that you're referring to.  So what I'm asking you --

1    I've asked you several times already, I'll ask you again -- is

2    tell me specifically what paragraph in this agreement that you

3    contend obligates Dikker to pay you $4 million.

4            THE WITNESS:  I can't respond to that question.  I

5    can't respond to that question, but I think that my attorney

6    could help me.

7            THE COURT:  Go ahead.

8    BY MR. BERKOVICH:

9    Q.  With respect to Exhibit 3, Plaintiff's Exhibit 3, did

10   Mr. Dikker make any payment to you?  It's the same document we

11   just discussed, Mr. Kislin.

12   A.  You mean this number three, paragraph number three over

13   here?

14   Q.  Not paragraph three.  Plaintiff's Exhibit 3, as we just

15   discussed a second ago.

16   A.  Okay.  So what was the question?

17   Q.  My question is whether Mr. Dikker paid you any money under

18   the Exhibit 3, pursuant to Exhibit 3.

19   A.  I just understand that this is what he owed me, 20 million.

20   He paid me 16 million.  He still owes me 4 million.  That's the

21   way I understand it.  I don't know how else I could understand

22   it.

23   Q.  So is it fair to say that Mr. Dikker did not pay any money

24   pursuant to the document, which is Plaintiff's Exhibit 3?

25   A.  From this agreement, no, he did not pay a single cent, nor

1    did he give me a single share.

2    Q.  My understanding, if I'm correct, based on your affidavit,

3    is that you were quite unhappy about the fact that Mr. Dikker

4    did not pay you any money or provide any shares of the Russian

5    investment fund to you pursuant to Exhibit 3.  Is that correct?

6    A.  Yes.

7    Q.  Now, it's also my understanding, based on your affidavit,

8    that there was another document signed between you and

9    Mr. Dikker which is Plaintiff's Exhibit 4.  Is that correct?

10   A.  Where is it?

11             INTERPRETER:  Do you want him to look at --

12             MR. BERKOVICH:  You don't have it?

13             INTERPRETER:  It's here.  You want me to give it to

14   him?

15             MR. BERKOVICH:  Yes, of course.  My apologies.  Sure.

16             THE WITNESS:  This document, yes?

17             MR. BERKOVICH:  Did the witness respond?  I'm not

18   sure.

19             THE WITNESS:  This document, yes?

20   BY MR. BERKOVICH:

21   Q.  Now, just look at the dates.  This document is dated about

22   three years later, is that right?

23   A.  Yes.

24   Q.  I'll have some of the same questions regarding this

25   document as I had on the previous one, so bear with me.

1           Is it your contention that Mr. Dikker owes you

2    $4 million pursuant to the terms of the Exhibit 4?

3    A.   Yes.

4    Q.   And the same question I asked you regarding Exhibit 3.

5    Would you point to the specific provision of this Exhibit 4

6    under which Mr. Dikker is obligated to pay you $4 million?

7    Please review it and tell me.

8    A.   I will answer the same way I answered the previous one.  I

9    don't know which point, which paragraph it is.  That's a

10   question to my attorney.  He could help me identify it.  But if

11   I were an attorney, I would have written it differently.  But I

12   don't know exactly which paragraph.

13   Q.   You did sign the document that's been identified as

14   Plaintiff's Exhibit 4, didn't you?

15   A.   I signed it and Dikker signed it.

16           MR. BERKOVICH:  Your Honor, I have no further

17   questions on cross.

18           THE COURT:  All right.  Redirect, Mr. Dannenberg?

19           MR. DANNENBERG:  Yes.  And I'm going to be very brief.

20   REDIRECT EXAMINATION

21   BY MR. DANNENBERG:

22   Q.   Mr. Kislin, just a few minutes ago Mr. Berkovich asked you

23   some questions.  And you mentioned my name in a context of

24   scaring Mr. Dikker -- that was your word -- and Mr. Levkovsky

25   regarding your suspicion that Mr. Dikker was stealing money.

1   And you referred to two documents that I prepared.

2           Do you remember that?

3   A.  Yes.

4           MR. DANNENBERG:  May I just hand these two documents

5   to the witness, your Honor.

6           THE COURT:  Yes.  Are they marked as exhibits?

7           MR. DANNENBERG:  Yes.

8   Q.  I'm showing you, Mr. Kislin, two documents that were marked

9   as Plaintiff's Exhibits 1 and 2.  And I will ask you if those

10  were the documents you were just referring to and that you were

11  referring to when Mr. Berkovich was asking you the question

12  that I mentioned.

13  A.  Yes.

14          THE COURT:  I don't understand what's happening,

15  Mr. Dannenberg.  I thought you were asking the witness about

16  some threatening communications you addressed.

17          MR. DANNENBERG:  That was what Mr. -- I'm sorry.

18          THE COURT:  And Plaintiff's Exhibit 1 is an agreement

19  that was entered into between Mr. Dikker and Mr. Kislin.  And

20  Plaintiff's Exhibit 2 is a statement from Mr. Levkovsky.  So I

21  don't see how either of these documents constitutes a threat

22  from you to Mr. Dikker.  I'm not seeing a connection at all.

23          MR. DANNENBERG:  Well, I have an advantage because I

24  knew what he was talking about when he gave his answer.  But I

25  think that, to put it into the proper context, the question --

1    THE COURT:  Maybe you can put it in a context to me,

2    because the context is lost on me, quickly at this point.

3    MR. DANNENBERG:  The question Mr. Berkovich asked had

4    to do with threats of litigation that were referred to in

5    Mr. Kislin's affidavit.  And then Mr. Berkovich said, did your

6    lawyer, Mr. Dannenberg, get involved in anything like that?

7    And Mr. Kislin referred to two documents that he said

8    I prepared to scare Dikker and Levkovsky regarding his

9    suspicion that Mr. Dikker was stealing money.

10   So it was a disconnect there.  He wasn't talking about

11   threat of litigation, and there is no threat of litigation in

12   those documents.  He was talking about the documents that were

13   prepared.  As is recited in the affidavit, those two documents

14   are discussed at length in the affidavit -- that were prepared

15   in response to Mr. Kislin's learning things that gave him

16   suspicions that Mr. Dikker was misappropriating funds.

17   So I knew what he was talking about.  I wanted to

18   clear it up.

19   MR. BERKOVICH:  Your Honor, I have an objection.  If I

20   may address the Court.

21   The objection is relevance, your Honor, because I

22   think your Honor indicated on my examination, my examination

23   prior to lunch that motivations of the -- why parties split

24   apart are not relevant.

25   With respect to the threats, clearly the threats

1    referred to in the affidavit are the threats of the claims

2    related to this lawsuit, related to the shares, to shares in

3    the Russian investment funds, talking about claims, either

4    $4 million cash or shares in the Russian real estate investment

5    funds, real estate investment funds.

6            The threats that are being discussed in these two

7    documents or implied by these two documents have nothing to do,

8    clearly, on their face with respect to these prior disputes

9    that parties may have had.  And your Honor said that it's

10   irrelevant for the purpose of this lawsuit.

11           Therefore, I object to introduction of these two

12   documents as irrelevant.  And they're not really proper

13   redirect, because I never raised this issue of these documents

14   in my direct.  The only question was with respect to affidavit,

15   which -- and I can point to specific paragraphs -- that only

16   refers to the threats of the lawsuit related to the shares of

17   real estate investment funds, which these documents are not.

18           MR. DANNENBERG:  With all due respect, your Honor,

19   these two documents were already in evidence.  And

20   Mr. Berkovich stipulated that they be in evidence.  So there

21   goes the relevance objection.

22           I don't want there to be some implication that I think

23   Mr. Berkovich was trying to establish that I have some

24   documents out there that I failed to produce regarding threats

25   of litigation, when I knew very well that when the witness

1  responded to that question, he was talking about documents that

2  I prepared that related to his suspicion on wrongdoing by

3  Mr. Dikker.  And I'm simply trying to clear up what I believed

4  to be a disconnect between the question that Mr. Berkovich

5  asked and the answer that Mr. Kislin gave.  There aren't a load

6  of documents out there that are somehow being hidden from

7  Mr. Berkovich.

8          THE COURT:  In any event, Mr. Berkovich, you agreed to

9  the admission of Exhibits 1 and 2 at the outset of the

10 proceedings.  So you certainly cannot take the position now

11 that these documents are irrelevant.  So to the extent that's

12 your objection, your objection is overruled.

13         I don't recall what paragraphs Mr. Berkovich was

14 addressing, what paragraphs in Mr. Kislin's affidavit

15 Mr. Berkovich was addressing when he asked the question about

16 threats.  But it seemed pretty clear to me that the threats

17 Mr. Berkovich was talking about were threats that had to do

18 with this $4 million that hadn't been paid.  And I don't

19 understand Plaintiff's Exhibit 1 and 2 to have anything to do

20 with that, right?

21         MR. DANNENBERG:  I agree.

22         THE COURT:  Okay.

23         MR. BERKOVICH:  Your Honor, if I may just add for the

24 record, I refer to paragraph 40 and 47, which is exactly as

25 your Honor described them in substance.  Absolutely.

1          THE COURT:  All right.  So I don't know why these

2    documents came to mind, but in any event, they're in evidence.

3    I understand they have nothing to do with the $4 million at

4    issue here.

5          So go ahead, Mr. Dannenberg.

6    BY MR. DANNENBERG:

7    Q.  This morning, Mr. Kislin, you were asked by Mr. Berkovich

8    about the payment of the $16 million that you did receive as

9    part of the agreement for the buyout of your 51 percent

10   ownership of TRI.  And you said that you received the payment

11   of $16 million over a two- or three-month period.  Do you

12   remember that?

