G46EKIS1                    Trial

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

SEMYON (SAM) KISLIN,

                Plaintiff,

        v.                          14 CV 237(PGG)

SIMON DIKKER,

                Defendant.

------------------------------x

                                    April 6, 2016

                                    10:29 a.m.


Before:

                    HON. PAUL G. GARDEPHE,

                                    District Judge

                        APPEARANCES

KESTENBAUM, DANNENBERG & KLEIN, LLP
        Attorneys for Plaintiff
BY:   JEFFREY CRAIG DANNENBERG

ALEXANDER BERKOVICH, ESQ
        Attorney for Defendant

1          (In open court)

2          THE COURT:  All right.  Mr. Dikker should retake the

3     stand.

4          You can be seated, Mr. Dikker.  Mr. Dikker, you remain

5     under oath.

6          Please proceed.

7          MR. DANNENBERG:  Your Honor, I'm just going to place

8     the documents up here that I may need to refer to.

9          THE COURT:  All right.

10     SIMON DIKKER, resumed.

11    CROSS EXAMINATION

12    BY MR. DANNENBERG:

13    Q.  Good morning, Mr. Dikker.

14    A.  Good morning.

15    Q.  Yesterday in some of the questions and answers there was a

16    reference to the real estate fund Solid-Podmoskovny.  Do you

17    remember that?

18    A.  Yes.

19    Q.  Is that the same as the name Solid Moscow Region?

20    A.  Yes.

21    Q.  Podmoskovny is a Russian word that means "Moscow region,"

22    correct?

23    A.  Yes, that's correct.

24    Q.  So someone might call that real estate fund that we were

25    discussing yesterday Solid-Podmoskovny or Solid Moscow region,

1    but they would be referring to the same entity, correct?

2    A.   Yes, that's the same thing.

3    Q.   But in your declaration, Defendant's Exhibit F, you use

4    those two names interchangeably, without explaining that you

5    were referring to the same entity.  I'll give you an example.

6           At the end of the last sentence of paragraph one, you

7    refer to, quote, a Russian real estate fund, Solid-Podmoskovny,

8    closed quote.  And in the beginning of the first sentence of

9    paragraph two, you refer to, quote, the real estate fund Solid

10   Moscow Region, closed quote.

11          Do you see that?

12   A.   Yes.

13   Q.   Do you understand why your failure to use the same name to

14   explain that these two names refer to the same entity could be

15   confusing to someone reading your declaration?

16   A.   Yes, I understand that.

17   Q.   And yesterday I asked you whether the Solid-Podmoskovny

18   fund had been created specifically for the buyout transaction

19   involving Mr. Kislin's TRI shares.  Do you remember that?

20   A.   Yes, I remember.

21   Q.   And did I understand your testimony yesterday correctly

22   that Solid-Podmoskovny was the only fund in which TRI had

23   invested at that time, at the time of Mr. Kislin's buyout, and

24   that the creation of that fund actually had nothing to do with

25   the buyout of Mr. Kislin's shares?

1           THE COURT:  That's compound.

2           MR. BERKOVICH:  Object to the form.

3           THE COURT:  That's compound.  It's two questions.

4    Q.  Is it true that Solid-Podmoskovny was created specifically

5    for the purposes of Mr. Kislin's buyout transaction?

6    A.  Yes.

7    Q.  Isn't it true that you formed the company Lentesco, Ltd., a

8    Cyprus corporation, specifically as a depository or holder of

9    TRI's shares in Solid-Podmoskovny?

10   A.  Yes.  That was the initial rationale for that, only for the

11   shares of Solid-Podmoskovny.

12   Q.  So because Solid-Podmoskovny was created for the Kislin

13   buyout transaction, the registry of those TRI shares in the

14   name of Lentesco was also for the purposes of the Kislin buyout

15   transaction, correct?

16   A.  At that time, yes.

17   Q.  Now, beginning in 2007 and ending in 2008, Mr. Kislin and

18   you engaged in discussions for a buyout of Mr. Kislin's

19   ownership interests in TRI; isn't that true?

20   A.  What time specifically did you mention, those years?

21   Q.  Sorry.  Beginning in 2007 and ending in 2008.

22   A.  Yes, we did.

23   Q.  And isn't it also true that following negotiations over the

24   value of that interest, Mr. Kislin's shares, Mr. Kislin and you

25   ultimately settled on a figure of $20 million?

G46EKIS1                    Dikker - cross

1   A.   Kislin and I did not come to an agreement on a specific

2   amount.

3   Q.   I'm going to read to you from the first two sentences of

4   paragraph E, Section 8 of the stipulated facts in the pretrial

5   order.  You don't have it in front of you.  I'm just going to

6   read it to you because these are facts that have been admitted

7   by both sides.

8            Following negotiation over the value of that interest,

9   Kislin and Dikker ultimately settled on a figure of

10  $20 million.

11           Does that refresh your recollection, sir, that

12  following negotiations over the valuation of Mr. Kislin's

13  interest, you and Mr. Kislin ultimately settled on a figure of

14  $20 million?

15  A.   I did not buy the company.  I did not buy the shares.  I

16  was only looking for a buyer for those shares and, yes, we were

17  looking for a buyer for shares for the amount of 20 million or

18  more.

19  Q.   That doesn't answer my question, with all due respect.  My

20  question is:  Isn't it true that following the negotiations of

21  the valuation of Mr. Kislin's interests, you and he ultimately

22  settled on a figure of $20 million?

23  A.   Preliminarily, yes.

24  Q.   And isn't it also true that Mr. Kislin and you agreed that

25  the $20 million sum would be paid through TRI's sale of

interest that TRI owned in a Russian real estate fund known as

Solid; in other words, Solid-Podmoskovny?

A.   That's not completely correct, because TRI did not own

those shares.  The shares were actually owned by Lentesco.  But

there was an agreement that Mr. Kislin's share or interest in

Solid-Podmoskovny would be sold.

Q.   Mr. Kislin did not own any share of Solid-Podmoskovny, did

he?

A.   No, he did not own the shares of Solid-Podmoskovny.

Q.   Prior to this transaction, didn't he own 51 percent of the

shares of TRI, and TRI owned 100 percent of the shares of

Solid-Podmoskovny, correct?

A.   In principle, yes.  Nominally, no, because nominally the

shares of Solid-Podmoskovny were held in the name of Lentesco,

which was under the complete control of the company, TRI.

Q.   Okay.  So I'll ask you again, that being the case:  Isn't

it true that Mr. Kislin and you agreed that the $20 million sum

would be paid through the TRI sale through its nominee,

Lentesco, of an interest that TRI owned in a Russian real

estate fund known as Solid-Podmoskovny?

A.   I guess you can say it that way.

Q.   Now, the buyout of Mr. Kislin's shares in the amount of

$20 million was agreed to be effected through the sale to

Blagosostoyaniye?

          THE COURT:  Again, I don't want questions that don't

1    make it clear who is agreeing to what.  I tried to communicate

2    yesterday, those types of questions are not useful to me

3    because I have no idea who you're talking about.  So when you

4    say it was agreed as a formulation, it's not useful to me.  I

5    don't want that formulation used.

6               MR. DANNENBERG:  Understood.

7               THE COURT:  Any agreement you want to ask about begins

8    with questions about who the agreement is between, and then we

9    take it from there.

10   BY MR. DANNENBERG:

11   Q.  The buyout of Mr. Kislin's shares in the amount of

12   $20 million was understood by you to be -- that it would be

13   effected or effectuated through the sale to Blagosostoyaniye of

14   the shares held by TRI through Lentesco in the

15   Solid-Podmoskovny fund, correct?

16   A.  With one correction.

17   Q.  Correct it.

18   A.  Blagosostoyaniye also didn't buy the shares directly; not

19   in its own name, but its own Cyprus subsidiary.  I don't recall

20   the name.

21   Q.  So let me ask it with that correction to make sure that I

22   understand what you're willing to concede.

23              The buyout of Mr. Kislin's shares in the amount of

24   $20 million was understood by you to be effectuated through the

25   sale to Blagosostoyaniye's Cyprus subsidiary of the shares held

G46EKIS1                         Dikker - cross

 1    by TRI through Lentesco in Solid-Podmoskovny?

 2    A.   Yes.

 3    Q.   So the $20 million that you and Mr. Kislin agreed to for

 4    the buyout of his TRI shares was supposed to be financed

 5    through the sale of TRI's Solid-Podmoskovny shares to

 6    Blagosostoyaniye's subsidiary for $20 million; isn't that

 7    correct?

 8    A.   Could you repeat that, please.

 9    Q.   The $20 million that you and Mr. Kislin agreed to for the

10    buyout of his TRI shares was supposed to be financed through

11    the sale of TRI's Solid-Podmoskovny shares to

12    Blagosostoyaniye's Cyprus subsidiary for $20 million; isn't

13    that correct?

14    A.   You can probably say it that way.  Yes.

15    Q.   And isn't it also true that at some point Mr. Kislin,

16    either directly or through a company that he controlled,

17    received at least $16 million out of that $20 million buyout

18    price?

19    A.   I think so, yes.

20            THE COURT:  How do you know that Kislin received

21    $16 million?

22            THE WITNESS:  From Sachkov and Kislin's own words.

23            MR. DANNENBERG:  I'll also point out, your Honor, that

24    it's one of the stipulated facts which I just quoted from in

25    the question, paragraph 8F.

G46EKIS1                    Dikker - cross

| | |
|---|---|
| 1 | THE COURT:  I'm aware of that, sir.  I just want to |
| 2 | know the source of the information.  That's all.  And the |
| 3 | stipulation doesn't identify the source of the information. |
| 4 | That's why I asked. |
| 5 | BY MR. DANNENBERG: |
| 6 | Q.  Is it your understanding, Mr. Dikker, that the company |
| 7 | through which Mr. Kislin received that sum of at least |
| 8 | $16 million was his Cyprus company, Kominelli? |
| 9 | A.  As far as I know, but I was not involved in the |
| 10 | transaction.  I wasn't involved in the transaction itself. |
| 11 | Q.  And is it also your understanding that the sum of at least |
| 12 | $16 million that was received by Kominelli was paid by |
| 13 | Blagosostoyaniye, either directly or through its subsidiary? |
| 14 | A.  As far as I understand, it was through the subsidiary. |
| 15 | Q.  And as far as you are aware, Blagosostoyaniye's subsidiary |
| 16 | paid the full amount of $20 million that it had agreed to pay |
| 17 | and received the full amount of the Solid-Podmoskovny shares |
| 18 | that it was supposed to receive?  Isn't that correct? |
| 19 | THE COURT:  Again, I don't know what as far as you |
| 20 | know means.  So you're welcome to explore what he knows, but a |
| 21 | question that is framed "as far as you know" is not helpful to |
| 22 | me, because I don't know how he knows.  And it's important that |
| 23 | I know how he knows. |
| 24 | MR. DANNENBERG:  Understood. |
| 25 | Q.  Isn't it your understanding, Mr. Dikker, that |

1    Blagosostoyaniye, either directly or through its subsidiary,

2    paid the full amount of $20 million that it had agreed to pay

3    and received the full amount of Solid-Podmoskovny shares that

4    it was supposed to receive?  Is that your understanding?

5    A.   The fact that the full amount of the shares was received by

6    the subsidiary of Blago in Cyprus, that, I know for certain.  I

7    checked that with the registration office.  How much money was

8    transferred to Lentesco, how much money was paid by the

9    subsidiary of Blagosostoyaniye, again, that, I only know from

10   the words of Sachkov and Kislin and Demidov.

11   Q.   Demidov was the principal of Blagosostoyaniye?

12   A.   At the time he was the vice president.

13   Q.   And is it your understanding from any source -- and I'll

14   ask you where this understanding came from -- that

15   Blagosostoyaniye paid out to some entity or entities the full

16   $20 million that it had agreed to pay for the TRI shares in

17   Solid-Podmoskovny?

18   A.   The full amount of what?

19   Q.   Twenty million dollars.

20   A.   I don't know.

21   Q.   You have your declaration in front of you, which is

22   Defendant's Exhibit F.  You say in paragraph 32 of that

23   declaration, quote, by acquiring the shares -- and you had

24   earlier defined the shares as shares of Solid-Podmoskovny --

25   Blagosostoyaniye has stepped into Kislin's shoes and became

G46EKIS1                    Dikker - cross

1    51 percent owner of Solid-Podmoskovny.

2              Do you see that?

3    A.   Yes.

4    Q.   Again, that's not true, is it?  Mr. Kislin never owned

5    51 percent of Solid-Podmoskovny, did he?

6    A.   Mr. Kislin was a 51 percent owner of the company, TRI,

7    which controlled 100 percent of the shares of Solid-Podmoskovny

8    through the company Lentesco.  And as a result of that, through

9    the transaction Blago received the 51 percent of that.

10   Q.   So am I correct that when you used the term "stepped into

11   Kislin's shoes" in paragraph 32 of your declaration, you were

12   referring to the fact that Mr. Kislin had given up 51 percent

13   of his ownership of TRI and Blagosostoyaniye had acquired

14   51 percent of the ownership of Solid-Podmoskovny?

15   A.   No.  They purchased the shares of Blagosostoyaniye --

16   sorry, Blagosostoyaniye purchased the shares of

17   Solid-Podmoskovny directly.  They never purchased shares of

18   TRI.

19   Q.   Let me ask it this way:  What did you mean in paragraph 32

20   of your declaration by the phrase "stepped into Kislin's

21   shoes"?

22   A.   Only with regards to the shares of the fund Solid Moscow

23   region.

24   Q.   Solid-Podmoskovny?

25   A.   Yes.  The same.

1   Q.   Refer to paragraph two of your declaration.  You say that

2   the reason why only at least $16 million was transferred to

3   Kominelli rather than the full amount of 20 million was because

4   Mr. Semernin intervened.  Do you remember saying that in

5   paragraph two of your declaration?

6   A.   The second paragraph doesn't say anything about

7   $16 million.

8   Q.   I wasn't suggesting.  I was quoting from the agreement.

9   Let me just ask it straight out.

10          Is the reason why only $16 million was transferred to

11  Kominelli rather than the full amount of $20 million that had

12  been agreed to for the Kislin buyout was because Mr. Semernin

13  intervened?

14  A.   I would say it that way.  Not the full amount was

15  transferred; four million less than had been agreed to.

16  Q.   And the reason why it was 4 million less was because

17  Mr. Semernin intervened, correct?

18  A.   Clarification.  The $4 million less than agreed upon.  I

19  didn't say we agreed to, they agreed to.  So $4 million less

20  than the agreed-upon amount.

21  Q.   The reason why the amount that Kominelli received --

22          THE COURT:  I'm going to ask a question.

23          How do you know that $4 million of the $20 million was

24  withheld?  How do you know that?

25          THE WITNESS:  I don't know what the overall amount

was, whether it was 20 million or 30 million or what it was.

But the conversation, the discussion that $4 million is going

to be deducted, I was involved in that conversation with

Mr. Kislin, Mr. Semernin and Mr. Demidov.