13   A.  Yes.

14   Q.  But you couldn't remember the year.  Do you remember that?

15   A.  Well, it was prior -- it was prior to the crisis.

16   Q.  What crisis are you referring to?

17   A.  The 2008 crisis.

18   Q.  I told him to -- say it again?

19   A.  The crisis of 2008.

20   Q.  Are you talking about the crash of the ruble?

21   A.  It wasn't just the ruble.  It was when in August of 2008

22   everything came crashing down.  The crisis both in Russia and

23   everywhere.

24   Q.  I'm trying to help refresh your recollection.  So just to

25   make it clear, did the transaction that you had with

1    Mr. Dikker, the agreement for the buyout of your shares and

2    payment of $16 million in partial satisfaction of that

3    agreement, take place before or after the beginning of the

4    financial crisis?

5    A.   Prior to the financial crisis.

6    Q.   Prior to the beginning of the financial crisis?

7    A.   Prior to the beginning of the financial crisis.

8    Q.   How much prior, do you remember?

9    A.   Maybe three months.  Maybe three months, yes.

10   Q.   Now, just one last item from your testimony this morning.

11          You were asked on cross-examination about testimony

12   you gave on page 83 of your 2015 deposition, which was marked

13   as Defendant's Exhibit E.  In that testimony you referred to a

14   paper that you signed which you said was in 2005 relating to a

15   debt that was owed by TRI to Mr. Semernin.  Do you remember

16   that?

17   A.   Yes.

18   Q.   At the time of your buyout transaction in 2008, do you know

19   whether that 2005 obligation had been satisfied?

20   A.   When I came to an agreement with Mr. Dikker, the agreement

21   was that I was -- for $20 million, and that there would be no

22   other debts.

23   Q.   In paragraph 27 of your affidavit of direct examination

24   which you were asked about by Mr. Berkovich, you referred to a

25   conversation you had with Mr. Dikker about the $4 million

1    shortfall in the payment of your $20 million buyout price.  And

2    you said in the affidavit that Mr. Dikker, quote, responded by

3    acknowledging the shortfall and apologizing that he had been

4    forced to divert $4 million to another individual named

5    Vladimir Semernin to whom Mr. Dikker apparently owes

6    significant amount of funds, end quote.

7            And my question is:  Do you know whether that

8    significant amount of funds was different from the prior debt

9    from 2005 that was referred to on page 83 of your deposition?

10           THE COURT:  I'm going to sustain the objection,

11   because the testimony about his deposition testimony on page 83

12   was in the context of the debt that TRI owed to Semernin.  So

13   asking him if the debt that TRI owed to Semernin is different

14   than the debt that Dikker owed is obvious in the sense that at

15   least on the present record, the earlier debt is a debt that

16   TRI owed.  And he's claiming, as I understand it, that the more

17   recent debt is one that Dikker owed.

18           MR. DANNENBERG:  I'm glad you think that's

19   self-evident, your Honor.

20           THE COURT:  That's the current state of the record.

21           MR. DANNENBERG:  I agree.  And I have no further

22   questions.

23           THE COURT:  All right.  Anything else, Mr. Berkovich?

24           MR. BERKOVICH:  Yes, very short recross.

25                          - - - - -

G45EKIST                    Kislin - recross

RECROSS EXAMINATION

BY MR. BERKOVICH:

Q.  Are there any documents demonstrating Mr. Dikker's debt to

Mr. Semernin just as -- referred to in your last response?

A.  I don't understand.

Q.  To the best of your knowledge, are there any documents

demonstrating that Mr. Dikker owed any money to Mr. Semernin,

which you referred to in your last response to Mr. Dannenberg's

question?

A.  Mr. Dikker personally confessed to me and told me that he

personally owed Mr. Semernin $4 million.

Q.  I'd like to ask my question again.

          THE COURT:  That wasn't the question.  And you're

still not listening to the question, nor are you making any

effort to answer the question.

          So, again, I have to instruct you:  Listen carefully

to the question.  If you don't understand it, tell the lawyer

you don't understand it.  But you need to answer the lawyer's

question; not some other question, the lawyer's question.

          Ask the question again

          MR. BERKOVICH:  Sure.

Q.  To the best of your knowledge, are there any documents that

demonstrate that Mr. Dikker owed Mr. Semernin -- personally

owed Mr. Dikker, Mr. Semernin, $4 million?

A.  I didn't see them.

1   Q.  And with respect to the first question I believe that

2   Mr. Dannenberg asked you about the timing of your -- or the

3   $16 million that you had received, I think, in 2008, there are

4   no documents that demonstrate any of this money received by

5   you, is that correct?

6   A.  Yes.

7   Q.  And there are no documents that show when you received that

8   money?

9   A.  Yes.

10          MR. BERKOVICH:  I have no further questions, your

11  Honor.

12          MR. DANNENBERG:  No further questions, your Honor.

13          THE COURT:  All right.  You can step down, Mr. Kislin.

14          (Witness excused)

15          THE COURT:  Any other evidence that you wish to offer,

16  Mr. Dannenberg?

17          MR. DANNENBERG:  Yes.  In the pretrial order we

18  summarized, or we itemized, I should say, the pages from

19  Mr. Dikker's deposition transcripts.  He gave two depositions

20  in the case that we would like to read in as part of our direct

21  case.  Would you like me to read them in, your Honor, or should

22  we submit them?

23          I should say, I should point out that in the pretrial

24  order, as required by your Honor's rules, there was an

25  indication of which portions of our read-ins Mr. Berkovich was

1    raising objections to.  And counsel informed me during the

2    lunch break today that he was withdrawing each of those

3    objections.

4              THE COURT:  Is that true, Mr. Berkovich?

5              MR. BERKOVICH:  That's correct, your Honor, yes.  I

6    have reviewed my objections, and I determined that we will

7    withdraw them.  That's correct.

8              THE COURT:  So just so the record is clear,

9    Mr. Dannenberg is offering the excerpts from Mr. Dikker's

10   deposition that are set forth on pages 6 and 7 of the joint

11   pretrial order.  And those will be received without objection,

12   given Mr. Berkovich's statement he just made.

13             MR. DANNENBERG:  So you don't need me to read them in?

14             THE COURT:  No, I'll read them.  We don't need to take

15   the time.  I'll read them separately.

16             MR. DANNENBERG:  What I did do, because your Honor's

17   rules asked me to do it, was that I had marked as exhibits the

18   excerpted pages, even though I have furnished copies to the

19   Court last week.

20             THE COURT:  All right.

21             MR. DANNENBERG:  The June 26, 2015, deposition

22   excerpts were marked as Plaintiff's Exhibit 7 and the May 22,

23   2014, deposition excerpts were marked as Plaintiff's Exhibit 8.

24             THE COURT:  All right.  So then I will receive

25   Plaintiff's Exhibits 7 and 8.

1          (Plaintiff's Exhibit 7 and 8 received in evidence)

2          MR. DANNENBERG:  I have not physically marked the

3    sections of those pages that are for the read-in, but the page

4    and line numbers are in the pretrial order.

5          THE COURT:  That's all right.  I'll just follow the

6    line and page numbers that are in the pretrial order, and I'll

7    just keep those exhibits, Plaintiff's Exhibits 7 and 8.

8          All right.  Anything else, Mr. Dannenberg?

9          MR. DANNENBERG:  If I may just check my notes, your

10   Honor.

11         That concludes the plaintiff's case, your Honor.

12         THE COURT:  So the plaintiff rests?

13         MR. DANNENBERG:  Yes.

14         THE COURT:  All right.  Mr. Berkovich, are you

15   prepared to proceed?

16         MR. BERKOVICH:  Yes, your Honor.  Well, my client,

17   Mr. Dikker, has submitted an affidavit or declaration in lieu

18   of direct testimony.  So he's available right now to be

19   cross-examined by Mr. Dannenberg.

20         THE COURT:  Do you have any objection to Mr. Dikker's

21   affidavit, Mr. Dannenberg?

22         MR. DANNENBERG:  I do have a number of objections,

23   your Honor.

24         THE COURT:  All right.  So those will have to be

25   addressed.

G45EKIST                     Kislin - recross

1              MR. DANNENBERG:  Starting on paragraph three on page

2       two.

3              THE COURT:  And let's have an exhibit number for

4       Mr. Dikker's declaration before we go any further so we know

5       what we're talking about.

6              What's the exhibit number going to be, Mr. Berkovich?

7              MR. BERKOVICH:  It would be Exhibit -- give me one

8       second, your Honor.  I believe it will be Defendant's

9       Exhibit F.

10             THE COURT:  All right.

11             MR. DANNENBERG:  Starting in paragraph three on page

12      two, there is a parenthetical reference at the end of line 1

13      going to line 2 to Mr. Kislin's deposition.  And I would ask

14      that that be stricken.

15             THE COURT:  I'm sorry.  Where are you?  What paragraph

16      are you in?

17             MR. DANNENBERG:  Three.

18             THE COURT:  All right.  I don't see any need for

19      citations to Mr. Kislin's deposition.  The point of a

20      declaration, Mr. Berkovich, is for Mr. Dikker to present

21      whatever facts he thinks are relevant that he has personal

22      knowledge of.  So it's not a brief.  It's not argument.  It's

23      just facts that are known to Mr. Dikker.

24             So I am going to strike the reference to the Kislin

25      deposition in paragraph three.