Q.   You know that the amount was $20 million.  You said it in

the last sentence of your paragraph one of your declaration,

didn't you?

A.   Yes, I know that information from Kislin and Sachkov, from

their own words.  I didn't see the transaction itself.  That

didn't go through any of the accounts that I have control over.

Again, I know about the $20 million from the words of Kislin

and Sachkov, that that was the amount that had gone through.

And I've known that from them since 2008.

Q.   It wasn't a coincidence that Blagosostoyaniye agreed to pay

$20 million for those Solid-Podmoskovny shares, was it?

A.   Of course that I understand it wasn't a coincidence.

Sachkov and I had worked on that for half a year.  I just don't

know -- I did not see the final amount that was involved in the

transaction that went through the accounts for the transaction.

That did not go through any of the accounts that I had control

over.  What I know is -- for certain is that $4 million were

withheld from the amount that was transferred by the company

controlled by Blago to the company that was controlled by

Solid-Podmoskovny.

          Pardon, clarification.  The company was called Solid

G46EKIS1                    Dikker - cross

1    Management, which was under the control of Semernin, and which

2    was the managing company of our first TRI fund

3    Q.  And was it withheld from -- that $4 million wasn't withheld

4    from Solid-Podmoskovny; it was withheld from Kominelli,

5    correct?

6    A.  That, I don't know.  I don't know how it was effectively

7    done, how technically it was done.

8    Q.  Now, if I understood a portion of your last answer,

9    Mr. Semernin was on the board at the management company that

10   controlled Solid-Podmoskovny, correct?

11   A.  Yes.  Not only was he on the board of directors; he is

12   also -- owned at least 51 percent of the shares of that company

13   at that time.

14   Q.  Of what company?

15   A.  The one that managed the shares of Solid-Podmoskovny.

16   Q.  And in that position that Mr. Semernin held, was it your

17   understanding that his approval would be required for the sale

18   of TRI's Solid-Podmoskovny shares to Blagosostoyaniye?

19   A.  Yes.  It was a large transaction and had to be approved by

20   everyone.

21   Q.  And you say in paragraphs 2 and 31 of your declaration that

22   Mr. Semernin refused to give that approval to the sale of TRI's

23   Solid-Podmoskovny shares to Blagosostoyaniye unless either he

24   or some company that he controlled received about $4 million to

25   cover what you were calling previous and future obligations.

1    Do you remember that?

2              MR. BERKOVICH:  Objection to form.

3              THE COURT:  What's the basis for your objection?

4              MR. BERKOVICH:  It appears to me that the implication

5    of the question is that somehow there was a payment to be made

6    to Mr. Semernin personally.  And there is no basis in anything

7    cited by Mr. Dannenberg to say that, other than paid to the

8    Semernin's company, which is Solid Management, the management

9    company.

10             THE COURT:  All right.  Can you amend it to refer to

11   his company?

12   Q.  You say in paragraphs 2 and 31 of your declaration that

13   Mr. Semernin refused to give his approval to the sale of the

14   TRI shares to Blagosostoyaniye unless he or some company that

15   he controlled received about $4 million to cover what you

16   called previous and future obligations.  Is that correct?

17             MR. BERKOVICH:  Same objection, your Honor.

18             THE COURT:  That's not what it says.  The objection is

19   sustained.

20             31 refers to the board of the real estate fund.

21   That's what it says.  So if you're going to ask him about that

22   paragraph, that's the language you're going to refer to, which

23   is the basis for his objection.  And the objection is

24   sustained.

25             MR. DANNENBERG:  Understood.

G46EKIS1                    Dikker - cross

BY MR. DANNENBERG:

Q.  Is it your understanding, Mr. Dikker, that the board of the

Solid-Podmoskovny fund refused to give approval to the sale of

Mr. Kislin's -- I'm sorry, of TRI's shares in Solid-Podmoskovny

to Blagosostoyaniye unless either Mr. Semernin or some company

that he was affiliated with received about $4 million to cover

previous and future obligations?

          MR. BERKOVICH:  Same objection, your Honor.  There's

an implication that somehow Mr. Semernin would be receiving the

funds.

          MR. DANNENBERG:  I just asked if that's an

understanding.

          THE COURT:  I'll overrule that objection.

          You may answer the question.

A.  Yes, with two small corrections.  First of all, not to

Mr. Semernin but to the company that had previously managed our

fund.  And also -- our first fund, who had managed our first

fund.

          And also, secondly, it wasn't the board of directors

of Solid-Podmoskovny but of the Solid Management company.

Q.  Okay.  But you do know that Mr. Semernin himself threatened

to block the transaction for the buyout of Mr. Kislin's TRI

shares and the transfer of TRI's Solid-Podmoskovny shares

unless he, Semernin, got paid $4 million?  Isn't that true?

A.  I don't -- there was never any conversation about him

1    personally receiving it.

2              THE COURT:  What was the name of the -- you said that

3    the money that Semernin wanted would go to the company that

4    managed the first fund.  What's the first fund?

5              THE WITNESS:  The name of the fund I remember, the

6    name of the fund was Boyarkino Invest.  Unfortunately I don't

7    recall the name of the management company.  A lot of the names

8    are so similar to each other that I don't recall.

9              THE COURT:  And who owned that Boyarkino Invest fund?

10             THE WITNESS:  Boyarkino Invest was the first fund

11   created by the company, TRI, which was created by the

12   management or organized by the management company of Semernin.

13   Sachkov was the administrator.  And they're also the ones who

14   found a buyer for the shares, under the requirements not only

15   of TRI -- I'm sorry, the assurance not only of TRI, but he also

16   requested personal guarantee from myself and from Sam, personal

17   guarantees from myself and Sam that we were going to continue

18   to pay a high interest, rather high dividends every year,

19   14 percent.  That is that document that Sam referred to

20   yesterday when he talked about the document from 2005.

21             Starting in the second half of 2006, for a series of

22   reasons we could no longer pay those dividends.  So Semernin

23   used the opportunity when his approval was required for the

24   sale of Solid-Podmoskovny.  And he demanded that all of the

25   unpaid dividends for the previous fund, the previous

1    transaction, be paid out, as well as the payment of dividends a

2    year and -- for the following year.  That's how the amount

3    $4 million came about.

4              THE COURT:  You said that Semernin and Sachkov found a

5    buyer for shares.  Was the shares in the Boyarkino Invest fund?

6              THE WITNESS:  Yes, that's absolutely correct.

7              THE COURT:  And as a result of them finding the buyer,

8    did TRI have an obligation to Semernin and Sachkov?

9              THE WITNESS:  In reality it wasn't to Semernin and

10   Sachkov.  It was to the buyer who was buying the shares.  But

11   everything passed through the management company.

12             THE COURT:  And is that where the obligation arose to

13   pay the 14 percent dividend?

14             THE WITNESS:  It wasn't because of that, but it was

15   because it was the first time we were selling the shares.  And

16   we agreed to a percentage that was too high.  Sorry, we agreed

17   to a price for the shares that was too high.  If we had

18   received an amount that was half of what we did, we could have

19   easily -- we could have easily paid out the 14 percent on that

20   amount.  But because we received a fairly large sum for that

21   first fund, we couldn't.  It was our business mistake.

22             THE COURT:  All right, Mr. Dannenberg.

23   BY MR. DANNENBERG:

24   Q.  Mr. Dikker, do you remember being deposed in my office,

25   attending a deposition in my office on June 26, 2015?

G46EKIS1                    Dikker - cross

1    A.  Yes.

2    Q.  And following the deposition I sent a transcript to your

3    attorney, Mr. Berkovich, so you'd have an opportunity to review

4    it sometime between then and now.  Have you had an opportunity

5    to review it?

6    A.  Yes, of course.  I reviewed them.

7    Q.  Do you remember being asked the following question and

8    giving the following answer?

9              THE COURT:  Page?

10             MR. DANNENBERG:  Page 88, line 22.

11   "Q  The last thing you said, if I understood you correctly, was

12   that Mr. Semernin threatened to block this transaction that was

13   supposed to be used to fund the buyout of Mr. Kislin's TRI

14   shares unless he got paid $4 million.  Did I get that correct?

15   "A  He didn't just say it.  That was his condition."

16             Yes or no, Mr. Dikker:  Do you remember being asked

17   that question and giving that answer?

18   A.  Yes.  Yes.  Yes.

19   Q.  Is it now your testimony that that answer was false?

20   A.  No.  I'm simply giving a fuller explanation.

21             MR. DANNENBERG:  Your Honor, we've reached a point

22   where I think there was some considerable confusion

23   yesterday -- maybe there still is -- regarding these

24   transactions or transfers that were going on.

25             I've prepared a visual aid that I've marked as

G46EKIS1                    Dikker - cross

1    Plaintiff's Exhibit 12, just for identification.  May I hand a

2    copy to the Court and to the witness --

3              THE COURT:  Yes.

4              MR. DANNENBERG:  -- so I can ask some questions?

5              THE COURT:  Yes.

6              MR. BERKOVICH:  Your Honor, I haven't had a chance to

7    review it.

8              MR. DANNENBERG:  I submitted it last night.

9              I'm going to hand it -- I'm going to ask some

10   questions.  It's just for identification.  I'm not offering it

11   into evidence.  I'm just using it to be able to illustrate

12   questions I'm trying to get answers to.

13             MR. BERKOVICH:  No objection, your Honor.

14   BY MR. DANNENBERG:

15   Q.  I prepared a list of six transactions, six transfers, that

16   I think came either from your testimony yesterday or from your

17   declaration, Plaintiff's Exhibit F.  But I'd like to go through

18   each of them with you to make sure that I have my information

19   correct.

20             Transfer number one is from Brunlow -- Mr. Kislin --

21   to OptTorgLider -- that's your company -- and Interprogress --

22   that's Parilis's company -- for the transfer of 51 percent of

23   the TRI shares.

24             That's a transfer that really took place in 2008,

25   correct?

1   A.  That transaction absolutely -- transfer did happen, but

2   that wasn't the first transfer.

3   Q.  Just bear with me.  Let me ask the questions my own way,

4   all right, Mr. Dikker?

5   A.  It's just that you said transfer number one.  That's why I

6   was saying it.

7   Q.  I'm not suggesting that these transfers happened in a

8   certain chronological order.  It's just the way I listed them.

9   All right?

10  A.  Okay.

11  Q.  Transfer number two on my list was from OptTorgLider, your

12  company, and Interprogress, Parilis's company, to Brunlow,

13  Mr. Kislin, of what you called yesterday a nominal amount.  Do

14  you remember that?

15  A.  I got a little confused.  So from the company OptTorgLider

16  and Interprogress to the Brunlow, correct?

17  Q.  Yes.

18  A.  Yes, that happened.

19  Q.  Okay.  And that really happened in 2008, too, right?

20  A.  Yes.

21  Q.  And, in fact, yesterday you mentioned that those transfers,

22  number one and two on my list, were pursuant to a written

23  agreement that you said was made between the transferring

24  parties back and forth, correct?

25  A.  Yes, that's correct.

Q.  So there was a written agreement that nobody has produced

in this case that said, in effect, that in exchange for

Mr. Kislin through his company transferring 51 percent

ownership of TRI to you and Mr. Parilis through your companies,

you and Mr. Parilis would pay a nominal amount to Mr. Kislin

and his company?

A.  Yes.

Q.  Transfer number three on my list was from TRI through its

depository, Lentesco, to Kominelli of the Solid-Podmoskovny

shares.  That's a transfer that you said yesterday took place

sometime in 2008 also, correct?

A.  Not sometime in 2008.  That was actually the first transfer

that took place.  And I am 100 percent completely sure that

those shares were transferred to Kominelli.  So in the

registration, the name of the holder of those shares was

changed from Lentesco to Kominelli.  That, I'm 100 percent sure

of.  That was the requirement from Sachkov in order to

facilitate the transfer of funds -- sorry, to execute the

transfer of funds.

Q.  What transfer of funds?

A.  The funds that Blagosostoyaniye was going to pay through

its company, to Kominelli.

            THE COURT:  And when did this happen, this transfer?

            THE WITNESS:  I can't tell you the exact date but it

was end of March, beginning of April, 2008.

1          I don't know if the shares were actually transferred

2     to Kominelli or whether Kominelli allowed the -- there's a

3     holding company, registration company -- whether those shares

4     were just held in its name at that registration company.  That,

5     I don't know.  But the fact that 51 percent of them were

6     transferred, were assigned to the name of Kominelli, that, I

7     can tell you for certain.

8          So in response to your question, yes, that transaction

9     did happen.

10    Q.  That transaction, transfer number three on my list, was

11    that done pursuant to a written contract that you are

12    knowledgable about?

13    A.  This transaction was pursuant to a written agreement, but

14    it was a written agreement that was done in Cyprus, according

15    to their regulations.  So it was a fairly simple page.

16          THE COURT:  And who were the signatories to that

17    agreement?

18          THE WITNESS:  I think on the part of Kominelli, the

19    signatory was Levkovsky.  Who was the signatory from the other

20    side, I don't remember.  It's a very simple agreement.  Because

21    at the time in Cyprus, the shares of Russian real estate funds

22    could be transferred without taxation.  It was a special

23    agreement, treaty between Cyprus and Russia about dual

24    taxation.

25    Q.  Mr. Dikker, this written agreement that you just referred

1   to, I'm not asking who -- I don't think the judge was asking

2   who the signers were.  Who were the parties to the agreement?

3   A.  From our side, from the side of TRI, it was Lentesco.  From

4   one side, one party was Lentesco.  And the other side I think

5   it was Kominelli.  The other party I believe was Kominelli.

6   Sachkov was the one who was organizing all of the agreements at

7   the time and receiving all of the documents.  He was the one

8   who was signing everything.

9   Q.  Now, in your previous answer, if I understood the

10  translation correctly, you said Levkovsky signed for Kominelli?

11  That's not true, is it?

12  A.  It was -- Kominelli was the one at the time who signed -- I

13  don't remember if he was there, but if it was him, if he was

14  there, then he is the one who had the right to sign all the

15  documents at the time.  I'm sorry.  I meant not Kominelli; I

16  meant Lentesco, on behalf of Lentesco.

17  Q.  Levkovsky was the financial director at TRI, right?

18  A.  Nominally.

19  Q.  So that's why he would sign for Lentesco, correct?

20  A.  Yes.  He was authorized to sign for TRI, Lentesco.

21          THE COURT:  I want to make sure I understand exactly

22  what was provided by Lentesco to Kominelli.

23          MR. DANNENBERG:  Can I clarify, your Honor.

24          THE COURT:  Sure.

25  Q.  In that written agreement, Lentesco -- correct me if I'm

G46EKIS1                    Dikker - cross

1   wrong -- was agreeing to transfer the Solid-Podmoskovny shares

2   to Kominelli, yes?

3   A.  I believe so.  The Cypriot agreements are very simple.  So

4   it would have been something like either selling the shares for

5   sum of, what, $10 or something, or simply signing the shares

6   over.