G45EKIST                    Kislin - recross

1          MR. BERKOVICH:  Your Honor, just to make sure, the

2    statement preceding that reference will remain, is that

3    correct?  I'm sorry.

4          MR. DANNENBERG:  Next, your Honor --

5          THE COURT:  I haven't -- he made a point.  I'm reading

6    the paragraph.

7          MR. DANNENBERG:  I agree with him.

8          THE COURT:  You may well, but I still need to read the

9    paragraph.

10          MR. DANNENBERG:  Sorry.  (Pause).

11          THE COURT:  All right.  Then I will just strike the

12    parenthetical in paragraph three.  Go ahead.

13          MR. DANNENBERG:  On page nine of the affidavit,

14    paragraph 31.

15          THE COURT:  Okay.

16          MR. DANNENBERG:  I'm objecting to the first sentence.

17    The purported nonapproval of a sale by the board of the real

18    estate management company.

19          THE COURT:  What's your position, Mr. Berkovich?

20          MR. BERKOVICH:  This is my client's understanding.  I

21    don't see why it's relevant to this case.

22          THE COURT:  Whether it's his understanding or not is

23    of no import.  What matters here is whether he has personal

24    knowledge of it.  That's what matters.  And this paragraph says

25    that the board of Semernin's company would not approve the sale

1    of the shares unless TRI agreed to cover both the prior debt,

2    as well as some future obligation, which is not identified.

3         So that sounds like hearsay.  It sounds like it's a

4    representation that's being offered for its truth; that is to

5    say, that the board of Semernin's company would not approve the

6    sale of the shares unless TRI agreed to address this prior

7    debt, as well as some future obligation.

8         Does your client have any personal knowledge of that?

9         MR. BERKOVICH:  Absolutely, yes.

10        THE COURT:  Tell me what the personal knowledge is.

11        MR. BERKOVICH:  His communication with Mr. Semernin.

12        THE COURT:  Well, that's not -- if Semernin told him

13   something, and you're now offering that statement for its

14   truth, that's hearsay, unless it falls within some sort of

15   exception; or you're not offering it for its truth.

16        MR. BERKOVICH:  I think it's in a way very similar to

17   what has been done by Mr. Dannenberg.  I think it's reasonably

18   offered to explain why the $4 million were paid to Mr. -- the

19   motivation behind why the $4 million had to be paid to

20   Mr. Semernin's company in order to close this transaction.

21        MR. DANNENBERG:  With all due respect, your Honor,

22   that's not what it says.  It doesn't say Mr. Semernin told me

23   something.  It's stating what he purports to have been told as

24   though it were true.

25        THE COURT:  Right.  I mean, I think it's a fair

1    inference that he was told that by Semernin.  Otherwise, how

2    would he know it?

3            But what I'm interested in is:  Do we care about

4    Dikker's state of mind on this issue?  And I don't know that we

5    do.  I mean, Mr. Berkovich, I thought your position -- maybe

6    I'm wrong, but it seemed pretty clear to me from the papers.  I

7    thought your position was that Mr. Dikker had no control over

8    this decision whether to pay 20 million or 16 million or some

9    other amount; that this was somebody else's decision.  And, in

10   fact, it was the decision of what you referred to as a Russian

11   pension fund, this Blago entity.  That's what I thought your

12   position was.  I thought your position quite clearly was that

13   Mr. Dikker had nothing to do with this.  He never agreed to pay

14   Mr. Kislin $20 million, never decided to pay him $16 million,

15   had nothing to do with this at all.  I thought that was your

16   position.

17           MR. BERKOVICH:  If I may explain, your Honor.

18           THE COURT:  Yes.  First of all, am I wrong?  Is that

19   not your position?  Is your position something different than

20   that?

21           MR. BERKOVICH:  It's a little nuanced.  If you may

22   allow me, your Honor.  It's clearly Mr. Dikker never paid any

23   money.  That's true.  But --

24           THE COURT:  Never paid the 16 million, right?

25           MR. BERKOVICH:  The 16 --

1          THE COURT:  Never paid a dime?

2          MR. BERKOVICH:  Absolutely, your Honor.  Absolutely.

3          But I'll be very brief.  But because of -- and I

4     apologize, by the way, to use the word, and I'll withdraw the

5     term -- what was it I used that was improper?  That it was --

6     you know, that something was forced by Mr. Kislin as blackmail,

7     I think it was, yeah.  I think I withdraw that term.  It's

8     inappropriate.

9          He was pressured.  He was pressured by Mr. Kislin to

10    buy -- Mr. Dikker and Mr. Parilis had the money to do so.  They

11    had to find a way to do it.  So they were involved in a way,

12    only in the sense that they found that Russian pension fund

13    that could do the job.  They could buy Mr. Kislin out because

14    Mr. Kislin would allow the company to function.  So in that

15    sense, yes, they were involved.  But not in the sense of making

16    any obligation or making any payments.  So Mr. Kislin and

17    Mr. Dikker and Mr. Sachkov were involved in actually getting it

18    done.

19         However, as my client's affidavit and his testimony

20    will demonstrate, Mr. Semernin was a principal in this Russian

21    investment -- in this investment fund management company.  And

22    he said he would not approve of sale of these shares.  That's

23    how Mr. Dikker, Mr. Kislin would be bought out, sale of the

24    shares to Blagosostoyaniye -- Blago as you call it, your

25    Honor -- unless TRI would take care of the previous debt.  And

1    we already had this discussion about page 83, about both sides.

2    Both Mr. Dikker and Mr. Kislin recognized it was a previous

3    debt.

4              So that's the story, your Honor.  The way my client

5    described in his papers.  So in that sense, the reason for my

6    client -- the reason for $4 million that Mr. Dikker --

7    Mr. Kislin did not receive for Blagosostoyaniye is because that

8    $4 million, according to my client, with Mr. Kislin's consent,

9    was paid off to Mr. Semernin's company -- not Mr. Semernin

10   personally -- as a previous obligation of TRI.  That's why we

11   have this show.  But both parties in this lawsuit agreed to

12   that being the case.

13             Obviously my client never made any payments, but he

14   was involved in making the arrangements because he was

15   pressured by Mr. Kislin to get him out of the business.  And

16   that's how we did it.

17             THE COURT:  So for purposes of Mr. Dannenberg's

18   hearsay objection, with respect to the first sentence of

19   paragraph 31 of the Dikker affidavit, which is Defense

20   Exhibit F, I'm not going to accept for its truth the

21   representation that Semernin's company wouldn't approve the

22   sale of shares unless some prior debt is well or some future

23   obligation was paid out from the proceeds of the sale of those

24   shares.  I have no idea whether the board of Semernin's company

25   would have approved the sale or not without that stipulation.

G45EKIST                    Kislin - recross

1    So I'm not going to accept it for the truth of that assertion.

2            I will accept it, to the extent that it bears on

3    Mr. Dikker's state of mind and, as Mr. Berkovich says, in a

4    manner similar to my receipt of certain statements that are in

5    Mr. Kislin's affidavit.  So that's the ruling on the first

6    sentence, paragraph 31, not received for its truth.  I will

7    consider it to the extent it sheds light on Mr. Dikker's state

8    of mind.

9            MR. DANNENBERG:  Next objection is to paragraph 38 on

10   page 11 in its entirety, which essentially contained a legal

11   argument and not a factual statement.

12           THE COURT:  Just give me a moment.

13           I'll strike paragraph 38.  Paragraph 38 is an

14   argument.  It's not facts.  It's an argument about what I

15   should draw from Mr. Kislin's deposition.

16           MR. BERKOVICH:  No objection, your Honor.

17           THE COURT:  Paragraph 38 is struck.

18           Go ahead, Mr. Dannenberg.

19           MR. DANNENBERG:  Same objection to the first two

20   sentences of paragraph 43 on page 12.

21           THE COURT:  This seems to be more argument,

22   Mr. Berkovich.  It's a comment on what Mr. Kislin is claiming

23   and whether he provided support for his allegations or not.

24           Anything you want to say?

25           MR. BERKOVICH:  No objection, your Honor.  I assume

1    you will strike it out.

2            THE COURT:  So the first two sentences of paragraph 43

3    are struck.

4            MR. BERKOVICH:  That's fine.

5            THE COURT:  Go ahead, Mr. Dannenberg.

6            MR. DANNENBERG:  The next objection is to paragraph 44

7    in its entirety.  There is no foundational basis provided.  And

8    it seems to be a comment on Mr. Kislin's deposition testimony.

9            THE COURT:  It seems to me more argument,

10   Mr. Berkovich, as to what Mr. Kislin clearly recognized, what

11   he testified to in his deposition and what he was aware of.

12           MR. BERKOVICH:  Your Honor, I do not have any

13   objections to your Honor striking the second sentence of

14   paragraph 44.  But I do believe that the first sentence is

15   describing my client's understanding of Mr. Kislin's -- his

16   awareness.  I believe the first sentence, your Honor, with due

17   respect, should stay in the last sentence, I agree your Honor

18   is -- particularly with reference to the deposition is an

19   argument that it's not for the party to make.

20           THE COURT:  Well, I mean, it would be one thing if

21   Mr. Dikker said in this affidavit that he discussed with

22   Mr. Kislin the role of the pension fund and its control of TRI

23   and the shares.  But that's not what it says.  It's a

24   conclusory statement.  It says he was fully aware, without

25   telling us the facts on which that assertion is based.

1        And so I can't agree with you.  I'm going to have to

2   strike the whole paragraph.