7   Q.  Well, you anticipated my next question, because --

8              THE COURT:  I have a question.

9              So I still want to understand.  I understand that

10  these are TRI shares in Solid-Podmoskovny.  I understand that.

11  What is the relationship between that amount of shares and

12  Kislin's interest in TRI?

13             THE WITNESS:  It was a direct one-to-one correlation.

14  51 percent of the shares of the fund Solid-Podmoskovny were

15  transferred to the company under the control of Kislin.  I'll

16  explain why.  If we had sold it from Kominelli, then the amount

17  of the funds would have had to be split equally between all the

18  shareholders; in other words -- or accordingly between all the

19  shareholders.  In other words, Kislin would have received

20  51 percent of the sale, and then OptTorgLider and Interprogress

21  would have received the other 49 percent of the shares.

22             We decided to split the shares in order for Kislin to

23  receive the full hundred percent of the funds for the sale of

24  the shares.

25             MR. BERKOVICH:  Your Honor, the witness again

1    misspoke.  He was referring to Kominelli.  I think he meant

2    Lentesco.

3            My understanding of this, as he did with the other

4    reference to Mr. Levkovsky, I think he's maybe a little tired

5    so he's using the wrong names.  I mean, you can clarify that

6    with the witness.

7            THE COURT:  Well, just for my purposes, what I'm

8    trying to understand, and I think this is correct, is that

9    Mr. Kislin's 51 percent interest in TRI is equivalent to the

10   shares of Solid-Podmoskovny that were transferred to Lentesco

11   and ultimately Kominelli.  And that everyone agrees on that?

12           THE WITNESS:  Yes, that's correct.

13           THE COURT:  You agree with that, right,

14   Mr. Dannenberg?

15           MR. DANNENBERG:  I believe I do, your Honor.

16           I think that it relates back -- I think the witness

17   actually put it in a way that I was more comfortable with

18   earlier, when he said that the transfer of the

19   Solid-Podmoskovny shares and the sale of Blagosostoyaniye was

20   used to finance the buyout of Mr. Kislin's shares.

21           THE COURT:  That's a different issue.  I'm just trying

22   to understand what those shares in Solid-Podmoskovny represent.

23   And I understand them to be equivalent to Mr. Kislin's

24   51 percent interest in TRI.

25           MR. DANNENBERG:  You mean in value?

1          THE COURT:  Yes.

2          MR. DANNENBERG:  Yes, I agree.

3          THE COURT:  All right.  Why don't we take a

4    five-minute break, okay?

5          (Recess)

6          THE COURT:  Go ahead, Mr. Dannenberg.

7    BY MR. DANNENBERG:

8    Q.  Where we left off, Mr. Dikker, was transfer number three.

9    And correct me if I'm wrong, but I think that you identified an

10   additional transfer that's not shown on my list here,

11   Plaintiff's Exhibit 12 for identification, which was a transfer

12   back from Kominelli to Lentesco of what you called a nominal

13   amount; I think you said $10.  Do you remember that?

14   A.  I remember saying that, but I'm really not certain about

15   that.  I don't know what the structure was of the transaction

16   between Lentesco and Kominelli or Lentesco and whatever company

17   Kominelli may have used.  So I'm really not certain of the

18   mechanics of that transaction.

19   Q.  Fair enough.  But it is your understanding that the

20   consideration paid for the transfer of those Solid-Podmoskovny

21   shares shown in transfer number three was a nominal amount,

22   correct?

23   A.  If there was any amount, it was a very small, nominal

24   amount.

25   Q.  So I'll call that transfer 3.1, because it goes with

1    transfer number 3, okay?  And transfers 3 and 3.1 were the ones

2    that were reflected in that written agreement that you

3    referenced just before the break, correct?

4    A.   Yes.

5    Q.   That was an agreement between Lentesco and Kominelli?

6    A.   It was definitely Lentesco.  Kominelli may have used

7    another registered holder instead of itself.  So I'm not sure.

8    I think that was probably the case, because I don't think

9    Kominelli had the authorization to hold these shares.  But I

10   know for certain that the shares were reregistered in the name

11   of Kominelli.

12   Q.   So can we say that the agreement that we were just talking

13   about was between Lentesco and either Kominelli or some company

14   on its behalf?

15   A.   Yes.

16   Q.   And that agreement -- in other words, in effect, transfers

17   3 and 3.1 -- were done in order to facilitate the next transfer

18   on my list, number 4, the same Solid-Podmoskovny shares that

19   Kominelli had just received from Lentesco being transferred to

20   Blagosostoyaniye, correct?

21   A.   Yes.

22   Q.   So TRI's Solid-Podmoskovny shares were reregistered in the

23   name of Kominelli, or some company on its behalf, as transfer

24   number three; and then those shares were again reregistered in

25   the name of -- from the name of Kominelli, or some company on

G46EKIS1                    Dikker - cross

1   its behalf, to Blagosostoyaniye, and that's transfer number

2   four?

3   A.   Not completely.  Again, it wasn't Blagosostoyaniye.  It was

4   a company that was acting on behalf of Blagosostoyaniye.  And

5   the second part is logically this transaction should have

6   occurred, but I was not involved in any way in the transaction

7   from this part on.

8   Q.   But you refereed yesterday to having knowledge of a written

9   agreement between let's say Kominelli or some company acting on

10  its behalf and Blagosostoyaniye or some company acting on its

11  behalf?

12  A.   Yes, there was.

13  Q.   What is the basis of your understanding that there was such

14  a written agreement?

15  A.   At one point Sachkov had to clarify something in that

16  agreement with me.  I don't remember what exactly it was, but

17  he had checked something with me in that agreement.  It was a

18  very simple agreement.  It was a very simple agreement.  And at

19  that time -- I don't remember what the amount in the agreement

20  was, but it wasn't the final amount.  It wasn't the final

21  agreement for the transaction.

22  Q.   The final agreement and the final amount was the

23  20 million, correct?

24  A.   Again, I can't confirm anything about the final amount.

25  All I can say about that was from the words of other

1    individuals.  When we started negotiating, we had actually

2    started from 30 million, not even 20 million.  And at one point

3    Sam said, this is not your money.  You don't have to be

4    involved.  And the only thing I was keeping an eye on was the

5    $4 million that was supposed to go to Semernin.  And even that

6    was really discussed later on without me, without my

7    participation.  All of the details of these transactions, these

8    following transactions, were done without my participation.

9    Q.  Well, Mr. Dikker, you acknowledged earlier today that the

10   purpose of the sale of the Podmoskovny shares to

11   Blagosostoyaniye was to finance the buyout of Mr. Kislin's TRI

12   shares.  Do you remember that?

13   A.  Yes, of course.

14             THE COURT:  Who told you that the final amount was

15   $20 million?

16             THE WITNESS:  No one told me about the final amount of

17   $20 million.  The final amount I was told about was

18   $16 million.  The $20 million was mentioned by Sam and by

19   Sachkov when they said that they had agreed to $20 million.

20   And that was before Semernin got involved.

21   Q.  You and Mr. Kislin were discussing --

22             THE COURT:  Sorry.  Who told you that the final amount

23   was 16 million?

24             THE WITNESS:  Sachkov and Kislin.

25             THE COURT:  Okay.  Go ahead, Mr. Dannenberg.

G46EKIS1                    Dikker - cross

1    Q.  Sachkov and Kislin never told you the final amount was

2    16 million; they told you that the final amount that was paid

3    was 16 million.  Isn't that true?

4    A.  The amount paid out was 16 million.  That's the final

5    amount.

6    Q.  That's the final amount that was paid.  But you know that

7    it wasn't the final amount that was agreed, because Mr. Kislin

8    was still demanding another $4 million after that.  Isn't that

9    true?

10   A.  At the time that the transaction actually went through,

11   Mr. Kislin did not -- wasn't demanding anything.  He spoke a

12   lot about that 4 million, but he's the one who personally

13   negotiated with Semernin, Sachkov and Demidov about how the

14   transaction was actually going to go through.  I know that they

15   weren't able to resolve -- that they weren't able to negotiate

16   down with Semernin.  Semernin started out by demanding 4

17   million and that's where it ended up.  Sam started complaining

18   about his money once the transaction actually went through.

19   And that was literally the next day.  He started complaining

20   about the $4 million after the transaction went through.

21   Q.  You're talking about whether Mr. Kislin had prior knowledge

22   of the fact that Semernin was going to grab that $4 million,

23   right?

24            MR. BERKOVICH:  Objection to form.

25            THE COURT:  Sustained.

1    Q.  In the answer you just gave, you were referring to the fact

2    that Mr. Kislin, to your knowledge, knew that Mr. Semernin was

3    going to get $4 million out of the Blagosostoyaniye funds,

4    correct?

5    A.  Of course he knew it.  Absolutely.  And he confirmed the

6    transaction.

7    Q.  I'm saying, I accept the fact that you believe that to be

8    true, although you heard from him that he does not believe it

9    to be true.  There's a dispute there.  That's fine.  I'm not

10   talking about that.

11           What I'm saying is that you and Mr. Kislin settled on

12   a buyout price for his TRI shares of $20 million, correct?

13   A.  I would like to repeat, that's not completely the case.  I

14   was not buying a share from Kislin for $20 million.  I found a

15   buyer for him.  And we brought a buyer to him for -- myself and

16   Sachkov brought him a buyer, who at that time agreed -- was

17   willing to pay him $20 million.

18   Q.  You didn't find a buyer for Mr. Kislin's shares of TRI;

19   you've already conceded in transfer number one that the --

20           THE COURT:  Well, that's just an argument.  So we're

21   not here for argument.  We're here to ask questions and get

22   answers.

23   Q.  Mr. Dikker, I'm reading to you from the second sentence of

24   paragraph E of Section 8 of the stipulated facts in this case

25   that both sides have agreed to:  Following negotiation over the

G46EKIS1                    Dikker - cross

1    valuation of that interest, Dikker and Kislin ultimately

2    settled on a figure of $20 million.

3          Does that refresh your recollection that you and

4    Mr. Kislin ultimately settled on a figure of $20 million for

5    the buyout of the shares?

6          INTERPRETER:  Sorry.  Could you repeat what section, E

7    of paragraph?

8          MR. DANNENBERG:  It's not in front of you.  I'm

9    reading it word for word.

10         INTERPRETER:  Could you repeat that, please.

11         MR. DANNENBERG:  I'm reading to you from paragraph 8E

12   of the stipulated facts that both sides have agreed to:  Quote,

13   following negotiation over the valuation of that interest,

14   Kislin and Dikker ultimately settled on a figure of

15   $20 million, closed quote.

16         So is it fair to say that you and Mr. Kislin agreed

17   that the value of the shares of TRI that he was giving up was

18   $20 million?

19   A.  No, I don't agree.

20   Q.  And isn't it also true that although transfer number one we

21   agreed shows that the actual acquirer of Mr. Kislin's

22   51 percent shares of TRI was you and Mr. Parilis through your

23   company, that transfer was going to be paid for through the

24   sale by TRI of the Solid-Podmoskovny shares to

25   Blagosostoyaniye?

1    A.   I didn't understand the question.

2    Q.   Am I correct -- withdrawn.

3         Isn't it true that in exchange for Mr. Kislin

4    transferring his TRI shares to you and Mr. Parilis through your

5    companies, he was expecting to get $20 million?

6         THE COURT:   Sustained.

7    Q.   Isn't it true, Mr. Dikker, that in exchange for

8    Mr. Kislin's transfer of shares to you and Mr. Parilis through

9    your companies, you had agreed to get him $20 million, although

10   that 20 million was not going to come from you?

11   A.   No.

12   Q.   The only way that you were going to be able to finance the

13   buyout of Mr. Kislin's 51 percent shares was by selling the

14   Solid-Podmoskovny shares to Blagosostoyaniye; isn't that true?

15   A.   No.

16   Q.   And, in fact, had you not sold those shares, had you not

17   entered into that buyout agreement with Mr. Kislin, there never

18   would have been any reason to have the sale of

19   Solid-Podmoskovny shares to Blagosostoyaniye?

20   A.   This is so confusing.  This is why I asked you to list

21   these transactions in chronological order.

22         This was the situation:  Mr. Kislin, after receiving

23   $16 million, came in the next day to the office.  And only at

24   that point did he sign the agreement to transfer the 51 percent

25   of the TRI shares, which shows that at the time he was

G46EKIS1                    Dikker - cross

1    satisfied with that amount.

2              As soon as he sold us the TRI shares, that very same

3    day he started talking about the $4 million.  Yes, that's true.

4    That was a separate conversation that we were discussing and

5    agreeing to certain things.  But that's how it happened

6    chronologically.  First, he got the $16 million, and then he

7    signed it.

8    Q.  Well, you knew when he asked you for that $4 million that

9    he was talking about the 4 million that Semernin had gotten out

10   of the Blagosostoyaniye money, correct?

11             MR. BERKOVICH:  Objection to form, your Honor.

12             THE COURT:  Wait.  Sustained.

13   Q.  Was it your understanding, Mr. Dikker, that when Mr. Kislin

14   was referring to that $4 million the next day, he was talking

15   about the fact that he believed that he had gotten $4 million

16   less than he thought he was entitled to out of the sale of his

17   TRI shares?

18   A.  Yes.  According to his words, he received $4 million less

19   from the transaction than he had anticipated.  But he had

20   confirmed the transaction of the $16 million.

21   Q.  You understood that he had already consented to Semernin's

22   getting $4 million out of the Blagosostoyaniye money; that's

23   what you said, right?

24   A.  That was the only way -- that was the only option he had.

25   Yes, he agreed to it.

Q.  But you also understood that he wasn't relinquishing his

right to get the balance of the 20 million -- in other words,

that $4 million -- ultimately for the sale of his TRI shares,

correct?

A.  I don't know that.

Q.  And, in fact, you understood that that's why the very next

day Mr. Kislin was saying, I'm still owed $4 million, isn't

that right?

A.  No, that's not correct.

Q.  All right.  Let me go back to my list here, Plaintiff's

Exhibit 12 for identification.

        You said there was a written agreement that reflected

transfers 1 and 2.  You said that there was a written agreement

that reflected transfers 3 and what we've identified as 3.1.

However, we don't have a copy of that written agreement, and

you haven't produced it at trial, have you?

A.  Yes, that's correct.

Q.  And you said that there was a written agreement between

Kominelli or some company on its behalf and Blagosostoyaniye or

some company on its behalf, but although you might have been

shown a copy of it by Sachkov, you never had a copy of it,

correct?

A.  I wasn't a party to the agreement, so, no, I never had it.

Q.  But you do know, or at least it is your understanding, that

transfer number 4 happened, correct?

G46EKIS1                    Dikker - cross

1    A.  Both sides confirmed it.

2    Q.  And it was your understanding that transfers numbers 5 and

3    6 also happened, correct?