3        MR. DANNENBERG:  Next objection is to paragraph 47 in

4   its entirety, which appears to be a comment on what the witness

5   thinks Mr. Kislin is trying to argue and a comment on a legal

6   claim.

7        THE COURT:  This is just argument, Mr. Berkovich?

8        MR. BERKOVICH:  Yes, your Honor.  I agree.

9        THE COURT:  47 is struck.

10        MR. DANNENBERG:  And same argument with the last

11   sentence of paragraph 48, beginning with the words "please

12   note."

13        THE COURT:  This is just argument, Mr. Berkovich.

14        MR. BERKOVICH:  Your Honor, no objection for that

15   being taken out.

16        THE COURT:  So the last sentence is struck in

17   paragraph 48.

18        What's next, Mr. Dannenberg?

19        MR. DANNENBERG:  Next is the last sentence and

20   parenthetical reference that follows it in paragraph 49.  The

21   sentence beginning "this is how Kislin himself understood."

22        THE COURT:  It seems like the same problem,

23   Mr. Berkovich.

24        MR. BERKOVICH:  I agree, your Honor.

25        THE COURT:  The last sentence and the parenthetical is

1    struck.

2          MR. DANNENBERG:  And the same objection to paragraphs

3    50 and 51 in their entirety on page 14.

4          THE COURT:  This looks like more argument,

5    Mr. Berkovich.

6          MR. BERKOVICH:  I agree, your Honor.

7          THE COURT:  50 and 51 are struck.

8          MR. DANNENBERG:  And I'm objecting to the last portion

9    of the paragraph 52, the words, and in any event, as Kislin was

10   fully aware, I had no control over -- of any of the shares or

11   their disposition.

12         Again, he's commenting on Mr. Kislin's state of mind.

13         MR. BERKOVICH:  Your Honor, if I may.  I agree that

14   the line "in any event, as plaintiff Kislin was aware," should

15   be taken out.  But the statement that I had no control of any

16   shares or their disposition, I think that should remain.

17         THE COURT:  That seems right to me, Mr. Dannenberg.

18         MR. BERKOVICH:  Also, your Honor, there's a typo in

19   paragraph 52.  It says in the very beginning, to the beast of

20   my understanding.  Of course it's meant to be to the best of my

21   understanding.  My apologies for that.

22         THE COURT:  So the words in paragraph 52 and "in any

23   event, as Kislin was fully aware," those will be struck.

24         MR. DANNENBERG:  And I'm objecting on the basis of it

25   being argumentative, paragraph 53 in its entirety.

 1          MR. BERKOVICH:  Your Honor, may I address this?

 2          THE COURT:  Yes.

 3          MR. BERKOVICH:  With respect to the first sentence of

 4   paragraph 53, I believe I would agree with Mr. Dannenberg that

 5   it should be taken out.

 6          With respect to the second sentence, give me one

 7   second, your Honor.  I think the same goes with the sentence

 8   that ends with the word "agreements," but the last sentence I

 9   think should remain, at least in large part.  The last sentence

10   says, all documents regarding these transactions, and there is

11   a parenthetical material that I think should be taken out as

12   being argumentative.  But if the rest of the sentence would be

13   reading now, all documents regarding this transaction -- all

14   documents regarding this transaction -- should be plural --

15   were negotiated and executed in Russia, in Russia, involved

16   Russia companies and were drafted in Russia by Russian

17   attorneys and business expert, I think that part of it,

18   paragraph 53, I think is my client's stated a fact and I think

19   should remain.

20          But the rest of it, first sentence and that

21   parenthetical language and the last sentence, I think, is

22   argumentative.  I agree.

23          MR. DANNENBERG:  The entire paragraph seems to set up

24   the argument that's made in paragraph 54, which I'm also going

25   to be asking be stricken, which is that this action, these

1   claims, should be decided applying Russian law, which

2   Mr. Berkovich specifically waived at the outset of today.  So I

3   think that 53 and 54 should be stricken as not relevant.

4            THE COURT:  Well, let's go back to 53 for a second.

5   The statement that Mr. Kislin has not produced any of the

6   documents regarding the transactions described above, and then

7   Mr. Dikker goes on to list those documents; the first and

8   second memorandum of understanding with Kislin, the agreement

9   with Blago, the TRI buyout agreement with Kislin, numerous

10  buyout agreements regarding subsidiaries of TRI or any

11  documents demonstrating Kislin and/or his company receiving

12  funds from TRI or its subsidiaries under buyout agreements or

13  receiving funds directly or indirectly from Blago.  I mean,

14  that's a statement of fact.

15           MR. DANNENBERG:  But it's commenting on pretrial

16  discovery, your Honor.  It doesn't belong as part of testimony

17  at trial.

18           THE COURT:  Well, it's something I have to consider.

19  I have to consider it.  I mean, the fact that none of these

20  documents have been produced, I can't ignore that.

21           MR. DANNENBERG:  Well, with all due respect, your

22  Honor, the plaintiff has the burden of proof, clearly.  And

23  we're either going to submit documents for admission at the

24  trial that's going to satisfy the burden of proof or we're

25  going to satisfy our burden of proof without documents.

1          THE COURT:  Well, let me explain it to you.  And this

2     hasn't been briefed at all, but it's going to have to be

3     briefed.

4          Your claim, at least in large part, is based on the

5     notion that there was an enforceable agreement in which

6     Mr. Dikker agreed to pay Mr. Kislin $20 million for his

7     interest in a company called TRI.  And I'm going to have to

8     make a finding as to whether there was an enforceable agreement

9     or not.  And part of that's going to be based on the testimony

10     of the witnesses and my evaluation of their credibility, but

11     part of it's going to be based on the complete and utter

12     absence of supporting documents.  Because that bears on the

13     likelihood of there having been an agreement along the lines of

14     what plaintiff claims.

15          And so the fact that these documents that are

16     identified by Mr. Dikker in his affidavit, it's not simply that

17     they weren't produced in discovery; it's that they existed.

18     He's making a representation that they existed but they were

19     not produced.

20          And your point is, well, that's a pretrial discovery

21     matter.  But my point to you is the fact that none of these

22     documents were produced, that's something I have to take into

23     account.  It's not an irrelevant fact.  And I don't think it's

24     inappropriate for it to come in through Mr. Dikker's affidavit

25     that these documents existed, but none of them were produced in

1    the course of this case.  I don't think that's inappropriate

2    either for me to consider or for him to point out in his

3    affidavit.  Because, otherwise, how would I know that these

4    documents existed but were not produced?

5            MR. DANNENBERG:  Because they're all referenced

6    earlier in the affidavit.  He's just giving a shopping list

7    here of what he says Mr. Kislin did not produce in pretrial

8    discovery.  All of these documents were referenced earlier in

9    the affidavit.  The only --

10           THE COURT:  If he says anywhere else in the affidavit

11   that they were not produced, I missed that.

12           MR. DANNENBERG:  No, he doesn't.  That's what the

13   purpose of this paragraph is; to say that these documents were

14   not produced in pretrial discovery.  And that's a legal item.

15   Counsel could make that argument.  He could have made it in a

16   motion, if he thought they existed and we were holding back.

17   And he's free to make it in post-trial briefs.

18           But for a fact witness to say, you know, there was a

19   defect in pretrial discovery here because there are documents

20   that I know exist, I'm not producing them either but he's not

21   producing them, I just want you to know is, I respectfully

22   submit, not appropriate for a fact witness.

23           THE COURT:  Your objection is overruled.  I'm going to

24   strike the language up to the words Mr. Kislin in paragraph 53.

25   So the language which reads, besides two not binding memorandum

1  of understanding as I understand under Russian law and business

2  practices, those phrases, those will be struck.

3          The sentence where it picks up, Mr. Kislin has not

4  produced, that will be admitted through the reference to Blago,

5  which is the way that sentence ends.

6          Then, Mr. Dannenberg, I take it you have an objection

7  to the next sentence, too?

8          MR. DANNENBERG:  The one starting with the words "all

9  documents"?

10         THE COURT:  Yes.

11         MR. DANNENBERG:  Yes.

12         THE COURT:  Other than to the parenthetical?

13         MR. DANNENBERG:  I'm objecting to that last sentence

14  and paragraph 54 for the same reason, because they're going to

15  an argument that Russian law should be applied in this case,

16  and that argument has been withdrawn by Mr. --

17         THE COURT:  I actually don't know that that's what it

18  addresses at all, actually.  It's making a point that all the

19  documents were in Russian.  We've seen some of the documents,

20  the original documents.  They are, in fact, in Russian.  I

21  don't really see that as a very disputable point.  So I'll

22  strike the parenthetical, which is just argument.  But other

23  than that, the sentence is admitted.

24         MR. DANNENBERG:  And then paragraph 54 ends with the

25  words, these documents were intended to be interpreted by a

Russian court applying Russian law.  That's the legal argument

that was being made there.  So it goes to both an effort by

counsel to preserve a forum non conveniens argument and to go

to this question of whether Russian law should be applied, both

of which arguments have now specifically been withdrawn.

MR. BERKOVICH:  Your Honor, if I may address that.

THE COURT:  Could I just read the paragraph?

MR. BERKOVICH:  Sure, your Honor.

THE COURT:  All right.  Is there something you wanted

to say, Mr. Berkovich?

MR. BERKOVICH:  Yes.  So there's two ways.  I mean, I

tried to play two sides of the street.  With respect to the

last line in this paragraph 54, first of all, while it says

that in view of the witness the agreements were intended to be

applied to Russian court applying Russian law, nothing to do

with applying Russian law in this case here.  It's what it

says.