4    A.  They were also confirmed by all the parties, yes.

5    Q.  When you say "all the parties," who are you talking about?

6    A.  Transfer number 5 was confirmed by Kislin, Sachkov and

7    Demidov.  Transfer number 6 was confirmed by Sachkov and

8    Semernin.

9    Q.  So transfer number 5 was the transfer of the 16 million

10   from Blagosostoyaniye to Kominelli, correct?

11   A.  Money belonging to Blagosostoyaniye through their entities

12   to Kominelli.

13   Q.  And transfer number 6 was the transfer of about $4 million

14   from Blagosostoyaniye or some company on its behalf to Semernin

15   or some company with which he was connected?

16   A.  I'm sorry, but I think transfer number 6, I think there

17   should be some sort of a correction to that.  Blagosostoyaniye

18   could not have transferred funds through Semernin's company.

19   Even their representative company could not have.  I don't know

20   how that was actually performed.

21   Q.  Do you know who or what company transferred $4 million

22   approximately to either Semernin or some company he was

23   affiliated with?

24   A.  Well, like I said, I don't know what the company was that

25   actually performed that transfer.  I know that this was either

1    Sachkov or people on his behalf.  I'm just telling you that it

2    couldn't have been Blagosostoyaniye themselves because

3    Blagosostoyaniye had no interaction or no legal agreement with

4    Semernin.

5    Q.  Did Sachkov or some people on his behalf have -- withdrawn.

6         Whatever the entity was that transferred the 4 million

7    to Semernin or some company that he was affiliated with, those

8    funds, as far as you know, originated from Blagosostoyaniye or

9    some company on its behalf, correct?

10   A.  That's my understanding, yes.

11   Q.  Am I correct that there was no written agreement between

12   you and Mr. Kislin, or you and Mr. Parilis and Mr. Kislin, for

13   the payment of $20 million to Mr. Kislin in exchange for his

14   51 percent TRI ownership?

15   A.  No, there was no agreement.

16   Q.  But you do know from your conversations with Mr. Kislin

17   during the negotiation for his buyout that he was expecting to

18   receive $20 million in exchange for the transfer of his TRI

19   ownership ultimately?

20   A.  At the time that the buyer first was found, at the time

21   that Blago first got involved, that $20 million was the amount

22   that was discussed.

23   Q.  You keep referring to Blagosostoyaniye as the buyer, but

24   Blagosostoyaniye was the buyer of the Solid-Podmoskovny shares,

25   correct?

1    A.  Yes, that's correct.

2    Q.  So Blagosostoyaniye was not the purchaser of Mr. Kislin's

3    51 percent ownership of TRI, was it?

4    A.  Yes, that's correct.

5    Q.  You and Mr. Parilis from your companies were the purchasers

6    of Mr. Kislin's 51 percent ownership of TRI, correct?

7    A.  Yes, that's correct.

8    Q.  And the sale of the Solid-Podmoskovny from TRI through

9    Lentesco to Kominelli and then to Blagosostoyaniye was done

10   just to facilitate the sale of -- the purchase by you and

11   Mr. Parilis of Mr. Kislin's 51 percent ownership, correct?

12   A.  No, that's not correct.  If you want to know, I can clarify

13   it.

14   Q.  Go ahead.

15   A.  After the fact that -- well, the 51 percent of the shares

16   of Solid-Podmoskovny were transferred to the structure that

17   belonged to Mr. Kislin or Mr. Sachkov under the power of

18   attorney of Mr. Kislin, the company TRI was left only with

19   shares that had been -- that had belonged to OptTorgLider and

20   Interprogress.  Because there were agreements on projects that

21   had nothing to do with the transaction, the sale to Blago, the

22   restructuring or the splitting-up with Mr. Kislin was going to

23   be done project by project.  So TRI was left only with the

24   shares of Solid-Podmoskovny, which belonged to OptTorgLider and

25   Interprogress.  That was a purely technical transaction.  We

1    didn't even have to pay the nominal amount for that.  Okay,

2    that's it.

3    Q.  Mr. Dikker, you're talking about the technical aspects of

4    various agreements that were being made more or less around the

5    same time.  But my question is more broad than that, so let me

6    ask it a different way.

7         You've identified three written contracts.  The first

8    one is reflecting my transfers 1 and 2 on Exhibit 12.  The

9    second is identified in transfers 3 and what we've identified

10   as 3.1.  And the third is between Blagosostoyaniye or some

11   company on its behalf and Kominelli or some company on its

12   behalf.

13        Those three written agreements were all put together

14   for the sole purpose of facilitating the buyout by you and

15   Mr. Parilis of Mr. Kislin's 51 percent ownership; is that

16   correct?

17   A.  No.

18   Q.  I'm going to refer back to your affidavit or your

19   declaration, Defendant's Exhibit 7.

20        THE COURT:  That's Defendant's Exhibit F.

21        MR. DANNENBERG:  I'm sorry, Defendant's Exhibit F.

22   Thank you.

23   Q.  In paragraph five, which starts at the bottom of page two,

24   you refer to a document called first memorandum of

25   understanding.  Do you see that?

G46EKIS1                    Dikker - cross

1    A.  Yes.

2    Q.  But you didn't produce any such document during the

3    pretrial discovery in this case, and you haven't produced it at

4    trial, have you?

5    A.  No, I did not provide it.  Unfortunately, I do not have a

6    copy.

7    Q.  Nor do you have a copy of the second memorandum of

8    understanding, which is referred to in paragraph 6.  And you

9    haven't produced that in this case, have you?

10   A.  Correct.  I did not provide that either, again, for the

11   same reason.

12   Q.  Bear with me for a second.  When Mr. Kislin came to you the

13   day after these various transactions were completed and

14   demanded payment of $4 million, an additional $4 million, you

15   understood that was the same $4 million that had been diverted

16   to Mr. Semernin, correct?

17   A.  Yes.  He was talking specifically about those funds.

18   Q.  And those conversations between you and Mr. Kislin over the

19   payment of an additional $4 million continued for some period

20   of time, correct?

21   A.  Yes.

22   Q.  And at some point those discussions evolved into the idea

23   of transferring to Mr. Kislin additional shares that TRI owned

24   in Solid-Podmoskovny, correct?

25   A.  No.

1    Q.  Do you deny that you and Mr. Kislin ever discussed

2    transferring to him or some company that he was affiliated with

3    254,556 shares of Solid-Podmoskovny?

4    A.  I'm not denying that there was a conversation about this.

5    Your question was different.  Your question was that we were

6    discussing the amount -- well, it started out with -- my

7    position was that this was a business expense and it should be

8    treated as such.

9    Q.  What was a business expense?

10   A.  The 4 million.

11   Q.  And how were you suggesting you have to treat it?

12   A.  My position was that the business paid this; that this was

13   something that was paid and that Kislin agreed to it, to the

14   smaller amount.  And that was his issue.  This wasn't money, as

15   Mr. Kislin had stated yesterday, that I had somehow stolen from

16   his account or something like that.  This wasn't money that I

17   received in exchange for some sort of additional assets or

18   shares that I sold to Mr. Semernin or anything like that.  This

19   was real money that had to be paid from the business that we

20   had received real profit from before.

21   Q.  Nevertheless, Mr. Dikker, at some point in time you and

22   Mr. Kislin discussed the concept of transferring to him 254,556

23   shares of Solid-Podmoskovny owned by TRI?

24   A.  You're pulling out pieces from the middle from different

25   parts.  Yes.  If you want to know whether that was ever

1    discussed, yes.  The answer is yes.  But you're not going

2    through this in a chronological manner.

3    Q.  I'll accept your criticism of my question.

4            But the answer is yes, at some point you had that

5    discussion?

6    A.  Yes, at some point that was discussed.

7    Q.  And the reason why that figure, 254,556, was chosen was

8    because it was a valuation at that point of Solid-Podmoskovny

9    shares at $4 million, correct?

10   A.  Not really.  If you want, I can explain.

11   Q.  Go ahead.

12   A.  This amount of 254,000 shares appeared prior to the crisis;

13   after the transaction, Blagosostoyaniye, but prior to the

14   crisis.  And it was related not to the Solid fund but to the

15   Boyarkino Invest fund.  Subsequently, when we were rewriting

16   the agreements, that number just went from the one fund to the

17   other fund.

18   Q.  When you were rewriting what agreements?

19   A.  I pointed it out here.  We wrote the agreements four times,

20   or rather, three times.  There was the original agreement, and

21   then there were three rewrites of that agreement.

22   Q.  You're talking about the memoranda of understanding that

23   are referred to in paragraphs five, six and nine of the

24   declaration?

25   A.  Yes.

1    Q.  And is it your testimony that those three memoranda of

2    understandings were each done at different times in order to

3    figure out a way to get Mr. Kislin to be satisfied that he was

4    getting everything that he was entitled to under the original

5    buyout agreement of his shares?

6                MR. BERKOVICH:  Objection to form.

7                THE COURT:  Sustained.

8                We're going to break for lunch at this point.  We'll

9    resume at 2:15.

10               Mr. Dannenberg, how much longer do you expect?

11               MR. DANNENBERG:  I really thought we'd be done by now,

12   your Honor, so my predictions have not been good.  But

13   certainly less than an hour.

14               THE COURT:  Mr. Berkovich, do you expect --

15               MR. BERKOVICH:  My redirect should not take more than

16   15 minutes, your Honor.

17               THE COURT:  Okay.

18               MR. BERKOVICH:  May I mention other things that we may

19   be doing in terms of the time management?

20               From my point of view, the only thing that I would

21   like to introduce is what was done by Mr. Dannenberg yesterday,

22   to introduce some pages to depositions of Mr. Kislin.

23   Mr. Dannenberg may have some objections.

24               And the rest of it is up to your Honor, whether you

25   want closing statements or they should be done in writing, etc.

G46EKIS1                    Dikker - cross

1    Obviously it's your Honor's decision in terms of the time

2    management.

3              THE COURT:  All right.  We'll resume at 2:15.

4              (Luncheon adjournment)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                       AFTERNOON SESSION

2                          2:31 p.m.

3              THE COURT:  Mr. Dikker, can you take the stand.

4              You may proceed, Mr. Dannenberg.

5              MR. DANNENBERG:  Thank you.

6    BY MR. DANNENBERG:

7    Q.  We left off before lunch, Mr. Dikker, with the reference to

8    paragraphs five, six and nine of your declaration, Defendant's

9    Exhibit F.  In particular, you were referenced to what is

10   characterized as a first memorandum of understanding, a second

11   memorandum of understanding and a third memorandum of

12   understanding.

13             The third memorandum of understanding, you indicated

14   that paragraph nine was actually reflected in two separate

15   documents, which are the documents, or at least the Russian

16   versions of documents, that were marked as Plaintiff's

17   Exhibits 3 and 4 in evidence, correct?

18   A.  Yes.

19   Q.  Those two documents were furnished by Mr. Kislin during the

20   course of pretrial discovery in this case.  Do you recall that?

21   A.  Yes.

22   Q.  You yourself do not have copies, nor have you produced

23   copies in this case, of any one of the three memoranda of

24   understandings that were reflected in paragraphs five, six and

25   nine of your declaration?

G46EKIS1                    Dikker - cross

1   A.  I don't have them.

2   Q.  But you indicated, correct me if I'm wrong, before the

3   lunch break that all three of these memoranda of understanding

4   were prepared sometime after the transactions that were

5   reflected on those list of transfers in my Plaintiff's

6   Exhibit 12 for identification?

7   A.  Yes.

8   Q.  And each of the memoranda of understanding was a document

9   that was signed by you and Mr. Kislin and nobody else, correct?

10  A.  Yes.

11  Q.  We have a third from Plaintiff's Exhibits 3 and 4.  But can

12  you approximate when the first memorandum of understanding and

13  the second memorandum of understanding were prepared and

14  signed?

15  A.  Number one was prepared -- was signed -- I couldn't tell

16  you the exact date but it was in April of 2008.

17          Number two was signed after the crisis, after we

18  realized that Semernin was going to take all of the shares for

19  himself.  And this was signed approximately either November,

20  December of '08 or January of '09.

21          And number three and four, you have there.

22  Q.  That answer confused me.  I'll tell you why, Mr. Dikker.

23  Mr. Semernin took the $4 million at or before the time of the

24  larger transaction which was reflected in Exhibit 12, correct?

25  A.  Yes, that's correct.

G46EKIS1                        Dikker - cross

1   Q.  But didn't you say that each of these memoranda of

2   understanding was done after the larger transaction?

3   A.  Of course it was after.

4   Q.  Let me just set -- in terms of a time frame, there was a

5   transfer of the $16 million to Lentesco that we were talking

6   about this morning.  And you indicated that the next day

7   Mr. Kislin was in your office talking about how he was going to

8   get an additional $4 million.  Do you remember that?

9           MR. BERKOVICH:  Objection to form, your Honor.

10          THE COURT:  What's your objection?

11          MR. BERKOVICH:  Objection is that assumes a fact not

12  in evidence.  It assumes that there was a transfer of

13  $16 million to the company called Lentesco.  It's -- I believe

14  the evidence will show that the witness testified his transfer

15  of $16 million was to a company called Kominelli or one of its

16  designees but not --

17          MR. DANNENBERG:  I'll rephrase the question.  That's

18  what Mr. Berkovich heard.

19  BY MR. DANNENBERG:

20  Q.  Correct me if I'm wrong, but did you testify this morning

21  that one day after $16 million was transferred to the Kominelli

22  account from that buyout transaction, Mr. Kislin was in your

23  office saying, how am I going to get an additional $4 million?

24  A.  Yes.

25  Q.  Relative to that date that he said, where he first said,

 1   how am I going to get an additional $4 million, how many days,

 2   weeks or months later did you and Mr. Kislin prepare and

 3   sign -- how many days, weeks or later did you sign the first

 4   memorandum of understanding that's referred to in paragraph

 5   five of your declaration?

 6   A.  I don't remember exactly.  Maybe a month or two later.

 7   Q.  And who prepared that document?

 8   A.  I sketched it out, but Levkovsky is the one who actually

 9   prepared it.

10   Q.  Again, at the time Mr. Levkovsky was the financial director

11   at TRI?

12   A.  It essentially was, but not nominally.

13   Q.  He was not a lawyer, correct?

14   A.  No, he was not a lawyer.

15   Q.  And relative to the date on which the first memorandum of

16   understanding was signed, how many days, weeks or months later

17   was the second memorandum of understanding signed?

18   A.  As I just said, end of 2008, beginning of 2009.  I don't

19   remember the exact month.

20   Q.  Okay.  And --

21   A.  Maybe seven or eight months later.

22   Q.  Who prepared that document, the second memorandum of

23   understanding?

24   A.  The same individuals.  I gave some changes, put some

25   changes, and Levkovsky prepared it.

1    Q.  And was that the same thing that was done with the third

2    memorandum of understanding; you sketched it out and

3    Mr. Levkovsky actually prepared it?

4    A.  I just jotted down a few things.  There were just a few

5    minor changes from the second one, so it was the same thing.