So to the extent this is appropriate, it should stay.

To the extent your Honor thinks it's inappropriate, I think

only this last line should be taken out.  But I don't believe

it says anything that Mr. Dannenberg says.  It doesn't say that

you have to apply Russian law.  It's this agreement that in

Russia should have been -- this term Russian court applying

Russian law not about your Honor applying.  So it should stay

in for that reason.  To the extent your Honor thinks it's

1    argumentative, only that part of the 54 should be taken out,

2    which is last line.

3              THE COURT:  All right.  The last sentence in paragraph

4    54 is struck.  It's obviously argumentative when it says that

5    the plaintiff doesn't remember the documents and doesn't

6    remember transactions that benefited him and that the documents

7    are not available to defend the lawsuit.  All of that is

8    argument.

9              And with respect to the last clause, I agree with

10   Mr. Dannenberg that it's irrelevant now, in light of the

11   defendant's concession that New York law governs.

12             MR. BERKOVICH:  No objection, your Honor.

13             THE COURT:  What's next, Mr. Dannenberg?  Anything

14   else?

15             MR. DANNENBERG:  Just one other thing.

16             To understand my objection to paragraph 55, I'm

17   referring you to paragraph 56, which contains the argument that

18   Mr. Berkovich withdrew at the beginning of the session today;

19   that the alternative to a dismissal of the case, he would like

20   a forum non conveniens dismissal.  This paragraph -- I'm not

21   asking to have paragraph 56 be withdrawn, because it's just a

22   summary.  But paragraph 55 is pretty much word for word lifted

23   from the affidavit in support of the motion to dismiss for

24   forum non conveniens from earlier in the case.  So it has no

25   relevance to the claims here in the trial today.

1      THE COURT:  I don't see the relevance of either 55 or

2   56, Mr. Berkovich.  Do you disagree?

3      MR. BERKOVICH:  My only point I would like to make,

4   your Honor, is obviously forum non conveniens, as I explained

5   or hope explained, your Honor, in the beginning of our case

6   today, is that since the motion that you ruled on denying

7   our -- since your ruling denying our motion to dismiss on forum

8   non conveniens grounds, which happened obviously before

9   discovery had taken place, I think while Mr. Dannenberg is

10   correct about paragraph 55, that it repeats what was said in

11   the previous submissions a year ago, more than a year ago, but

12   the fact there's evidence -- there's much more evidence right

13   now in this case that these statements are accurate.  And I

14   think it's relevant for this Court to know, as stated by

15   defendant, that not only we are lacking documents, maybe

16   documents potentially, your Honor, not only in defending

17   himself but the Court, but also we're lacking potential

18   witnesses who would be relevant and familiar with this case.

19   But they're not available because they are in a foreign

20   country.

21      So I think as to the extent there's a relevance in --

22   or availability of the documents, I think there's relevance in

23   availability to the witnesses.  Whether or not your Honor will

24   consider alternative remedy of the motion or motion to dismiss

25   for forum non conveniens, the information as laid out in

1  paragraph 55, I think it's relevant for your Honor's

2  consideration.

3           THE COURT:  I'm striking 55 and 56.  And I'm not going

4  to be revisiting the forum non conveniens argument.  I've

5  rested.  I've recalled on it.  I'm not going to revisit it.  So

6  paragraphs 55 and 56 are struck.

7           Anything else, Mr. Dannenberg, on the affidavit?

8           MR. DANNENBERG:  No, your Honor.

9           THE COURT:  Then, Mr. Berkovich, you are offering

10  Defense Exhibit F, subject to my ruling?

11           MR. BERKOVICH:  Yes, your Honor.

12           THE COURT:  Any objection, Mr. Dannenberg?

13           MR. DANNENBERG:  No.

14           THE COURT:  All right.  Then Defense Exhibit F is

15  received, subject to my rulings on the issues raised by

16  Mr. Dannenberg.

17           (Defendant's Exhibit F received in evidence)

18           THE COURT:  Other exhibits that you want to offer,

19  Mr. Berkovich, at this point?

20           MR. BERKOVICH:  Give me literally a second, your

21  Honor.

22           In our pretrial order, your Honor, I listed certain

23  exhibits that defendant wanted to introduce at trial.  It's

24  Defendant's Exhibit B and C specifically, which are the

25  essentially corporate chart of Transregion Invest, the two of

1    them.  And if there's no objection by Mr. Dannenberg, I would

2    like to offer them into evidence.

3            MR. DANNENBERG:  In fact, your Honor, as we noted in

4    our pretrial order, we do object.  And I apologize that I

5    neglected to include that objection to the reference to those

6    two documents.

7            MR. BERKOVICH:  Wait.  Let me see what you're --

8            MR. DANNENBERG:  Paragraph 20 of Mr. Dikker's

9    affidavit.

10           MR. BERKOVICH:  What paragraph?

11           Okay.  Your Honor, I'm not sure specifically what

12   Mr. Dannenberg objects to.  I'm looking at the pretrial order.

13   It's at paragraph 11, 11B, little B, and then Exhibit B and C.

14   It seems to say object, lack of foundation, hearsay, relevance.

15   Just a few comments regarding these two documents.

16           Number one, they were produced in this lawsuit by

17   plaintiff.  And defendant -- I mean, plaintiff, Mr. Kislin, was

18   examined about this document.  And he confirmed at his

19   deposition that these are charts, at least during some period,

20   describing, you know, the corporate flow chart of Transregion

21   Invest, which had many subsidiaries, as well as ownership

22   structure on both of them.

23           So I believe -- so they don't lack foundation because

24   that's how they were described.  I don't believe it's hearsay.

25   And I think they're relevant, at least to the Court, to

1    understand what we're talking about here.  Because there's an

2    issue here of Transregion Invest, or as you can see from any of

3    our submissions, some of its subsidiaries transferring funds --

4    not funds; transferring titles to land into the real estate

5    funds in exchange for the shares of real estate funds.  So this

6    shows how the company was structured.  And --

7              THE COURT:  Where do you contend that in Mr. Kislin's

8    deposition that he identified these charts?

9              MR. BERKOVICH:  Oh.  Okay.  Sorry.  One second.  I

10   know for sure he did, because I asked him questions about it.

11   I think it's Exhibit G.  Give me a second, your Honor.  I'm

12   looking at the cross reference.  I didn't expect we'd have this

13   discussion.  I'm looking at the exhibit list.  Okay.  G and H.

14   Okay.

15             These are pages 99, 97 to 99, of Mr. Kislin's

16   deposition.  I'm just going by the index.  So if we go into

17   actual pages.

18             MR. DANNENBERG:  May I respond, your Honor?

19             THE COURT:  No.  I need to read the pages.

20             MR. DANNENBERG:  Sure.  (Pause)

21             THE COURT:  I mean, a couple of comments,

22   Mr. Berkovich.  First of all, Mr. Kislin says with respect to

23   both exhibits, both Exhibit B and Exhibit C, that the documents

24   were prepared by Dikker.  Dikker or by Tatyana Runova.

25             MR. BERKOVICH:  Yes, who is counsel for TRI.  Yes.

1          THE COURT:  So that's point one.  Kislin didn't

2     prepare the documents.

3          MR. BERKOVICH:  That's correct, your Honor.

4          THE COURT:  Number two, I don't see where in here

5     Kislin says that the charts are accurate.  And that's what you

6     would need for foundation.  You need somebody who has knowledge

7     of the information that's conveyed in the charts saying that

8     the charts are accurate.  And you don't have either.  You don't

9     have a person who has said that the charts are accurate, nor do

10    you have the person who prepared the charts.

11         So I don't see how you get the charts in between

12    Mr. Kislin -- you may be able to get them in through

13    Mr. Dikker, if he can say the charts are accurate.  But there

14    isn't anything in Kislin's deposition that would permit me to

15    receive the charts.

16         MR. BERKOVICH:  The only point I would like to make,

17    your Honor, very briefly, on page 98, it's line 15 through line

18    21, particularly line 21.  They ask him -- starting with line

19    15, I am asking Mr. Kislin whether this document, initially he

20    thought there was some sort of avoiding taxes or cheating

21    stuff.  Then I asked him a question whether it's possible that

22    if you --

23         THE COURT:  You have to speak more slowly,

24    Mr. Berkovich.

25         MR. BERKOVICH:  I'll do it again.  Starting on line

1    15.  I'm asking Mr. Kislin that if it's possible, if you look

2    carefully at this document, referring to what now is Exhibit B,

3    that this seems to be a structure of Transregion Invest, its

4    ownership, who owns it and who it owns.  Is it possible that if

5    you look at that carefully again?

6            And the response is it is possible.

7            So that's what I --

8            THE COURT:  If you think that's sufficient to identify

9    something, let me assure you it is not.  It is not enough to

10   say it's possible.  That's not even close.

11           MR. BERKOVICH:  I understand.

12           THE COURT:  All right.  So as I said, you can attempt

13   to admit B and C through Mr. Dikker, but if you're asking me to

14   admit the documents through Mr. Kislin, Mr. Kislin's deposition

15   testimony, that, I cannot do.

16           Other documents you want to introduce at this point,

17   Mr. Berkovich?

18           MR. BERKOVICH:  No, your Honor.

19           THE COURT:  All right.  Then I think we're at the

20   point of cross-examination of Mr. Dikker.  So, Mr. Dikker,

21   would you please take the stand.