6    The third and the fourth one were prepared by Levkovsky.

7    Q.  Each of these three documents -- the first, second and

8    third memorandum of understanding -- were intended by you and

9    Mr. Kislin to address Mr. Kislin's claim for the additional

10   $4 million he is seeking from the buyout transaction, correct?

11   A.  Can I clarify that question?

12   Q.  I'd prefer an answer.  You don't have to clarify the

13   question.

14          THE COURT:  Do you understand the question?

15          THE WITNESS:  Yes, I understand it.

16          THE COURT:  All right.  Then you should answer it.

17   A.  No.  It wasn't to return $4 million to him that he felt

18   that we owed him.

19   Q.  What were they intended to do, then?

20   A.  I felt that this whole business was successful because of

21   Mr. Kislin's contribution.  And so I felt that it would be

22   improper to just disregard his concerns.  And after discussion

23   with my business partner, we brought him back to selling the

24   real estate shares -- the property shares, rather, by

25   providing -- giving him part of the Boyarkino Invest.  I'm

1    sorry, not the actual Boyarkino Invest, but a limited amount of

2    the proceeds from the sales of the shares of Boyarkino Invest.

3          At the same time, the division of the revenue streams

4    from the cash flow was at the time being divided among the

5    three parties.  So it wasn't going all to Mr. Kislin.  Part of

6    it went to development, to developing the company -- I'm sorry,

7    development of the properties.  The second part went to

8    Mr. Kislin.  And the third part of the cash flow went to us.

9    By "us" I mean OptTorgLider and Interprogress; essentially to

10   TRI.

11   Q.  Now, let me just ask about one phrase that you used at the

12   beginning of that answer.  You said that you were trying to

13   address his concerns.  That's the phrase that you used.

14         The concerns that you were referring to was an

15   expression on Mr. Kislin's part of a belief that he had that he

16   was still owed $4 million.  I'm not saying that you agree with

17   him, but he expressed a concern to you that he was still owed

18   $4 million.  Isn't that true?

19   A.  No.  I had a different motivation.

20   Q.  I'm not asking what your personal motivation was.  I'm

21   asking you to explain the phrase that you used, to address his

22   concerns.  I'm asking whether it's true that the concern that

23   he raised with you was that he was still owed another

24   $4 million from the buyout transaction.

25   A.  That was his opinion.  Yes.

Q.  And in order to address that concern, you put together a

concept of a way to generate funds that you and Mr. Parilis

would share with Mr. Kislin, correct?

A.  Correct.

Q.  So we don't have the first and second memoranda of

understanding, but they're referred to and characterized in

your declaration.

        But we do have what you call a third, which is

actually two separate documents.  So let me focus on those two

documents, starting with Plaintiff's Exhibit 3.  Exhibit 3 is

the one that was signed in November of 2009, correct?

A.  Yes, correct.

Q.  Now, in your declaration, with respect to all three

memorandum of understanding, including this one, you used a

Russian word, *Ponyateika*, P-O-N-Y-A-T-E-I-K-A.  And could you

explain what that word means in English.

A.  The thing is in reality, in the activity of TRI, the normal

activity of TRI, there was a large number of documents that

were being prepared, agreements and other documents.  Sam never

really -- was never involved and never read and asked not to be

inundated with these agreements.

        THE COURT:  I'm sorry.  I'm going to break in,

Mr. Dikker, because the question was very simple.

        Mr. Dannenberg asked you if you could define the

Russian word *Ponyateika*.  That's the question.  So can you tell

1    us what *Ponyateika* means in English.

2                THE WITNESS:  I agree with the translation.  It's a

3    type of memorandum of understanding.

4    Q.  And you used that term, *Ponyateika*, or memorandum of

5    understanding, to distinguish from an actual legal contract; is

6    that your intent in using that term?

7    A.  When things reached a level of a legally binding agreement,

8    then the conditions, the terms in the memorandum of

9    understanding, were that transfer into the legally binding

10   agreement.

11   Q.  Okay.  So am I correct that the reason why you used that

12   Russian word in paragraphs five, six and nine of your

13   declaration was to make clear that these were not intended to

14   be binding agreements?

15   A.  Sorry.  Could you just repeat that one more time.

16   Q.  I'm trying to understand your reasoning in using that term

17   in paragraphs five, six and nine of your affidavit.  And I'm

18   asking whether the reason why you used it was to be able to

19   express a belief that these three documents that were referred

20   to as memorandum of understanding were not legally binding

21   documents.

22   A.  They certainly were not legal documents.  At any point

23   while they were being implemented, things could turn in a way

24   that any number of the points could not be fulfilled, at which

25   point we would go back and renegotiate the terms of the

1  memorandum of understanding.  That's the way Sam and I worked.

2  We were constantly reviewing and renegotiating the terms of the

3  memorandums.

4          (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

G46HKIS2

1    BY MR. DANNENBERG:

2    Q.  Well, let me ask you, sir, do you have the actual Russian

3    document that was signed in November of 2009 in front of you

4    that's part of Plaintiff's Exhibit 3?  The word *Ponyateika* does

5    not appear anywhere in that document; am I correct?

6    A.  It's just, like, a nickname.  So the fact that the word

7    isn't here, that doesn't mean that this is some sort of a legal

8    agreement.  By Russian law the points in this, in this

9    document, cannot be enforced as a legal agreement.

10   Q.  With all due respect, I see your knowledge of Russian law,

11   Mr. Dikker --

12           THE INTERPRETER:  Sorry, from the interpreter.  Just a

13   clarification, that's the witness, the witness states.

14   A.  That's not what I meant.  I meant that none of these points

15   in this memorandum could be performed as part of the agreement.

16   Each one of these forms, points in this memorandum, had to be

17   separately -- set separately into an agreement or agreed to

18   separately.

19   Q.  Mr. Dikker, I asked you a yes-or-no question, and if you

20   can't answer a yes or no, tell me; but if you can, I'm just

21   looking for a yes-or-no answer.

22           Was the word *Ponyateika*, the Russian word, used in the

23   Russian version of the document that's marked as Plaintiff's

24   Exhibit 3?

25   A.  No.

G46HKIS2

1   Q.  When you got the document from Mr. Levkovsky -- by the way,

2   the one that you signed in November of 2009, was that the only

3   version of that particular agreement, the third memorandum of

4   understanding that Mr. Levkovsky did, or did it go through some

5   revisions?

6   A.  Possibly.  I don't recall.

7   Q.  When you saw the document, before you signed it --

8           THE COURT:  Could we refer to it by the exhibit.

9   You're talking about plaintiff's exhibit; right?

10          MR. DANNENBERG:  I'm talking about that, yes.

11          THE COURT:  So let's refer to it by the exhibit.  We

12  have the exhibit.  Let's refer to it by the exhibit number.

13  Q.  When you saw the Russian document that's part of

14  Plaintiff's Exhibit 3 and you saw at the very top of it the

15  heading said, "Agreement No. 12-11/1", did you go to Levkovsky

16  and say, This is not an agreement.  This is just a memorandum

17  of understanding, or words to that effect?

18  A.  I did not say that, but this is the personal numbers or

19  recordkeeping of Levkovsky.  This is not a legal recordkeeping.

20  Meaning the dash, 12-11.

21  Q.  Now I'm referring to paragraphs 6B and 8 of Plaintiff's

22  Exhibit 3.  In particular, the reference in each of those

23  paragraphs to 254,556 shares of Solid-Podmoskovny for the other

24  fund that's referred to in that document, Russkoye Polye.  Do

25  you see that?

1  A.  Do you mean those paragraphs?

2  Q.  I'm just asking if you see that number in those two

3  paragraphs.

4  A.  Yes, I see it.

5  Q.  Where did that number come from?

6  A.  It was automatically transferred from the first memorandum.

7  Q.  Where did it come from in the first memorandum?  Why did

8  you pick that particular number?

9           MR. BERKOVICH:  Object to the form.

10          THE COURT:  Sustained.

11  Q.  Why was the number 554,500 -- 254,556 shares of

12  Solid-Podmoskovny fund chosen in that first memorandum of

13  understanding?

14  A.  The specific -- the first memorandum was determined by the

15  reality at the time.

16  Q.  The reality being that at that time --

17  A.  (In English) I am not done.  I'm sorry.

18          THE INTERPRETER:  "I am not done.  I'm sorry."

19  A.  At that time, the -- probably shares of Boyarkina Invest.

20  This was before --

21          THE COURT:  Just to confirm this, you've given all

22  these names to the court reporters; right?

23          MR. DANNENBERG:  Not Boyarkina.  That was not on the

24  list.

25          THE COURT:  Every single foreign name, reference, I

G46HKIS2

1    want provided to the court reporters so we have an accurate

2    transcript.

3            MR. DANNENBERG:  That was one --

4            THE COURT:  There's a term called Boyarkina Invest?

5            MR. DANNENBERG:  That was the one I did not know

6    about, but I did put all the other ones in there.

7            THE COURT:  All right.  So I guess we should probably

8    spell it for this court reporter now.

9            Go ahead.  Okay.  Go ahead, Mr. Dikker.  I interrupted

10   you.  Finish your answer.

11           THE WITNESS:  The last transaction with Boyarkina

12   Invest with a buyer that was brought over by Semernin was

13   transacted at a price that allowed us to split the cash flow in

14   such a way for TRI and Sam to split $4 million and to leave

15   another $2 million for the development of properties, of other

16   properties.

17   BY MR. DANNENBERG:

18   Q.  Let me ask about Exhibit 3.  Exhibit 3 has that $4 million

19   reference in it.  It appears twice in paragraphs 6A and 8.  Do

20   you see that?

21   A.  Yes, I see it.

22   Q.  What is said in those two paragraphs -- I'm only talking

23   about this document -- is that the division of proceeds from

24   the sale of certain assets or equities was going to be divided

25   in a way that Mr. Kislin would be given a share up to

G46HKIS2

1   $4 million.  Is that what it says?

2   A.  Yes, that's correct.

3   Q.  Putting aside the first and second memorandum of

4   understanding, because we don't have them in front of us, just

5   talking about this document, Plaintiff's Exhibit 3,

6   essentially, what you were reflecting in that agreement was

7   that the division of proceeds, regarding the sales that are

8   referred to in the document, would be such that the maximum

9   amount that Mr. Kislin could be given would be either a

10  transfer of 254,556 shares of the equity or $4 million or some

11  combination that added up to $4 million, but no more; correct?

12  A.  Yes.

13  Q.  Now, paragraph 1 of Exhibit 3 refers to exchange of 254,556

14  units of the Solid-Podmoskovny for the other fund that's

15  referenced there, Russkoye Polye; correct?

16  A.  Yes.

17  Q.  In paragraph 2, there is a deadline for that exchange of

18  December 31, 2009.  Do you see that?

19  A.  Yes.

20  Q.  At the time that you signed the document in November of

21  2009, did you believe that you would be able to accomplish that

22  exchange by December 31, 2009?

23  A.  We thought so, yes.

24  Q.  On what basis do you believe that you were going to be able

25  to accomplish that exchange of shares by December 31, 2009?

G46HKIS2

1    A.  At that time there was a credit open for the development of

2    property, property, land.  And the way things were moving

3    along, we were convinced that we would be finished by that

4    point.

5    Q.  At that point had the Russkoye Polye fund been created?

6             THE COURT:  As of what point?

7             MR. DANNENBERG:  I'm talking about at the point he

8    signed Exhibit 3.

9    A.  Russian -- Russkoye Polye had been created.

10   Q.  Had TRI already become an equity shareholder, bondholder,

11   in Russkoye Polye at the time that he signed Exhibit 3?

12            MR. BERKOVICH:  Objection to form, your Honor.

13            THE COURT:  What's your problem with the question?

14            MR. BERKOVICH:  That it assumes facts not in evidence.

15   He didn't ask the question whether Simon Dikker had any equity

16   units in Russkoye Polye.

17            THE COURT:  Sustained.

18   BY MR. DANNENBERG:

19   Q.  At the time that you signed Exhibit 3, did TRI already own

20   any shares or equity interest in Russkoye Polye?

21   A.  It did not own any of the property shares.

22   Q.  At any point in time after November 2009 when you signed

23   Exhibit 3, did TRI become an equity interest holder in the

24   Russkoye Polye fund?

25   A.  Prior to that point where I left Russia, no, that never

1    happened.

2    Q.  When did you leave Russia?

3    A.  Beginning of July 2013.

4    Q.  To your knowledge, did TRI acquire any interest in Russkoye

5    Polye fund at any time after you left Russia in July 2013?

6    A.  I don't know that.  I don't think so.

7    Q.  Am I correct that you were not able to accomplish the

8    exchange of shares referred to in paragraph 1 of Exhibit 3

9    prior to December 31 of 2009?

10   A.  Yes, I was -- yes, we weren't able to.  TRI never held any

11   of the shares, and we did not even get to the point where we

12   could think of selling them.  We never had a single share.

13   Q.  So there never came a point, to your knowledge, in which an

14   exchange of any Russkoye Polye -- any Solid-Podmoskovny shares

15   owned by TRI were exchanged or converted to Russkoye Polye

16   shares?

17   A.  As far as I know, no, never.

18   Q.  With regard to the other time frame that's referred to in

19   Exhibit 3 which is at paragraph 7 that refers to the time frame

20   for selling off Russkoye Polye shares, and refer to the time

21   period of December 2009 through May of 2010, that, obviously,

22   could not have happened either because there was never any

23   conversion to begin with of Solid-Podmoskovny to Russkoye

24   Polye?

25   A.  That's correct.

1  Q.  Take a look at paragraph 52 of your declaration,

2  Defendant's Exhibit F, page 14.

3       I'll just read the part I'm going to be asking you

4  about:  "To the best of my understanding, as described above,

5  the additional TRI shares of Russkoye Polye could not be sold

6  under the two memoranda of understanding produced by Kislin,

7  see Plaintiff's Exhibits 3 and 4, because of the sharp decline

8  in real estate market in Russia and restructuring of Russkoye

9  Polye."

10      Do you see that?  My only question is do you see that?

11 A.  Yes.

12 Q.  Why would you use the phrase "the additional TRI shares of

13 Russkoye Polye" when you say that there were no shares of

14 Russkoye Polye owned by TRI?

15 A.  I don't have a response to that question.  I think that

16 that's a mistake, a typo.

17 Q.  You say typo.  You mean it's false, what's written in

18 paragraph 52 of your declaration; correct?

19 A.  The word "additional" is incorrect.

20 Q.  Well, if you say additional was correct, it implies there

21 was something to begin with?

22 A.  Additional is incorrect.

23 Q.  If you say the word "additional" is incorrect, it still

24 implies there's something to begin with, but your testimony

25 here today was that there were never any TRI shares in Russkoye

1   Polye; isn't that your testimony?

2   A.  Can I respond in a non-yes-or-no form and explain?

3   Q.  I'd like to know why you can't answer that yes or no?

4   A.  Because it would not clarify the situation in any way.

5   Q.  Let me rephrase it.  I'm sorry, your Honor.

6          THE COURT:  All right.

7   Q.  Is it fair to say that any reference in paragraph 52 of

8   your declaration or anywhere else in your declaration in which

9   a reference is made to TRI owning shares of Russkoye Polye is

10   incorrect?