22                           - - - - -

23

24

25

1    SIMON DIKKER,

2         called as a witness by the Defendant,

3         having been duly sworn, testified through the interpreter

4         as follows:

5    CROSS EXAMINATION

6    BY MR. DANNENBERG:

7    Q.  Good afternoon, Mr. Dikker.

8    A.  Good afternoon.

9    Q.  You understand, sir, do you not, that the dispute in this

10   case arises out of a buyout of the 51 percent ownership

11   interest Mr. Kislin had through a nominee corporation in TRI,

12   Transregion Invest, do you not?

13   A.  Yes, I understand that.

14   Q.  For reference, Mr. Dikker, I'm handing you a copy of the

15   declaration that you made in lieu of direct examination, which

16   I'll be referring to.  It was marked as Defendant's Exhibit F.

17   A.  Yes.

18   Q.  Could you take a look at paragraphs 36 and 37 on page ten.

19   A.  Yes.

20   Q.  Yes.  So just to be clear, your reference in those

21   paragraphs to additional transactions between you and

22   Mr. Parilis on one hand and Mr. Kislin on the other hand that

23   were being done independently from that buyout transaction for

24   the 51 percent ownership is unrelated to the $20 million

25   transaction, correct?

A.   Actually, they were related because they were all happening

at the same time.  All of these agreements were being signed at

the same time.  And they were all part of a bigger transaction,

that the buyout of the shares of TRI was only part of the

transaction.  And there wasn't a single transaction to buy out

the shares for 20 million; that this was all part of a bunch of

transactions that were being signed at the same time.

Q.   So the three of you -- Mr. Parilis, you and Mr. Kislin --

were the owners through your nominee corporations of TRI,

correct?

A.   Yes, that's correct.

Q.   And the three of you were also owners of a company that was

the owner of what you referred to as the Sadko properties,

correct?

A.   Correct.

Q.   And similarly, three of you were the owners of another

company that was the owner of what you referred to as the

Avrora property, correct?

A.   Correct.

Q.   And I understand that there was buyouts going on that were

related to time, but independent from the $20 million buyout of

Mr. Kislin's 51 percent shares in TRI, you did deals on the

ownership of these other companies, correct?

A.   Could I just make a correction to something that's been

repeated today several times?

 1              THE COURT:  No.

 2    Q.  I prefer that you answer my question.

 3              THE COURT:  No.  Answer his questions.

 4              Ask your question again.

 5    Q.  You and Mr. Parilis bought out Mr. Kislin's ownership of

 6    the companies that were only in the Sadko properties, right?

 7    A.  Including that, yes.

 8    Q.  You negotiated a price for that particular ownership and

 9    you paid it, correct?

10    A.  Yes.

11    Q.  And Mr. Kislin bought out your ownership, you and

12    Mr. Parilis, in the Avrora company, the company that owned the

13    Avrora property, correct?

14    A.  Including that, yes.

15    Q.  All I'm saying is that with reference to paragraphs 36 and

16    37, that was a separate financial transaction from the

17    $20 million buyout of Mr. Kislin's 51 percent shares of TRI, am

18    I correct?

19    A.  No.

20    Q.  No?

21    A.  No.

22    Q.  At some point in time, Mr. Dikker, you and Mr. Kislin

23    agreed on a price for the buyout of his TRI shares for

24    $20 million, correct?

25    A.  No.

G45EKIST                    Dikker - cross

1   Q.  I'm reading to you from the last sentence of your paragraph

2   one of your declaration:  The buyout of Kislin, paren, Brunlow

3   Inc., in the amount of $20 million was agreed to be effected

4   through the sale of a third party in Russia, a pension fund

5   Blagosostoyaniye, of the shares held by TRI, etc.

6           That's what your affidavit says, right?

7   A.  Yes.

8   Q.  So you would agree with me that at some point in time a

9   price was agreed for the buyout of Mr. Kislin's or his nominee

10  company Brunlow's 51 percent ownership of TRI shares, and that

11  price was $20 million?

12          THE COURT:  It's not -- this is all about who agreed

13  to what.

14          MR. BERKOVICH:  I was going to object, your Honor.

15  Yes.

16          THE COURT:  So it's not helpful to speak in the

17  abstract.  We have to understand who the agreement was between.

18  That's as important as how much -- who was it between?  So I

19  want you to -- if you're going to address an agreement, your

20  question has to implicate who the agreement was between.

21          MR. DANNENBERG:  Well, I'll get to that, your Honor.

22  I want to be able to start with what the price term was.  And

23  to my surprise, the witness said that I was incorrect when I

24  said it was 20 million when the affidavit said it was

25  20 million.  We were just starting with that term.  I'll get to

1    the others.

2            THE COURT:  I don't know what part of your question he

3    found incorrect.  So I don't know.  I don't know whether it was

4    the price term or whether it was some other aspect of your

5    question he didn't agree with.

6            MR. DANNENBERG:  All right.  I'll ask it a different

7    way, your Honor.

8    BY MR. DANNENBERG:

9    Q.  As you read that last sentence of your affidavit today,

10   Mr. Dikker, do you have any disagreement with the truth of

11   what's said in that last sentence?

12   A.  Yes, there is.

13   Q.  I'm sorry?

14   A.  Yes, there is some unclarity.

15   Q.  You're taking issue with your own affidavit?  Tell me

16   what's wrong with it.

17   A.  The way it's formulated.

18   Q.  Well, if it's not true what you said in your affidavit, the

19   last sentence of paragraph one, tell me what is true in the

20   context of that specific fact statement that's contained in

21   that sentence.

22   A.  The purchase of -- by Blago of the shares that belonged to

23   Brunlow was part of the transaction buying back the shares from

24   Brunlow back to OptTorgLider and Interprogress.  In addition to

25   that, there was a series of other transactions that were part

1    of the condition for the buying back of the 51 percent.

2    Q.  Is it your testimony, Mr. Dikker, that your nominee

3    company, OptTorgLider, and Mr. Parilis's nominee company,

4    Interprogress, were acquiring Mr. Kislin's company, Brunlow's

5    51 percent shares of TRI?

6    A.  Yes.  That was a separate agreement.  Yes, there was.

7    Q.  Separate from what?  I'm just asking who the buyer was.

8    It's a simple question.  It's very fundamental to the whole

9    case, which is the buyout of Mr. Kislin's 51 percent.  That's

10   what the case is about.

11          Who was the buyer?

12   A.  That's not all you're asking.  You're asking who purchased

13   it for 20 million.  I didn't buy it for 20 million.

14   Q.  You're misunderstanding my question.

15          An agreement was made to acquire Mr. Kislin through

16   his company Brunlow's 51 percent ownership interest in TRI.

17   Yes?

18   A.  Yes, there was.

19   Q.  Who was the buyer?

20   A.  Interprogress and OptTorgLider.

21   Q.  Those were the companies, nominee companies owned by you

22   and Mr. Parilis, correct?

23   A.  That's correct, yes.

24   Q.  And in exchange for Mr. Kislin's relinquishing his

25   51 percent ownership interest, Mr. Kislin, it was agreed, would

1    be paid $20 million, yes?

2              MR. BERKOVICH:  Objection to form, your Honor.

3              THE COURT:  I've indicated a number of times these

4    kinds of questions are absolutely of no use to me whatsoever.

5    But it's your examination.  You can ask whatever question you

6    want.  I've told you it's not going to have any bearing on my

7    decision, nor is it useful to me in making a decision.  But

8    it's your examination.  There's certainly nothing improper

9    about the question.  It's just not a useful question because it

10   doesn't get at the issues in the case.

11             But to the extent you're objecting, Mr. Berkovich,

12   your objection is overruled.

13   Q.  Do you remember the question?

14   A.  Repeat it, please.

15   Q.  In exchange for the shares of Mr. Kislin, 51 percent, being

16   transferred to your company, Mr. Parilis's company, Mr. Kislin,

17   his company, was supposed to receive $20 million, correct?

18             MR. BERKOVICH:  Objection to form.

19             THE COURT:  Overruled.

20   A.  No.

21   Q.  Well, was an agreement made to pay to Mr. Kislin, his

22   company, Brunlow, $20 million for something?

23             THE COURT:  Again, without knowing who the agreement

24   is, that -- I'm not going to allow this anymore, because it's

25   just a waste of time.  It's a waste of everyone's time.  We

G45EKIST                    Dikker - cross

1    need to establish who the agreement was between or we're

2    nowhere.  And we're not moving this case forward at all.

3            So from now on, the question has to be founded on:

4    Who is the agreement between?  And if we don't understand that,

5    we're never going to get to the end of this case.  So from now

6    on, every question that addresses this point has got to be

7    founded on, an agreement between who?  Because if I don't know

8    who the agreement was between, it's going to be impossible to

9    decide who is owed what here.

10           And this has been a problem.  It's been a problem in

11   the papers.  It was a problem in the pretrial submissions.

12   It's been a problem in the proof today.  And it continues.  And

13   it has to be dealt with.  It's got to be addressed head on.  We

14   can't keep on talking in the abstract about an agreement when

15   we don't even understand what the witness is talking about.  An

16   agreement between who?  That's what it's all about.

17           So from now on, when you ask a question that relates

18   to an agreement, you have to begin with, an agreement between

19   who, and then we'll proceed from there.  But until I understand

20   who the agreement is between that you are referring to, this is

21   just pointless, useless examination.