11   A.  Can I explain the situation or not?

12   Q.  You seem to be dying to give me an explanation, so go

13   ahead.

14   A.  TRI, in an agreement with the board of directors, was

15   supposed to own 25 percent of the shares of Russkoye Polye.

16   The management, Trinfko, froze the awarding of the shares until

17   the development of the property, of the land, was to be

18   completed.

19   Q.  I understand, Mr. Dikker.  You're not really explaining

20   what the answer to my question is, though.

21          My question is any suggestion made in your declaration

22   that TRI actually owned shares in Russkoye Polye is incorrect;

23   correct?  Am I correct?

24   A.  If it says that TRI owns shares of Russkoye Polye, yes,

25   that's incorrect.

G46HKIS2

1   Q.  So the management freeze that you're referring to, you just

2   referred to in your answer and that you're referring to in

3   paragraph 52, was a freeze on the sale or disposition or

4   transfer of shares of Solid-Podmoskovny; correct?

5   A.  Russkoye Polye.

6   Q.  Are you saying that the management --

7        THE COURT:  You used the terms Solid-Podmoskovny.  Did

8   you intend to use that term?

9        MR. DANNENBERG:  Yes.

10        THE COURT:  Okay.  So he said no, it's the Russkoye

11   Polye.

12   Q.  In that case, Mr. Dikker, I don't understand because you're

13   saying that management --

14   A.  (In English) I'm sorry for interruption.

15        I'm sorry for interrupt.  I thought that you misspoke,

16   so I didn't respond to your question yet.  You had --

17   Q.  I want to make the record clear, so let me rephrase the

18   question.  I'll withdraw the last question.

19        When you talked in a prior answer about a management

20   company freeze, and when you used that phrase, the management

21   company froze the sale in paragraph 52, are you talking about a

22   freeze in the sale of Russkoye Polye shares?

23   A.  I meant the shares of Russkoye Polye, but in this

24   paragraph, it says -- uses the word "froze the sales."  The

25   actual freezing was freezing of the distribution among the

G46HKIS2

1   holders of the shares.

2   Q.  But there was no freeze on the acquisition of shares --

3   withdrawn.  Withdrawn.

4       Let me just ask you if there's another mistake in

5   paragraph 52, because it talks about, in line 4 going to line

6   5, Russkoye Polye management company froze the sale of all

7   shares, with a capital "S" of the word "shares."  Do you see

8   that?  And the reason that the word -- that the letter "S" is

9   capitalized in the word "shares" is because it's a defined term

10  in this document, a definition being set forth in the last

11  sentence of paragraph 1; isn't that true?

12  A.  Yes, that's correct.

13  Q.  Are you now saying that it was a mistake by capitalizing

14  the letter "S" in paragraph 52 because the word "shares" with a

15  capital "S" is defined as shares of Solid-Podmoskovny in

16  paragraph 1?

17  A.  Yes.

18  Q.  Solid-Podmoskovny shares were not being frozen, were they?

19  A.  No, they were also frozen at the demand of

20  Blagosostoyaniye.

21  Q.  I didn't understand that answer.  Could you explain.

22  A.  Blagosostoyaniye also froze the shares.  The reason that we

23  switched from Solid-Podmoskovny to Russkoye Polye was because

24  Blagosostoyaniye, through the registry, froze completely the

25  sale of shares of Solid-Podmoskovny.

1    Q.  When did that, that freeze by Blagosostoyaniye, take place?

2    A.  At the end of -- no, I'm sorry, in the middle of 2009.

3            THE COURT:  We're going to have to take a break at

4    this point, unless you tell me you're going to end in the next

5    minute.

6            MR. DANNENBERG:  I'm going to end this section in the

7    next minute.  Could I just finish this last question?

8            THE COURT:  Well, I have a TRO.  It's been waiting.  I

9    assumed this was going to be over hours ago.

10           MR. DANNENBERG:  Me, too, your Honor.

11           THE COURT:  I have a TRO I have to address because it

12   has to be done today, so I'm going to come back as soon as I

13   can, but this is something I have to do now.

14           MR. DANNENBERG:  I understand.  But just for planning

15   purposes, I've got about 15 more minutes.

16           THE COURT:  Hopefully we can still conclude today.

17   That's my hope.

18           MR. BERKOVICH:  I will be short, your Honor.  Again,

19   apparently, there's some objection to some of the deposition

20   pages, and I don't know how many.

21           THE COURT:  I suggest this.  While I'm upstairs, maybe

22   you can go through the deposition objections and maybe resolve

23   them so we don't have to waste time on that.

24           MR. DANNENBERG:  Yes.

25           THE COURT:  I'll be back as soon as I can.

G46HKIS2

1          (Recess)

2          THE COURT:  Mr. Dikker, would you take the stand.

3          Please proceed, Mr. Dannenberg.

4     BY MR. DANNENBERG:

5     Q.  Mr. Dikker, the other exhibit that you have before you is

6     Plaintiff's Exhibit 4.  That is the second part of what you

7     called the third memorandum of understanding, and that is a

8     document that you signed in 2012, is it not?

9     A.  Yes, that's correct.

10    Q.  Right before we broke this afternoon, you said that the

11    Blagosostoyaniye management had frozen the Solid-Podmoskovny

12    fund in the middle of 2009; correct?

13    A.  They didn't freeze the fund.  They froze the shares or,

14    rather, blocked the shares, the distribution of shares.

15    Q.  The shares of Solid-Podmoskovny?

16    A.  Yes, that's correct.

17    Q.  And that prevented any transfer or exchange of

18    Solid-Podmoskovny fund shares for Russkoye Polye; correct?

19    A.  No.

20    Q.  What was the reason why you were unable to exchange the

21    Solid-Podmoskovny shares for Russkoye Polye shares as reflected

22    in Plaintiff's Exhibits 3 and 4?

23    A.  Because of the lack of funds in the fund, we were never

24    able to -- at least while I was in Moscow, we were never able

25    to complete the development of the land, of the property, in

1   the fund Russkoye Polye.  And that was the reason why the

2   management company, Trinfko, did not allow the shares to be

3   distributed.

4   Q.  The shares of what fund?

5   A.  Russkoye Polye.

6   Q.  That was the freeze that you were referring to in

7   paragraph 52 of your declaration; correct?

8   A.  Yes, that's correct.

9   Q.  Freeze by the management of Russkoye Polye for the issuance

10  of any Russkoye Polye shares; right?

11  A.  Yes, the distribution of the shares.

12  Q.  When did that freeze first go into effect?

13  A.  It was actually the whole time.  They were supposed to

14  unfreeze it when we finished up the development.

15  Q.  When did that freeze go into effect?

16  A.  Right from the beginning, from the time the fund was

17  registered, they did not allow the shares to be distributed.

18  Q.  When did the fund become registered?

19  A.  Sometime in the second half of 2009.  I don't remember

20  exactly.

21  Q.  Is it your testimony that at no time from the point at

22  which Russkoye Polye's fund was registered until you left

23  Moscow in July of 2013, did that freeze ever get removed?

24  A.  Yes.

25           MR. DANNENBERG:  No further questions.  Thank you.

1          THE COURT:  Redirect.

2     REDIRECT EXAMINATION

3     BY MR. BERKOVICH:

4     Q.  Mr. Dikker, actually, with respect to the last question

5     that was asked by Mr. Dannenberg, did anyone own shares in the

6     fund Russkoye Polye?

7     A.  Yes, the companies that invested the land into the fund,

8     Russkoye Polye, they formally -- they received the shares of

9     the fund.

10    Q.  Was there one company which owned shares in Russkoye Polye?

11    A.  No, there wasn't one company.  There were several of them.

12    I don't remember exactly, but it was at least five or six.

13    Q.  Let me ask you this question:  One way or the other, did

14    TRI own directly any shares in Russkoye Polye?

15    A.  No.  Those transactions were frozen.

16    Q.  In your view, in your understanding, did TRI own indirectly

17    any shares in Russkoye Polye?

18    A.  Of course, indirectly it did own some of the shares because

19    TRI owned 25 percent of the shares of those companies.

20    Q.  Did anyone have a majority interest in any of these

21    companies that you just described?

22    A.  No.  When I was there, I don't think anyone ever had a

23    majority share of the companies.

24    Q.  Did anyone control actions of any these companies that

25    owned the shares in Russkoye Polye?

1    A.  With regards to the distribution, control of the

2    properties, of the land and the shares, the management company

3    Trinfko controlled the fund.

4    Q.  When you testified earlier to the questions by

5    Mr. Dannenberg that Trinfko was freezing or preventing

6    distribution of shares, do you mean that Trinfko would not

7    distribute shares to the shareholders of the companies that

8    owned the shares?

9           MR. DANNENBERG:  Objection.

10          THE COURT:  Grounds?

11          MR. DANNENBERG:  Objection to the form of the

12   question.  He's asking a leading question.

13          THE COURT:  Sustained.

14          Rephrase the question, Mr. Berkovich.

15          MR. BERKOVICH:  Sure.

16   Q.  You testified earlier, just a few minutes ago, as an owner

17   of 25 percent in the companies that owned the shares in

18   Russkoye Polye, did TRI have the ability to obtain the shares

19   of Russkoye Polye?

20   A.  That's exactly what was frozen, the movement of the shares

21   from the companies that provided land, invested the land, to

22   companies like TRI and Lentesco.  Those transactions were

23   frozen.

24   Q.  TRI's inability to obtain the shares, actual shares, in

25   Russkoye Polye, the fund Russkoye Polye, was the reason for

1    that because TRI only owned 25 percent of these companies; is

2    that your understanding?

3              MR. DANNENBERG:  Objection.  Leading.

4              THE COURT:  Sustained.

5    Q.  Why wasn't TRI able to obtain shares, directly itself

6    obtain shares, in real estate fund Russkoye Polye?

7    A.  The first reason was that TRI did not own the land; but,

8    rather, it was the companies that had invested it.  Secondly,

9    it was a block that involved all of the parties, all the

10   investors, not only TRI.

11   Q.  Would you just describe -- did you discuss this at any

12   point with Mr. Kislin?

13   A.  I don't remember specifically, but I think so.  I think

14   that there was this discussion because Sam asked questions

15   about this over the course of three years.  So I had to explain

16   it to him.

17   Q.  Now, I haven't asked you a question generally regarding the

18   shares in the real estate funds.  We described several of them.

19   Were these shares like stock certificates in a corporation?

20   A.  No, there were no stock certificates as it were.  The

21   shares were controlled electronically.  All of that was done in

22   electronic form.  Some they were issued and reassigned

23   electronically.  There were no physical certificates.

24   Q.  Was it a government agency that controlled administration

25   of the shares in the real estate funds?

1   A.  The responsibility was of the main state registry for

2   shareholders, but because of the sheer volume of the work, they

3   were not able to perform all of it.  So they subcontracted the

4   process out to these special license firms that were holders of

5   registration information.

6   Q.  Just to refresh your recollection with respect to the name

7   of the government agency, if you look both at Exhibit 3 and 4,

8   both of them, paragraph 1 of the exhibits, there's a Russian

9   Federal Commission for Securities Markets.  Is this the

10  organization that was registering the shares?

11  A.  So, essentially, they didn't register the actual shares.

12  They held the registration of the funds, the list of holders of

13  the funds.  So the registration holders, the subcontractors,

14  were the ones who registered the individual shareholders.

15  Q.  I just want to use the example based on your testimony.

16  You say you were familiar with the process.  Let's say TRI

17  wanted to sell a hundred shares in one of the real estate funds

18  that it controlled to somebody else.  What would be the process

19  of transfer of these kind of shares?

20          MR. DANNENBERG:  Objection.

21          THE COURT:  What's the grounds?

22          MR. DANNENBERG:  He's asking a hypothetical question.

23          THE COURT:  Overruled.  He's trying to explain the

24  role of this state agency in a way that's comprehensible.  Your

25  objection's overruled.

1    A.   There would be an agreement, a contract of sale and

2    purchase.  That agreement was then registered in the civil

3    records office of the county.  Then this agreement was given to

4    the registration holding company, along with either some sort

5    of guaranty that payment would be made or proof that payment

6    has been made.  And at that point, that registration holding

7    company would then just change the name of the holder of the

8    shares, for example, from TRI to another entity that now

9    controlled those shares.

10   Q.   Mr. Dannenberg asked you several questions regarding the

11   three memoranda of understanding referred to in paragraphs 5,

12   6, and 9 of your affidavit.  Do you recall that?

13   A.   Yes.

14   Q.   My understanding or my recollection is that you gave the

15   basic information regarding what should be in this memoranda of

16   understanding to Mr. Levkovsky who actually drafted it; is that

17   correct?

18   A.   Yes, yes.

19   Q.   Did you discuss the terms of these memoranda of

20   understanding with Mr. Kislin prior to giving instruction to

21   Mr. Levkovsky?

22   A.   Of course.

23   Q.   Does it apply to all three or every memoranda of

24   understanding referred to in your affidavit?

25   A.   Yes, all of them.

1    Q.  Were the terms that you provided to Mr. Levkovsky the terms

2    that were, your understanding, agreed to between you and

3    Mr. Kislin?

4    A.  Sometimes wasn't completely agreed, but both parties --

5    sometimes there was some changes that we would add after

6    Levkovsky had written the memorandum, but they were usually

7    minor changes that we added.  The main part of the memorandum

8    were agreed to prior to giving that information to Levkovsky.

9    Q.  When you use the term "we," are you referring to you and

10   Mr. Kislin agreeing on some changes or something else?

11   A.  Yes, myself and Mr. Kislin.  No one aside from us took part

12   in this -- in these *Ponyateika*, as we call them.

13   Q.  Now, the question asked to you by Mr. Dannenberg is why the

14   word *Ponyateika* is not mentioned in Exhibit 3 and 4.  Do you

15   recall that question?

16   A.  Yes.

17   Q.  Do you understand why the word *Ponyateika* does not appear

18   in Exhibit 3 or 4?

19   A.  *Ponyateika* is just a simple word.  It's not something that,

20   you know, you would put at the title of something, and that's

21   why.  It's like slang, and that's why Levkovsky used the term

22   "agreement."

23   Q.  By "slang," do you mean a business slang?

24              MR. DANNENBERG:  Objection.

25              THE COURT:  Sustained.  I sustained the objection.

1    THE WITNESS:  (In English) I'm sorry.

2  Q.  Earlier today Mr. Dannenberg asked questions regarding your

3  and Mr. Kislin agreeing to $20 million, a payout to Mr. Kislin.

4  Is this that you agreed with Mr. Kislin with respect to

5  $20 million or you agreed to look for the buyer with respect to

6  $20 million?