22           MR. DANNENBERG:  Understood.

23   BY MR. DANNENBERG:

24   Q.  Mr. Dikker, was there an agreement for the purchase of

25   Mr. Kislin's company Brunlow's 51 percent shares of TRI?

1   A.   Yes, there was.

2   Q.   Who was that agreement between?

3   A.   Between Brunlow, OptTorgLider and Interprogress.

4   Q.   Those were the nominee companies of Mr. Kislin, you and

5   Mr. Parilis respectively, correct?

6   A.   Yes.

7   Q.   What were the terms of that agreement?

8   A.   The sale of the shares for some nominal price, from

9   Brunlow, as far as I recall, the price was something like

10  1 million rubles, which would have been about $30,000.  I may

11  be mistaken, but it was somewhere in that region.  It was not

12  even $100,000.

13  Q.   Okay.  So when you said in your affidavit that the buyout

14  of Kislin/Brunlow in the amount of 20 million was agreed, we're

15  talking about some other agreement?

16          MR. BERKOVICH:  Objection to form, your Honor.

17          May I address very briefly, your Honor.  There's a

18  confusion for selling shares in Russian company, which is TRI,

19  and selling shares in the fund.  So there are statements in the

20  affidavit regarding shares, selling shares of the fund.  And

21  that's where the $20 million comes in by the Blago.

22          And there is a separate agreement which my client just

23  testified as to selling shares in a corporation in which his

24  company and Mr. Parilis's company and Mr. Kislin's company were

25  members or shareholders.  So that's why there's a confusion

1    using the word shares.  So that's why I objected to the form,

2    because that's not what his declaration talks about.

3              MR. DANNENBERG:  I don't think that was my question,

4    your Honor.  I'll withdraw the question.  I'll ask it a

5    different way.

6    Q.  You just referred to a buyout agreement between the three

7    nominee companies of you, Parilis and Mr. Kislin regarding the

8    shares of TRI, correct?

9              THE COURT:  Well, to be precise, Kislin's shares of

10   TRI, right?

11             MR. DANNENBERG:  Yes.

12   A.  Yes, that's correct.

13   Q.  And it's not in your affidavit, but you now say that the

14   buyout price for that transaction was 1 million rubles.  Do I

15   understand you correctly?

16   A.  Maybe it was 2 million, but it was a small amount.  It was

17   a nominal amount.  There was maybe several thousand dollars.

18   Q.  Okay.  So I'm going to refer to that transaction that you

19   just described as the buyout of Kislin/Brunlow's 51 percent

20   interest in TRI.  Okay?

21   A.  Okay.

22   Q.  In paragraph one of your affidavit, last sentence, you

23   refer to a buyout of Kislin/Brunlow in the amount of 20

24   million.  And my question is whether that is a separate

25   transaction you were referring to there from the one that we

1   just described.

2   A.  Yes, naturally.  That's a completely different transaction,

3   completely different agreement.

4   Q.  So who were the parties to that agreement?

5   A.  I don't remember who represented Blago.  It was also some

6   sort of Cyprus company.  I just don't remember the name.  On

7   the other -- the other party was -- the other side was

8   Kominelli.

9   Q.  So there was an agreement between Blagosostoyaniye and

10  Kominelli, is that what you're saying?

11  A.  Between the company that represented the interests of

12  Blagosostoyaniye and Kominelli.

13  Q.  You don't remember the name of the company that represented

14  the interests of Kominelli?

15  A.  No, I don't.  No.  It wasn't the interest of Kominelli.  It

16  was the interest of Blagosostoyaniye.

17  Q.  Yes, I'm sorry.  You're right.

18          But that was a buyout agreement also?  Is that what

19  you're saying in paragraph one of your affidavit?

20          MR. BERKOVICH:  Object to the form.

21          THE COURT:  Overruled.  Go ahead.

22  A.  Yes, absolutely.  Sam agreed to sell his shares for that

23  nominal price, as long as the other transactions went through

24  as well, including the transaction for the $20 million.

25          I'm sorry.  Just a slight clarification.  That wasn't

 1    to mean that all of the funds were going to go through at the

 2    same time, but that all the agreements would be signed at the

 3    same time.  The only funds that we wanted to go through at the

 4    time were the funds from Blagosostoyaniye.

 5    Q.  I'm going to make it easier for myself.  We've now

 6    identified two transactions, so I'm going to call them the

 7    first transaction and the second transaction.  The first

 8    transaction is what you referred to as the sale of Brunlow

 9    company, Mr. Kislin's 51 percent for a nominal amount of one or

10    two million rubles.  Okay?

11    A.  Okay.  That's fine.

12    Q.  And the second transaction is the other one you referred to

13    in which Blagosostoyaniye was paying $20 million to Kominelli

14    company for something, okay?

15    A.  I'm aware of the transaction, and I saw the agreement.

16    And -- but I wasn't involved in the agreement.  I wasn't party

17    to the agreement.  In other words, I facilitated the agreement,

18    but I wasn't party to that agreement.  And Sam made it

19    contingent -- the sale of his 51 percent contingent on the

20    transaction with Blago.

21    Q.  That second transaction in which $20 million was to be paid

22    to Kominelli, what were the terms of that agreement, as best as

23    you understand?

24    A.  The purchase of the shares of the company -- the funds,

25    Solid investments at a specific price.  I'm sorry.  Clarify.

1   The name of the fund was Solid-Podmoskovny.

2   Q.  So is it your testimony, Mr. Dikker, that Kominelli owned

3   shares of the fund Solid-Podmoskovny?

4   A.  Prior to the transaction we transferred -- prior to the

5   agreement we transferred shares from -- we transferred shares

6   to -- of Solid-Podmoskovny to Kominelli.

7           THE COURT:  Who transferred the shares?

8           THE WITNESS:  It was the company that was holding the

9   shares.  It was a Cypriot company, Lentesco, that was providing

10  the service for TRI.

11          THE COURT:  Before we go too much further, I want to

12  go back to the first transaction, because I don't want that

13  forgotten.  I want to go back to the first transaction, find

14  out who the parties were to that.  So you don't have to do it

15  this moment, but at some point I want to go back to that and

16  find out who the parties were.

17          MR. DANNENBERG:  Well, I think that the witness

18  said --

19  Q.  But I'll ask you again, Mr. Dikker:  In that first

20  transaction, Mr. Kislin, through Brunlow, was selling his

21  shares of TRI, 51 percent, to you and Mr. Parilis through

22  OptTorgLider and Interprogress, your nominee companies, for

23  some nominal amount, which he said was one or two million

24  rubles; correct?

25  A.  Yes, correct.  Rubles.

1          THE COURT:  And was that transaction, was there a

2    written agreement concerning that transaction?

3          THE WITNESS:  Yes.  Of course.

4    Q.  But you don't have that, do you, Mr. Dikker?

5    A.  No.  I don't have any other agreements.

6    Q.  What efforts have you made during the course of this

7    litigation or before to obtain a copy of that agreement?

8    A.  I know for certain, absolutely for certain, who has them.

9    I tried to inquire from that individual, but he would not speak

10   with me.

11   Q.  Who is that?

12   A.  Runova, Tatyana Runova.  She's the one who wrote them.

13         THE COURT:  All right.  You'll have to spell that name

14   for the court reporter.

15         MR. DANNENBERG:  She has it, your Honor.

16   Q.  Tatyana Runova was the in-house lawyer for TRI, correct?

17   A.  At the time, yes.

18   Q.  That second contract, transaction, between Kominelli and

19   either Blagosostoyaniye or some company representing the

20   interest of Blagosostoyaniye, was that in writing?  Was that

21   agreement in writing?

22   A.  Naturally, there was.

23   Q.  And what efforts, if any -- withdrawn.

24         You don't have a copy of that agreement, or you

25   haven't produced it in this case, have you?

1    A.  I was not party to this agreement, so I couldn't have had a

2    copy of it.

3    Q.  And what efforts have you made, if any, during the course

4    of this litigation or before to obtain a copy?

5    A.  I tried to get it from Sachkov, but, again, with no --

6    unsuccessful.

7    Q.  Mr. Sachkov was originally named as a defendant in this

8    case, but he was never served, and the case was ultimately

9    withdrawn.  Do you remember that?

10   A.  Yes.

11   Q.  But before the case was withdrawn as against Mr. Sachkov,

12   his interests in the case were represented by Mr. Berkovich

13   here, your lawyer, correct?

14   A.  That's true.  I don't know how it pertains, but yes, that's

15   true.

16   Q.  Well, I'll tell you that it pertains.  Am I correct that

17   your attorney here who represented Mr. Sachkov had the same

18   opportunity you did to obtain copies of any relevant documents

19   during the period in which he represented him, didn't he?

20          MR. BERKOVICH:  Your Honor, I'm objecting to this.

21   And if I may speak with the reason for that.

22          With respect to Mr. Sachkov, as well as Mr. Dikker, we

23   advised the Court at the time, and we to make a motion not only

24   for forum non conveniens of both parties but also

25   jurisdictional motion to dismiss case for lack of jurisdiction

1    against Mr. Sachkov.  A few days before the motion was to be

2    filed, Mr. Dannenberg has withdrawn without prejudice his

3    complaint against Mr. Sachkov.  So that was -- my

4    representation with Sachkov was not on the merits of the case,

5    but, rather, with respect to the only motion to dismiss for

6    lack of jurisdiction.  So the implications made here by

7    Mr. Dannenberg, I think, are not warranted.

8             THE COURT:  I don't really see the point of your

9    question, Mr. Dannenberg.  To the extent there's an objection,

10   it's sustained.

11   BY MR. DANNENBERG:

12   Q.  Mr. Dikker, you knew when this transaction was being put

13   together these two transactions were part of a larger deal,

14   correct?