7    MR. DANNENBERG:  Objection.

8    THE COURT:  Grounds?

9    MR. DANNENBERG:  Leading.

10    THE COURT:  No, overruled.

11  A.  I think I already answered this question.  I was looking

12  for a buyer.  I just came to an understanding with Mr. Kislin

13  about what would be a reasonable sum to try to find a buyer

14  for.  And, by the way, when we started looking, we started out

15  with 30 million, not 20 million.

16  Q.  You say "we."  Are you referring to a sale to Mr. Sachkov

17  or anybody else?

18  A.  Myself -- myself and Mr. Sachkov, yes.  The two of us,

19  myself and Vadim Sachkov.

20  Q.  Did you apprize Mr. Kislin with respect to your efforts to

21  find a buyer for the shares in the real estate fund?

22  A.  Of course we kept him informed, but that information he

23  wasn't very interested in, Mr. Kislin.  As soon as we found an

24  actual buyer, that's when he became more interested and wanted

25  to be involved.

1    Q.  Am I correct to understand that a real estate fund in which

2    Blago ultimately purchased shares did not exist until you have

3    arrived at some understanding with Blago; is that correct?

4              MR. DANNENBERG:  Objection.

5              THE COURT:  Grounds?

6              MR. DANNENBERG:  Leading question.

7              THE COURT:  Overruled.

8              You can answer the question.

9    A.   In reality, we started registering, myself and Mr. Sachkov,

10   started registering the fund, not investing property or land

11   into the fund but just registering the fund itself in advance

12   because just the registration of the fund takes several months

13   before you could actually invest property into the fund.  But

14   the actual assets only started -- only started investing the

15   actual assets into the fund after the agreement had been or

16   understanding had been reached with Blago.

17   Q.  Not just understanding, am I correct it was no agreement,

18   nothing was finalized, but there was a preliminary

19   understanding; is that my understanding of --

20             THE COURT:  Sustained.

21             MR. DANNENBERG:  Objection.

22             THE COURT:  Try not to lead, Mr. Berkovich.

23             MR. BERKOVICH:  I have only very little, your Honor.

24   I would like to show the witness exhibit.  It's Defendant's

25   Exhibit C.

1  Q.  Mr. Dikker, if you could tell me, if you know, what Exhibit

2  C is.

3  A.  Yes, I do.

4  Q.  What is it?

5  A.  This is the structure of the company Trans Region Invest

6  and its subsidiaries at a certain point in time.

7  Q.  If we're going into the time part, do you know who prepared

8  this document?

9  A.  It was Runova.

10 Q.  The attorney for the TRI; is that correct?

11 A.  Yes.

12 Q.  If you look at this document, is it fair to say that it

13 shows the ownership structure of TRI?

14         MR. DANNENBERG:  Objection.

15         THE COURT:  Grounds?

16         MR. DANNENBERG:  He's leading the witness, your Honor.

17         THE COURT:  He's trying to get him to identify a

18 document and lay the foundation for its receipt.  Now, how

19 would you suggest that he ask in a nonleading fashion whether

20 it accurately reflects the structure of TRI?

21         MR. DANNENBERG:  He could ask what does it show.

22         THE COURT:  No.  Overruled.

23         Does it accurately show the structure of TRI and its

24 subsidiaries?

25         THE WITNESS:  At a certain point in time, yes.

1          THE COURT:  At what point in time?

2          THE WITNESS:  Approximately the beginning of 2007,

3    maybe the middle.

4          MR. BERKOVICH:  I'd like to show the witness another

5    document.  It's Defendant's Exhibit B.

6    Q.  Mr. Dikker, are you familiar with this document,

7    Defendant's Exhibit B?

8    A.  Yes.

9    Q.  Tell me what this is.

10   A.  It is a similar structure of the company as the prior

11   document, except at a different point in time.  I believe this

12   is the end of 2005, middle of 2006.

13   Q.  Does it accurately reflect, to the best of your

14   recollection, the structure of TRI at that time?

15   A.  As far as I recall, yes, it does.  We made these for our

16   internal needs, to clarify things internally.  I believe so,

17   yes.

18   Q.  With respect to the org document, if you see, in addition

19   to the three companies which are owners of TRI, which is

20   Brunlow, OptTorgLider, and the third company which escapes my

21   recollection at this point -- and Interprogress, in addition to

22   these three companies, there are also many other companies.

23   Can you tell me what these companies were, if you remember?

24   A.  Aside from working with shares of land, property, the main

25   activity of TRI was the development of property and land.  And

1  it was broken up into different projects that consisted of

2  either a large parcel of land or several parcels of land that

3  were combined into one project.  Each one of them had their own

4  overall concept.  One of them might be breaking up the land

5  into small properties, subdividing it into small plots of land

6  and selling off the plots.  Or it might be the creation of a

7  development plan for developing the property and then selling

8  the property, along with that plan, for its development, along

9  with the various permits for the development.  Or in some

10 instances, not many but a few instances, the property actually

11 had houses built on them.

12 Q.  Did TRI actually own any land, TRI itself?

13 A.  No.

14 Q.  I think you said on a number of occasions that TRI

15 transferred title to some real estate into the fund.  Did you

16 mean that TRI did it itself, or was it done by any of the

17 companies listed in Exhibit H and G -- I'm sorry, B and C?

18 A.  No, of course it was done by the subsidiary companies that

19 actually owned the properties, the land.

20         MR. BERKOVICH:  Your Honor, I have no further

21 questions, and I move to have this exhibit, Plaintiff's

22 Exhibit -- Defendant's Exhibit, I'm sorry, B and C to be

23 admitted into evidence.

24         MR. DANNENBERG:  Objection on two grounds, your Honor.

25 One is hearsay and failure to establish a business record

1    exception, and the second is the relevance of documents that

2    purport to reflect a snapshot of the company's ownership

3    structure, first in 2007, the witness said, and the second in

4    2005.

5          THE COURT:  Why do I care about the structure in

6    2005, '6, and '7?

7          MR. BERKOVICH:  Because that was just about --

8    number one, it was just before the issues that are relevant in

9    this case came about and also demonstrates how TRI worked

10   because there were a lot of loose terms used, unfortunately by

11   every witness, both of them; but, in fact, TRI didn't own any

12   land, as explained by this witness.  It was owned by other

13   companies, TRI subsidiaries.

14         Mr. Kislin accused, I think in his deposition and his

15   affidavit, Mr. Dikker of doing some shenanigans, opening many

16   companies for some nefarious reasons, and this shows that this

17   was legitimate practice for the company to have different plots

18   of land to be owned by different corporations and this shows

19   the structure.  And it's in the interest of the decision-maker,

20   your Honor, to know that and to see that as example.

21         MR. DANNENBERG:  That is not what these documents

22   show.  They simply represent what the witness claims is a

23   snapshot of the ownership structure, one of them in 2005 and

24   one of them in 2007, both of which are at least one year prior

25   to the transactions that are the basis of this litigation.

1          MR. BERKOVICH:  Your Honor, we do not claim this to be

2     anything but snapshot, but I think it's very useful information

3     for the Court to have in understanding complexities of this

4     case as well as some allegations or accusations made by

5     Mr. Kislin.  It is a snapshot, we absolutely agree.  Yes, it's

6     not record of every transaction.  I'm sure the companies

7     changed some names; some subsidiaries changed over time.  We

8     don't claim otherwise.

9          MR. DANNENBERG:  I will say, your Honor, that, just to

10     elaborate, there's a failure to establish a foundation for

11     business records exception to the hearsay rule.

12          MR. BERKOVICH:  Your Honor, we're shorthanded on this

13     issue.  We understand that.  We don't have any other witnesses

14     from the foreign country.  Unfortunately, we're limited in how

15     we can establish this kind of record.  It was produced by

16     Mr. Dikker -- by Mr. Kislin, I'm sorry, in this lawsuit.  And

17     Mr. Dikker is, obviously, more familiar with this document and

18     how it's prepared.  And we don't have opportunity to bring

19     Ms. Runova, or anybody else, in this courtroom, so we are

20     obviously operating with some limitations, and we hope the

21     Court recognizes that.

22          THE COURT:  So it was produced by your client, and

23     you're claiming it's not reliable; is that your position?

24          MR. DANNENBERG:  I'll tell you exactly how it came

25     about.  It was not produced from Mr. Kislin's own records.  A

1    discovery request was made of all documents in certain

2    categories that were in the ownership, control, possession of

3    Mr. Kislin; and my office had some documents that had been

4    e-mailed to me, as Mr. Kislin's attorney, back in 2005 and

5    2007.  And it fell within the scope of the discovery request,

6    so I produced it.

7            Mr. Kislin said at his deposition that he had no

8    knowledge of these.  I assume that they had been drafted by

9    Runova or Mr. Dikker, but we're not saying that they're

10   relevant to any of the issues in this trial.  He served a broad

11   discovery request, and we responded.  That doesn't make them

12   admissible at trial, and counsel seems to be conceding the

13   point that they're not sufficient to establish a business

14   records exception because he says that he doesn't have the

15   witnesses here.

16           THE COURT:  I'm not interested in whether they fit

17   within a business records exception or not.  If this man says

18   that they accurately reflect the structure of the company at a

19   particular time, I don't need a business records exception.

20   This is an org chart.  This is an organization chart.

21           MR. DANNENBERG:  Yes, it is, your Honor.

22           THE COURT:  I don't need every base of the business

23   record exception established to receive it.  It's an org chart.

24   If he says the org chart is accurate at a particular point in

25   time, I have no reason to question that, particularly when it

1    came from you.  The question is whether it's of any use, that's

2    my question.  I will note that it reflects information that

3    both sides have submitted to me, in particular, the ownership

4    distribution among Dikker's company, Kislin's company, and

5    Parilis' company.  Those percentages are reflected in these

6    charts exactly as they are in the parties' submissions to me.

7           The question is what else do they add, that's the

8    question, and it's not clear to me what they add.  There are

9    many, many entities mentioned here.  There hasn't been any

10   testimony about any of them.  So I don't know how useful it is

11   for me to have an org chart that lists countless entities about

12   which there's been no evidence.

13          So that's the problem, Mr. Berkovich.  I'm not sure

14   what you want me to make of this.  There hasn't been any

15   testimony about most of the entities that are reflected in

16   these org charts, so what would you have me draw from them?

17          MR. BERKOVICH:  If I may respond to that, your Honor.

18   And it's a late hour.  I can ask witnesses with respect to

19   every company, but I asked the generic question with respect to

20   companies which are not three owners, and the witness can

21   testify that these companies are subsidiaries of TRI that own

22   separate plots of land.  So that's evidence that's been

23   established.  If you want, your Honor, to go over every one of

24   them, I could, but I think he gave the general answer.

25          THE COURT:  How does that bear on the issues?  You

1    know, I've tried to focus the lawyers' attention.  I made an

2    effort at the very outset of this case to tell you what

3    mattered to me, and I was pretty clear about it.  What matters

4    to me is whether there was an agreement between these two

5    gentlemen, an enforceable agreement; whether it was oral or

6    whether it was written; and what the terms of that agreement

7    were.  Now, these org charts, Mr. Berkovich, I don't know how

8    they shed light on that issue.

9         MR. BERKOVICH:  I agree with you hundred percent, your

10   Honor.  These are provided essentially as a background

11   information regarding TRI and how it was structured.  And

12   whether they would be useful to your Honor in any way in

13   rendering your decision, I'm obviously not going to argue at

14   this point.  But your Honor may consider this without,

15   obviously, admitting them right now, but at least you have them

16   if they're admitted in evidence.

17        THE COURT:  There's also the problem of time frame.

18   The relevant time frames, as I understand it, is 2008.  They're

19   not from 2008.  The witness has testified they're accurate as

20   of a moment in time, which is some moment in time in 2005 or

21   2006 and 2007.  How they are different from the structure that

22   was in place in 2008, I have no idea.

23        MR. BERKOVICH:  Could I ask the witness the question?

24   You want me to, your Honor?

25        THE COURT:  You can conduct your examination in any

1    way you deem appropriate.

2            MR. BERKOVICH:  This is the end of my examination, so

3    I'll just ask this question.

4    Q.  Mr. Dikker, with respect to the two charts that you have in

5    front of you, which is Plaintiff's Exhibit B and C, are they in

6    any way similar to the charts that would have been made in 2008

7    and 2009?

8    A.   In 2009, it would differ greatly.  In 2008, at the time of

9    the transaction, if there were any differences, I couldn't say

10   for certain, but if there were, they would be fairly slight.

11           MR. BERKOVICH:  Your Honor, I have no further

12   questions.  I respectfully move to admit the two documents into

13   evidence.

14           MR. DANNENBERG:  Our objection's noted, your Honor.

15           THE COURT:  Well, based on the witness' representation

16   that the structure of the companies was not significantly

17   different in 2008, I will receive B and C.

18           MR. BERKOVICH:  As I said, your Honor, I have no

19   further questions.

20           (Defendant's Exhibit B and C received in evidence)

21           THE COURT:  All right.  You can step down, Mr. Dikker.

22           Do you have any other evidence, Mr. Berkovich?

23           MR. BERKOVICH:  Yes, your Honor.  Well, not evidence,

24   but the last issue is the pages of Mr. Kislin's deposition

25   testimony.  There were two depositions that defendant would

1    like to introduce.  We went through most of them -- all of

2    them, actually, with Mr. Dannenberg while your Honor was

3    handling the TRO.  And we have reached an agreement on all

4    except for the two issues.  So there's only two issues or two

5    particular pages that Mr. Dannenberg has objection to, and I

6    think that's the only argument we have.

7               THE COURT:  Mr. Dannenberg, why don't you tell me your

8    objections.

9               THE INTERPRETER:  I apologize, your Honor.  May I be

10   excused?

11              THE COURT:  Do you need the interpreter anymore?

12              MR. DANNENBERG:  No.

13              MR. BERKOVICH:  No, no.

14              THE COURT:  Thank you.

15              THE INTERPRETER:  Thank you, your Honor.

16              MR. DANNENBERG:  I don't want to lose sight of the

17   agreement that Mr. Berkovich told you we just made.  There are

18   some changes that need to be made to the recitation of pages

19   being submitted, page and line references by Mr. Berkovich.

20              MR. BERKOVICH:  I made the changes.  I made the

21   changes.

22              MR. DANNENBERG:  Can you read them into the record.

23              MR. BERKOVICH:  Your Honor, what I did is this:  We

24   have a cover page to each deposition pages which lists only the

25   pages which we're seeking to be read in.  So I made the changes

1    consistent with our conference with Mr. Dannenberg, and the

2    only thing we have not done is those two other things.  So

3    while there may be more pages than, in fact, should be read in,

4    the cover -- the cover governs the process.  So it's whatever

5    the pages listed on the cover are.

6            THE COURT:  You want to mark that as an exhibit,

7    Mr. Berkovich.  It would Defense Exhibit --

8            MR. BERKOVICH:  G and H.

9            THE COURT:  Defense Exhibit -- these are excerpts from

10   Mr. Kislin's deposition, I assume?

11           MR. BERKOVICH:  Yes, I'm sorry.

12           THE COURT:  G is excerpts from his deposition on

13   April 29, 2014, and H is excerpts from his deposition on

14   June 23, 2015?

15           MR. BERKOVICH:  That's correct, your Honor.

16           THE COURT:  So you want to tell me what are the

17   remaining disputes.