15   A.  That was the -- Sam's condition.

16   Q.  And the reason why Mr. Kislin insisted that the two

17   transactions that you described happened together was because

18   he wanted to end up with $20 million at the end of the day?

19            THE COURT:  Sustained.  Sustained as to what

20   Mr. Kislin wanted.  Improper question.

21   Q.  Isn't it true, Mr. Dikker, that Mr. Kislin told you that he

22   wanted the transactions that you described to happen together

23   because he told you he wanted to end up with $20 million at the

24   end of the day?

25   A.  Not even the 20 -- well, the first transaction had to go

1  through first, the transaction for -- and it did go through

2  first, the transaction for the purchase of the shares.

3  Q.  But you knew, Mr. Dikker, that Mr. Kislin wanted to end up

4  with $20 million after these two transactions?

5          MR. BERKOVICH:  Objection.

6          THE COURT:  Sustained.  Same reason.

7  Q.  Isn't it true that the reason why these two transactions

8  were connected was because it was necessary to have the

9  Kominelli and Blagosostoyaniye transaction put into place in

10  order to fund the transaction involving Mr. Kislin's

11  obtaining -- ending up with $20 million?

12          MR. BERKOVICH:  Objection.

13          THE COURT:  I don't understand the question.

14  Q.  Isn't it true, Mr. Dikker, that the Kominelli and

15  Blagosostoyaniye transaction was done for the purposes of

16  financing?

17          THE COURT:  I'm going to sustain the objection

18  because, again, regardless of what the answer is, I'm not going

19  to know what to draw from it.  If you are contending there was

20  an agreement among the parties, then you're welcome to explore

21  that.  But an answer to that question is not going to help you

22  resolve the case, because I won't know what to draw from the

23  answer.

24          MR. DANNENBERG:  Understood.

25  Q.  In the second transaction, Blagosostoyaniye or some company

G45EKIST                    Dikker - cross

1    representing its interest was going to pay to Kominelli

2    $20 million, yes?

3    A.   Verbally, yes, that was the case.  But I did not see the

4    final agreement, so I don't know.

5    Q.   I'll take verbally.  So verbally, what was your

6    understanding of what Kominelli was giving in exchange for that

7    $20 million?

8    A.   51 percent of the shares of the fund Solid-Podmoskovny.

9    Q.   But those shares were furnished to Kominelli right before

10   the transaction solely for the purposes of being able to make

11   the transaction, correct?  Isn't that what you said?

12   A.   Naturally.

13   Q.   Well, you say "naturally," but in reality, what did

14   Kominelli have that Blagosostoyaniye wanted to pay $20 million

15   for?

16              MR. BERKOVICH:  Objection.

17              THE COURT:  Sustained.

18   Q.   For what purpose were those shares transferred to

19   Kominelli?

20              THE COURT:  Well, we need to step back for just a

21   second.  In order for him to understand why the Solid shares

22   were transferred to Kominelli, we need to know who transferred

23   the Solid shares to Kominelli.  And I don't think there's been

24   any testimony on that, unless it was the Cypriot company.

25   Q.   Did you say it was the company Lentesco that transferred

G45EKIST                    Dikker - cross

1   those shares?

2   A.  Yes.

3       THE COURT:  Then who transferred the Solid shares to

4   Lentesco?

5       THE WITNESS:  From the very beginning of the -- when

6   the fund was organized, the shares of Solid were at Lentesco.

7   Q.  Who was the real owner?

8       MR. BERKOVICH:  Objection to the form.  "Real owner,"

9   I don't know what that means.

10      THE COURT:  Overruled.

11  A.  I don't know.  I don't know who the owners were.  It was a

12  Cypriot company.  I assumed some sort of lawyers, but it was

13  organized to represent the interests of TRI for the project,

14  for the fund Solid-Podmoskovny.

15  Q.  TRI --

16      THE COURT:  Let me just ask here:  So should I

17  understand your testimony to mean that TRI created the Solid

18  fund?

19      THE WITNESS:  Absolutely correct.

20      THE COURT:  All right.  Go ahead.

21  Q.  But TRI never held the shares in the Solid fund in its own

22  name; it held it through Lentesco, correct?

23  A.  When TRI received the shares, the real estate shares,

24  property shares it transferred -- when TRI transferred the

25  property, it received shares in return.  And those shares were

1    transferred to Lentesco.

2    Q.  Just to clarify the record, Mr. Dikker, TRI owned certain

3    properties in the Moscow region, correct?

4    A.  Yes, that's correct.

5    Q.  And when TRI got involved in the original Solid fund, it

6    did so by transferring the ownership of certain property to

7    Solid fund in exchange for which it was given certain equity

8    interests in the Solid fund, which were held in the name of

9    Lentesco on TRI's behalf; correct?

10   A.  No.  It was in the name of Lentesco.  The shares were held

11   in the name of Lentesco.

12   Q.  Those were the shares that were allocated as a result of

13   TRI's contributing property to the fund, yes?

14   A.  Absolutely.

15   Q.  So is it fair to say that TRI's interest in the Solid fund

16   was held in the name of Lentesco?

17   A.  I think so, yes.

18   Q.  And when the transaction involving Mr. Kislin's buyout was

19   being put together, a certain amount of shares were allocated

20   to a new Solid fund named Podmoskovny, correct?

21   A.  No.

22   Q.  What was the purpose of the Solid-Podmoskovny fund?

23   A.  I got confused.  We were talking the whole time about the

24   fund Solid-Podmoskovny.

25   Q.  I thought that you used the term original Solid fund to

1    distinguish from Podmoskovny.  There's only one Solid fund?

2    A.   Solid-Podmoskovny was just the one fund.

3    Q.   So when the transaction involving a buyout of Mr. Kislin's

4    51 percent was being put together, a certain amount of shares

5    in Solid-Podmoskovny was allocated for the purposes of the

6    Kominelli to Blagosostoyaniye transaction, correct?

7             THE COURT:  I have to say, I don't understand the

8    question.  The only way we've gotten this far is being very

9    specific about who we're talking to, who the agreements were

10   between.  Absent that specificity, we were nowhere.  Now we

11   have the beginning of an understanding about what was a series

12   of transactions.

13             MR. DANNENBERG:  Allegedly.

14             THE COURT:  Well, yes, allegedly.  I might say, none

15   of this was discussed in any of the things I read.

16             MR. DANNENBERG:  Nor is it consistent with the

17   stipulated facts.  But I'm cross-examining the witness, and I'm

18   trying to measure his credibility.

19             THE COURT:  My only point is that when you say -- so

20   this is your question:  So when the transaction involving a

21   buyout of Mr. Kislin's 51 percent was being put together --

22   that's how your question begins.  I don't know what you're

23   talking about, because there's two transactions.

24             Are you talking about the first transaction, which

25   involved the nominal sale; or are you talking about the second

1    transaction; or are you talking about preliminary discussions

2    before it was even agreed that there would be a series of

3    transactions?  I don't know what step in the process your

4    reference to buyout goes to.

5         MR. DANNENBERG:  Okay.  I'll start it over with this

6    line of questioning.  I understand exactly what you're saying,

7    your Honor.

8    BY MR. DANNENBERG:

9    Q.  These two transactions were discussed more or less

10   simultaneously, were they not?

11   A.  Yes, absolutely.  They were linked to each other.

12   Q.  And --

13        THE COURT:  And those discussions were between whom?

14        THE WITNESS:  For the smaller transaction, for TRI, it

15   was only myself, Runova and Sam.

16        With respect to the big transaction with the buyout of

17   the shares, that was -- sometimes it was all of us together.

18   Sometimes it was just Sam with the general director of the

19   company, with Semernin.

20        THE COURT:  Sorry.  When you say "all of us together,"

21   I have no idea what you're talking about.

22        THE WITNESS:  All of the parties who were interested

23   parties in the transaction.  Myself; Sam; Demidov from the

24   fund; Sachkov, who was the head of the managing company of the

25   fund.  When the issue of the $40 million came up -- sorry,

1   $4 million came up, then Semernin also became involved.

2              MR. DANNENBERG:  I'll get to that $4 million, but

3   we're not there yet.

4              THE COURT:  Well, what we are at is 5:00.  It might be

5   good to take stock of where we are in preparation for

6   additional questioning.

7              Mr. Berkovich?

8              MR. BERKOVICH:  No, I just wanted to stand.  I have no

9   objection.

10              THE COURT:  So I have a matter that's going to take me

11   until 10:15 tomorrow.  So we will begin in the vicinity of

12   10:15, 10:20.  We'll resume with the testimony of Mr. Dikker.

13              Anything else anyone wants to say before we break for

14   the evening?

15              MR. BERKOVICH:  No, your Honor.

16              MR. DANNENBERG:  Not from plaintiff.

17              THE COURT:  All right.  Then we'll resume at 10:15.

18              (Adjourned to April 6, 2016, at 10:15 a.m.)

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

SEMYON KISLIN

Cross By Mr. Berkovich . . . . . . . . . . . .45

Redirect By Mr. Dannenberg . . . . . . . . . .95

Recross By Mr. Berkovich . . . . . . . . . . 103

SIMON DIKKER

Cross By Mr. Dannenberg  . . . . . . . . . . 130

PLAINTIFF EXHIBITS

Exhibit No.                                    Received

 1, 2, 3 and 4  . . . . . . . . . . . . . . .26

 11 . . . . . . . . . . . . . . . . . . . . .43

 7 and 8  . . . . . . . . . . . . . . . . . 106

DEFENDANT EXHIBITS

Exhibit No.                                    Received

 F  . . . . . . . . . . . . . . . . . . . . 125