18           MR. DANNENBERG:  There's just two lines from the

19   second transcript, Exhibit H.

20           THE COURT:  All right.

21           MR. DANNENBERG:  The objection, it's the same

22   objection to both.

23           THE COURT:  What page?

24           MR. DANNENBERG:  Page 107.

25           THE COURT:  What line?

1          MR. DANNENBERG:  Line 18 through 112, line 6, and also

2     page 114, line 16, through 121, line 4.  These are --

3          THE COURT:  I'm sorry.  Give me those numbers again.

4     107 lines --

5          MR. DANNENBERG:  18 through 112, line 6.

6          THE COURT:  Okay.

7          MR. DANNENBERG:  And page 114, line 16, through 121,

8     line 4.

9          THE COURT:  You want to tell me generally what your

10    objection is to the --

11         MR. DANNENBERG:  These are a series of questions that

12    Mr. Berkovich asked Mr. Kislin to explain his understanding of

13    what was set forth in the complaint and what was meant by it,

14    what was set forth in the complaint, which may be fair game in

15    a deposition but, I respectfully submit, are not legitimate

16    questions and answers for trial.

17         THE COURT:  I've just skimmed a number of these pages.

18    You're objecting to five pages here.  I see many questions that

19    I don't perceive a problem with, so I guess we could go through

20    it line by line.  But, for example, on the top of page 110,

21    there's a question:

22    "Q. Do you have any reason to believe that Mr. Dikker

23    personally owned any shares in Solid-Podmoskovny?

24    "A. Of course I did.

25    "Q. What's your basis for making this assertion?

1    "A. He had -- well, maybe not him personally, but in his

2    company, his company had these shares."

3            Then it goes on from there.  You're objecting to that

4    testimony?

5            MR. DANNENBERG:  Mr. Berkovich and I discussed during

6    the break that all of these questions arose out of what was in

7    the complaint and questions asked by what was in the complaint.

8            THE COURT:  It's no problem with him asking.  I mean,

9    the complaint is a document filed by the plaintiff.  Why is

10   that an inappropriate subject for examination?

11           MR. DANNENBERG:  Not in a deposition, it's not

12   inappropriate.

13           THE COURT:  Well, it's not inappropriate at trial

14   either.  And if we had a jury here and Mr. Berkovich wanted to

15   question Mr. Kislin line by line about every statement in his

16   complaint, he absolutely would be permitted to do that because

17   everything in the complaint is an admission, and it's proper

18   ground for examination.  Whether it's meaningful or not, I

19   don't know, but that's not a basis for an objection that he

20   can't be questioned about his complaint.  Of course he can be

21   questioned about his complaint.  So if that's the basis for

22   your objection, that objection's overruled.  If you have

23   another basis, I'm happy to here it.

24           MR. DANNENBERG:  That's my only basis, your Honor.

25           THE COURT:  And that goes to both sets of excerpts?

1          MR. DANNENBERG:  That's the entire --

2          THE COURT:  All right.  The objection's overruled, and

3     Defense Exhibits G and H are received.

4          (Defendant's Exhibit G and H received in evidence)

5          THE COURT:  Do you have any other evidence,

6     Mr. Berkovich?

7          MR. BERKOVICH:  No, your Honor.

8          THE COURT:  Mr. Dannenberg, do you have any other

9     evidence?

10          MR. DANNENBERG:  No, your Honor.

11          THE COURT:  Let's turn to how we're going to proceed.

12     To say I was surprised by the testimony in the trial would be a

13     severe understatement.  The submissions I received from the

14     lawyers in no way prepared me for the proof.  I believe that I

15     need a complete redo as to proposed findings of fact,

16     conclusions of law.

17          With respect to the legal issues, those weren't

18     properly addressed in the submissions in any event.  So what do

19     I mean by that?  There are two claims that were on trial here,

20     breach of contract, fraudulent misrepresentation.  So as to the

21     law, it's necessary to lay out what the elements of those

22     causes of action are under New York law, given the parties'

23     agreement that their dispute is governed by New York law.  So I

24     need an analysis of the elements of each of those causes of

25     action under New York law and how the proof either does or does

1    not satisfy those elements.

2              With respect to the breach of contract claim, I must

3    confess to you that at this point I'm not entirely sure what

4    contract it is we're talking about.  I had come to the trial

5    believing that the plaintiff's theory was that there was a

6    handshake agreement that Mr. Dikker would pay Mr. Kislin

7    $20 million for his interest in TRI; and, in fact, Mr. Kislin

8    testified that there was no more than an oral agreement; that

9    there were no documents.  In fact, he said that he had no

10   reason to do a written agreement with Mr. Dikker.  Mr. Dikker,

11   in complete contradiction to that, testified about a whole

12   series of agreements.  There are so many I couldn't even tell

13   you how many.  It was a lot.  It was a lot of agreements.

14             In terms of proposed findings of fact, conclusions of

15   law, I believe we're starting, I won't say with a blank slate,

16   but let's just say the proof has varied quite a bit from what I

17   anticipated based on pretrial submissions.  So I'm happy to

18   hear what the lawyers think, but my inclination would be to

19   require new proposed findings of fact and conclusions of law.

20   And I want to emphasize that with respect to the legal portion

21   of the submission, it has to address each element of these

22   causes of action and explain, on plaintiff's side, how each

23   element is satisfied and as to Mr. Berkovich's side, how it is

24   not satisfied.  That's what I require.

25             If plaintiff is contending that there was an oral

1    agreement, and I don't know whether that's what plaintiff is

2    contending now, but if plaintiff was going to go down the road

3    of arguing there was an oral agreement between Mr. Kislin and

4    Mr. Dikker, then, obviously, I would need an analysis of New

5    York law on the question of the enforceability of an oral

6    agreement involving the property that is at issue here.

7              In any event, let me hear from the lawyers what they

8    think is appropriate at this point.  Mr. Dannenberg.

9              MR. DANNENBERG:  I was surprised by some of the

10   testimony myself, your Honor, from the defendant.

11             THE COURT:  By the way, I'm not suggesting I'm going

12   to adopt what Mr. Dikker said, but I am suggesting I was

13   surprised by his testimony.

14             MR. DANNENBERG:  Right.

15             THE COURT:  It has changed the playing field

16   substantially.  But, anyway, what do you think about

17   supplemental submissions, post-trial submissions?

18             MR. DANNENBERG:  I think it's absolutely necessary.

19             THE COURT:  Mr. Berkovich?

20             MR. BERKOVICH:  I absolutely agree with your Honor.

21             THE COURT:  All right.

22             MR. BERKOVICH:  It is, correct, your Honor, you're

23   totally right, if you look at the pretrial submissions, in part

24   probably because the position didn't go into the many areas

25   where we went in our direct and then cross and redirect,

1    clearly, there's much more to this case than what was presented

2    to your Honor initially, absolutely, your Honor.

3              THE COURT:  Now, another issue which I'm going to ask

4    you to talk about between yourselves, at least initially, is

5    there were stipulations of fact here that the parties entered

6    into before the trial.  I haven't gone back over them to see

7    whether they all still make sense in light of the testimony.

8    Maybe they do.  I don't know.  But if either of you are

9    troubled by the stipulations of fact in light of the evidence

10   that we heard, I would ask you to talk about it between

11   yourselves in the first instance.  I haven't been back over the

12   stipulated facts to see whether they still make sense or not.

13   Maybe they do.  I hope they do.  But if they don't, that raises

14   an issue, too, because they were stipulated to before the trial

15   started.

16             Schedule, I guess schedule and also sequence.  It's

17   plaintiff's case, so it seems to me that plaintiff should go

18   first and present plaintiff's proposed findings of fact and

19   conclusions of law supported by the legal analysis I described.

20             Mr. Dannenberg, how long would you want to put in your

21   papers?

22             MR. DANNENBERG:  Well, I would like to be able to get

23   the transcript.

24             THE COURT:  Yes, that's a necessity.

25             MR. DANNENBERG:  Yes.  One of the reporters had

1    indicated, Patricia, previous reporter had indicated that she

2    had a vacation later in April.  The normal turnaround time, as

3    I understand it, is 30 days.

4              THE COURT:  All right.  Accepting that as true, today

5    is April 6, so that would bring us to May 9.

6              MR. DANNENBERG:  Can I suggest end of May?

7              THE COURT:  Sure.  So Memorial Day is the 30th.  You

8    want to bump it to June 1 or do you want to do it earlier?

9              MR. DANNENBERG:  Last business day of May.

10             THE COURT:  Last business day of May is May 31.

11             MR. DANNENBERG:  Okay.

12             THE COURT:  Plaintiff's papers are due May 31.

13             Mr. Berkovich.

14             MR. BERKOVICH:  Your Honor, having 30 days to respond

15   would be welcome.

16             THE COURT:  That would bring us to --

17             MR. BERKOVICH:  Just before the holidays, I presume.

18             THE COURT:  June 30, yes.

19             Mr. Dannenberg, do you want a reply?

20             MR. DANNENBERG:  I would like an opportunity to reply.

21   I would request two weeks.

22             THE COURT:  That would bring us to July 14.

23             MR. BERKOVICH:  Your Honor, just for clarification,

24   your Honor is not requiring us to submit a new memorandum of

25   law, just new findings of facts and conclusions of law; is that

1    correct?  Just make sure what you want to see.

2            THE COURT:  What I'm saying to you is that I did not

3    find the briefs that were submitted adequate.  So, yes, I'm

4    telling you that I want more legal analysis focused on the two

5    causes of action that we went to trial on and explaining, in

6    your case, how the elements of breach of contract and

7    fraudulent misrepresentation have not been demonstrated by the

8    proof in the case.  So, yes, I want you to file a new brief

9    that is focused on, first of all, the elements of the causes of

10   action we went to trial on but also takes into account what the

11   evidence was and how the evidence, from your point of view,

12   does not make out the elements of breach of contract and

13   fraudulent misrepresentation.

14           Let me ask you this:  Has there ever been any effort

15   to settle this case?

16           MR. BERKOVICH:  We discussed it with Mr. Dannenberg,

17   as required, but we discussed it.  In any event, we know each

18   other outside of this case.  We have some disputes, but also

19   had some non-dispute relationship.  Remember, these parties

20   have been involved in business for many years.  So we had a

21   friendly discussion with Mr. Dannenberg.  It's just the parties

22   are so far apart.  They require $4 million.  My client doesn't

23   have the money; doesn't know if he owes it.  We had discussion,

24   but nothing came of them.

25           THE COURT:  Go ahead, Mr. Dannenberg.  You want to say

1    something.

2            MR. DANNENBERG:  It wasn't just Mr. Berkovich and me.

3    The two parties met separately from us on their own and made an

4    effort unsuccessfully.

5            THE COURT:  Let me say this:  I don't know the entire

6    relationship between these two men, but I suspect they were in

7    business for a significant period of time.  There's evidence

8    here that the parties came to an understanding that

9    Mr. Kislin's interest in the business was worth as much as

10   $20 million, if not more.  The parties disagree as to what

11   Mr. Dikker agreed to do in terms of buying out Mr. Kislin.  But

12   according to Mr. Dikker, what he agreed to do was attempt to

13   find a buyer that could pay $20 million for Mr. Kislin's

14   interest and, according to Mr. Dikker, he found such a buyer,

15   the Russian pension fund that I refer to as Blago.

16           Perhaps, as the result of a problem that neither man

17   anticipated, it turned out that there was an obstacle to

18   obtaining the full $20 million from Blago, and that obstacle,

19   the evidence suggests, was in the form of a man named Semernin

20   who believed that TRI, the venture in which Mr. Dikker and

21   Mr. Kislin were partners, owed his management company

22   $4 million.  We heard testimony, both today and yesterday,

23   about that debt.  And from Mr. Kislin's point of view, he

24   doesn't believe he should have borne the brunt of that

25   $4 million debt.  And what Mr. Dikker thinks, I don't know, but

1    there is some evidence that he made some efforts to try to get

2    Mr. Kislin that $4 million.  And there was also testimony that

3    the debt, the $4 million, the evidence wasn't entirely crystal

4    clear on this, but there was evidence that both Mr. Dikker and

5    Mr. Kislin took on some sort of obligation with respect to that

6    debt.  But the way it worked out, it may be the case that

7    Mr. Kislin bore the brunt of that $4 million debt when perhaps

8    it was a debt that should have been shared between the two.  I

9    don't know.

10            What I do wonder about is given the long relationship

11   between these two men, the fact that they made a lot of money

12   together, the fact that they both agreed at the outset that

13   Mr. Kislin's interest was worth at least $20 million, and the

14   fact that Mr. Kislin didn't get $20 million, he got 16, whether

15   it might be reasonable to reach some kind of agreement

16   somewhere in the middle and put this matter behind you.  I'm

17   not going to be able to do that.  If I were an arbitrator, you

18   know, arbitrators have a lot more freedom to do what they think

19   is fair, in part because unless the parties require a reasoned

20   decision, arbitrators are not required to give one.  They just

21   give a number.  I don't have that luxury.  So while an

22   arbitrator might find a place in the middle between the two

23   sides here, I suspect it's highly unlikely that that's where

24   I'm going to wind up.  It's either going to be Mr. Dikker owes

25   Mr. Kislin $4 million or he doesn't owe him anything.

1          So I would ask all of you to consider whether a

2   resolution that involves some number between the middle of zero

3   and $4 million might be sensible in light of all the

4   circumstances, the long relationship between the people

5   involved, the fact that they made a lot of money together, and

6   whether it's time to bury the hatchet on this and move on.

7   Because you know, whatever happens here, whatever I do, one

8   side or the other will likely appeal; and it will go on for

9   another year or two years.  I'm not sure that makes any sense

10  in this case.  So I'd ask you to think about that.

11         If at any point you feel like the involvement of a

12  neutral third party would be helpful, obviously, I can refer

13  the case to a magistrate judge for that purpose.  But I hope

14  you'll make a serious effort to discuss the dispute between

15  yourselves and try to reach a result that can put the matter

16  behind you now.  That's my recommendation.

17             All right.  Mr. Dannenberg, anything else?

18             MR. DANNENBERG:  No, your Honor.

19             THE COURT:  Mr. Berkovich, anything else?

20             MR. BERKOVICH:  No, your Honor.

21             THE COURT:  All right.  We're adjourned.

22             (Adjourned)

23

24

25

1                    INDEX OF EXAMINATION

2    Examination of:                         Page

3    SIMON DIKKER                            155

4    Cross By Mr. Dannenberg  . . . . . . . . . . 155

5    Redirect By Mr. Berkovich  . . . . . . . . . 222

6                    DEFENDANT EXHIBITS

7    Exhibit No.                          Received

8     B and C  . . . . . . . . . . . . . . . . 238

9     G and H  . . . . . . . . . . . . . . . . 243

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25