USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __8/7/17__

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SEMYON (SAM) KISLIN,

                                        Plaintiff,

                - against -

SIMON DIKKER,

                                        Defendant.

**MEMORANDUM
OPINION & ORDER**

14 Civ. 237 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

            This is an action for breach of contract and fraudulent misrepresentation under New York law. Plaintiff Seymon Kislin and Defendant Simon Dikker were partners in Joint Stock Company TransRegionInvest ("TRI"), a Russian real estate investment firm. (Joint Pretrial Order (Dkt. No. 69) ¶¶ 4, 8(c)-(d)) Kislin claims that Dikker breached an alleged oral agreement to buy out Kislin's share of the business for $20 million. According to Kislin, Dikker provided only $16 million of the promised $20 million purchase price. (Cmplt. (Dkt. No. 1) ¶¶ 13-16, 30-34) Kislin also claims that Dikker fraudulently misrepresented that he would pay Kislin the remaining $4 million in order "to induce plaintiff to take no action to enforce Dikker's obligation."[1] (Id. ¶¶ 17-18, 35-44) Jurisdiction is premised on diversity of citizenship, (id. ¶¶ 1-5), and the parties have stipulated that their dispute should be resolved in accordance with New York law, (Trial Tr. ("Tr.") 2:13-3:12).

---

[1] The Complaint's claims against Defendant Vadim Sachkov were voluntarily dismissed on June 9, 2014. (Dkt. No. 19) On April 5, 2016, the Complaint's conversion claim against Dikker was dismissed on consent. (Dkt. No. 82)

A bench trial was conducted on April 5 and 6, 2016.[2] This opinion sets forth the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). For the reasons stated below, this Court concludes that Plaintiff has not met his burden of proof on either his breach of contract claim or his fraudulent misrepresentation claim.

## FINDINGS OF FACT

### I. FORMATION OF TRI

1.    TRI was a Russian corporation formed in or about 2002 by Kislin, Dikker, and Sergey Parilis. Ownership shares in TRI were allocated 51% to Kislin (though a nominee company, Brunlow Inc.), 24½% to Dikker (though a nominee company, Closed Joint Stock Company OptTorgLider), and 24½% to Parilis (though a nominee company, InterProgress Ltd.). (Joint Pretrial Order (Dkt. No. 69) ¶¶ 4, 8(c); PX 11 (Kislin Aff.) ¶ 8)

2.    Kislin contributed the initial capital to TRI, while Dikker and Parilis contributed their labor and knowledge. (PX 11 (Kislin Aff.) ¶ 8; DX F (Dikker Decl.) ¶ 15) Dikker managed TRI on a day-to-day basis in Moscow. (DX F (Dikker Decl.) ¶ 17; see also PX 11 (Kislin Aff.) ¶ 9)

3.    From its creation until about July 2013, TRI maintained an office in Moscow. TRI, directly and through subsidiaries, made investments in and developed residential real property in Moscow Oblast, a metropolitan region outside Moscow. (Joint Pretrial Order (Dkt. No. 69) ¶ 8(d); DX F (Dikker Decl.) ¶ 18)

### II. TRI'S INVESTMENT IN BOYARKINO-INVEST

4.    By 2005, Kislin and Dikker wanted to sell some of the real estate they had invested in, in order to raise funds for further development and to pay dividends. (See DX F

---

[2] Although the Complaint contains a jury demand, (see Cmplt. (Dkt. No. 1) ¶ 45), the parties agreed to waive their right to a jury trial, (Joint Pretrial Order (Dkt. No. 69) ¶ 6).

(Dikker Decl.) ¶¶ 21, 25) Kislin and Dikker believed that putting parcels of land into a real estate fund and selling shares in the fund would be easier than selling the land itself. (See id. ¶¶ 23-24) To that end, Kislin and Dikker met with Vladimir Semernin and Vadim Sachkov, who were, respectively, chairman of the board and chief executive officer of Solid-Management, a Russian real estate fund management company. (Id. ¶¶ 19-20)

5.     Solid-Management had a real estate fund – Boyarkino-Invest – which it managed through a management company. (Id. ¶ 20; Tr. 170:2-13) In 2006, Kislin and Dikker decided to have certain TRI subsidiaries transfer real property to Boyarkino-Invest in exchange for shares in Boyarkino-Invest.[3] (DX F (Dikker Decl.) ¶¶ 20, 22) Once TRI obtained shares in Boyarkino-Invest, it planned to liquidate some of the shares. (See id. ¶¶ 21, 23, 25)

6.     Because TRI's shares in Boyarkino-Invest could not be sold on public stock exchanges, TRI enlisted Sachkov and Semernin to assist TRI in finding private investors to buy TRI's Boyarkino-Invest shares. (Id. ¶¶ 21-24; Tr. 171:4-6) In connection with these sales, Solid-Management required Kislin and Dikker to personally guarantee that investors who purchased TRI's Boyarkino-Invest shares at Solid-Management's prompting would receive an annual dividend of 14%. (Tr. 170:13-19, 171:7-21; DX F (Dikker Decl.) ¶ 25) Beginning in the second half of 2006, however, Kislin and Dikker agreed that they would stop paying this 14% dividend. (Tr. 170:21-22, 171:14-21) Because the 14% dividend was supposed to be paid to the Boyarkino-Invest shareholders through the Boyarkino-Invest management company overseen by Solid-Management, the shareholders complained to Solid-Management's chairman Semernin

---

[3] There is some evidence that TRI's interest in Boyarkino-Invest was not in shares of equity but rather in bonds or financial derivatives. (See, e.g., DX H (June 23, 2015 Kislin Dep.) at 38:16–21; DX F (Dikker Decl.) ¶ 24) The precise nature of the financial instrument in which TRI held its interest is not material. Accordingly, the Court refers to that interest as "shares" in Boyarkino-Invest.

when Kislin and Dikker stopped paying the dividend. (Tr. 171:7-171:11; PX 7 (June 26, 2015 Dikker Dep.) at 90:12-91:18)

## III.   KISLIN'S DESIRE TO LIQUIDATE HIS INTEREST IN TRI

7.   Beginning in late 2007, Kislin told Dikker that he wanted to liquidate his interest in TRI. (See DX F (Dikker Decl.) ¶ 26; PX 7 (June 26, 2015 Dikker Dep.) at 72:24-73:17; Joint Pretrial Order (Dkt. No. 69) ¶ 8(e); see also Tr. 157:17–22)  Kislin sought $20 to $30 million for his interest, and Dikker agreed to help find an outside buyer. (PX 11 (Kislin Aff.) ¶ 23; Tr. 183:1–2, 228:2–25)

8.   In order to avoid disrupting TRI's agreements with other parties, and to take advantage of a Russia-Cyprus tax treaty, Dikker and Kislin agreed that the liquidation of Kislin's interest in TRI would take place through the exchange of shares of Russian real estate funds nominally owned by Cyprus companies. (DX F (Dikker Decl.) ¶ 29; Tr. 160:18-161:2, 176:18-24; 192:8-193:2; PX 7 (June 26, 2015 Dikker Dep.) 77:4-78:11; see also PX 11 (Kislin Aff.) ¶ 13; Tr. 140:5-8)

### A.   Preparations for the Liquidation of Kislin's Interest in TRI

9.   In preparation for the liquidation of Kislin's interest in TRI, TRI established a new real estate fund, Solid-Podmoskovny,[4] whose management company was overseen by Solid-Management. (DX F (Dikker Decl.) ¶¶ 2, 29; Tr. 148:16-19, 157:4-6, 167:8-11; PX 7 (June 26, 2015 Dikker Dep.) at 67:6-21, 89:9-90:11)

---

[4] In his direct testimony, Dikker sometimes refers to this fund as "Solid-Moscow Region," apparently because "Podmoskovny" means "Moscow Region" in English. (Tr. 155:15-156:5; e.g., DX F (Dikker Decl.) ¶¶ 1-2)  To avoid confusion, this Court uses only the Solid-Podmoskovny name.

4

10.     TRI then transferred real property to the Solid-Podmoskovny fund. (Tr. 148:24-25) In exchange, TRI was to receive shares in the Solid-Podmoskovny fund. (Tr. 148:24-148:25)

11.     TRI then established Lentesco, a Cyprus company, to receive and hold TRI's shares of Solid-Podmoskovny. (DX F (Dikker Decl.) ¶ 29; Tr. 148:3-6; 148:23-149:1, 149:5-11, 157:7-11)

12.     Lentesco then transferred an amount of shares in the Solid-Podmoskovny fund equivalent to Kislin's fifty-one percent interest in TRI to Kominelli – a Cyprus company controlled by Kislin – or its nominee. (Tr. 142:2-10, 147:20-148:2, 175:8-17, 176:5-7, 179:7-12; PX 11 (Kislin Aff.) ¶ 14; see also Tr. 147:5-12)

## B.     Valuation of and Sale of Kislin's Interest in TRI

13.     When Kislin and Dikker initially discussed the buyout of Kislin's interest in TRI during the second half of 2007, Kislin sought $30 million for his interest in TRI. (PX 11 (Kislin Aff.) ¶ 23; Tr. 183:1-2, 228:14-15) By April 2008, however, Kislin and Dikker had agreed that Kislin's interest in TRI would be sold for $20 million. (PX 11 (Kislin Aff.) ¶ 23; Joint Pre-Trial Order ¶ 8(e); Tr. 183:1-19, 228:2-14)

14.     Kislin testified that Dikker proposed to buy Kislin's stake in TRI himself, and to finance that purchase through the sale of part of Dikker's portion of TRI's shares in Solid-Podmoskovny. (PX 11 (Kislin Aff.) ¶ 23) Dikker disputes Kislin's account, claiming that he only agreed to help Kislin find a buyer willing to pay $20 million for Kislin's portion of TRI's Solid-Podmoskovny shares. (Tr. 158:15-18, 191:16-22, 228:2-25) Based on Kislin's and Dikker's relative credibility – discussed in detail below – the Court credits Dikker's testimony that he did not agree to purchase Kislin's interest in TRI for $20 million, but instead only agreed

to help find a buyer to purchase Kislin's portion of TRI's Solid-Podmoskovny shares for $20 million.

15. Dikker, together with Sachkov, searched for a buyer for Kislin's portion of TRI's Solid-Podmoskovny shares. (Tr. 228:12-25) They found a Russian pension fund – Blagosostoyaniye – that was willing to purchase Kislin's portion of TRI's Solid-Podmoskovny shares. (DX F (Dikker Decl.) ¶ 27) Kislin negotiated with Blagosostoyaniye to determine a final price. (Id. ¶ 29; Tr. 182:22-184:20) Kislin initially sought $30 million, but Kislin and the pension fund ultimately agreed in April 2008 that Blagosostoyaniye would pay $20 million. (PX 11 (Kislin Aff.) ¶ 23; Tr. 175:21-25, 182:22-183:19) Kislin agreed to sell his TRI shares to Dikker and Parilis for a nominal price as long as Blagosostoyaniye's purchase of Kislin's portion of TRI's Solid-Podmoskovny shares was consummated. (Tr. 137:24-138:12, 140:22–24, 142:19-25, 175:1-7)

16. Dikker testified that it was necessary to obtain Solid-Management's approval in order to transfer Kislin's portion of TRI's Solid-Podmoskovny shares – held by Kominelli – to Blagosostoyaniye. Solid-Management's approval was necessary because it controlled the Solid-Podmoskovny management company, which in turn controlled the transfer and distribution of shares in the Solid-Podmoskovny fund. (DX F (Dikker Decl.) ¶ 2; Tr. 167:16-20, 169:2-20; see also PX 7 (June 26, 2015 Dikker Dep.) at 89-90; Tr. 220:10-16) In exchange for approving Kislin's transaction, however, Solid-Management demanded that TRI pay outstanding dividends it owed on the Boyarkino-Invest shares TRI had sold in 2006. As noted above, Kislin and Dikker had personally guaranteed that investors who purchased TRI's Boyarkino-Invest shares would receive a 14% annual dividend, (Tr. 170:13-19, 171:12-21), but beginning in the second half of 2006, Kislin and Dikker had agreed that they would stop paying

this dividend, (Tr. 170:21-22, 171:14-21). Solid-Management – which controlled the dissemination of the 14% dividend – demanded that TRI pay the outstanding dividends owed to the purchasers of TRI's Boyarkino-Invest shares, as well as a 14% dividend for the following year. Together, this amounted to $4 million. (Tr. 169:2-20, 170:22-171:11) Dikker testified that Kislin negotiated with Semernin in an attempt to reduce the $4 million payment, but that Kislin ultimately consented to having the $4 million taken out of the $20 million purchase price from Blagosostoyaniye. (DX F (Dikker Decl.) ¶¶ 30-31; Tr. 184:10-185:6, 188:21-25, 195:1-20)

17.    In his direct testimony, Kislin denied that (1) TRI owed $4 million in dividends to the Boyarkino-Invest investors; and (2) he had agreed that Solid-Management would receive $4 million of the $20 million paid by Blagosostoyaniye. Indeed, Kislin asserted that Dikker had told him that Dikker owed a personal debt of $4 million to Solid-Management's chairman, Semernin. (PX 11 (Kislin Aff.)) ¶¶ 27-28) On cross-examination, however, Kislin variously testified that (1) the $4 million represented Dikker's personal debt to Semernin; (2) the $4 million might represent a debt owed by TRI; and (3) he could not recall the circumstances of the $4 million. (Tr. 72:23-74:14, 75:14-77:25)

18.    In contrast to his trial testimony, Kislin had testified at deposition that he and Dikker had signed a "paper" stating that they each "owe[d] some money to Semernin." Kislin testified that he did not know whether the money he agreed to pay Semernin reflected a personal debt Dikker owed to Semernin, or reflected a debt that TRI owed to Semernin. (DX H (June 23, 2015 Kislin Dep.) at 81-84)

19.    As to Dikker's alleged agreement to buy out Kislin's interest in TRI for $20 million, Kislin asserts there is no written document reflecting this alleged agreement, because "neither [Kislin nor Dikker] asked for a written acknowledgment of the deal." (PX 11

(Kislin Aff.) ¶¶ 23, 25) By contrast, Dikker testified that each of the transactions involved in the buyout of Kislin was reflected in a written agreement. (Tr. 142:19-143:3, 174:21-175:7, 176:10-24, 182:8-21, 189:12-23) Dikker testified that he was unable to produce documentary proof of his and Parilis's agreement with Kislin to purchase Kislin's shares of TRI for a nominal amount, because the relevant documents were located in Moscow, and TRI had refused to provide the documents to Dikker. (Tr. 143:1-17; PX 7 (June 26, 2015 Dikker Dep.) at 99-103) Dikker explained that he could not himself retrieve the documents because he had left Moscow in 2013 to avoid arrest on tax charges. (See PX 11 (Kislin Aff.) ¶ 45; PX 8 (May 22, 2014 Dikker Dep.) at 27-31) Dikker further testified that he did not have copies of Kislin's agreements with Blagosostoyaniye and Solid-Management, because he was not a party to the transactions and the parties had refused to provide copies of these agreements to Dikker. (Tr. 143:18-144:2)

21.    Having weighed the credibility of the two witnesses in this case – Kislin and Dikker – the Court rejects as not credible Kislin's testimony concerning the $4 million deducted from Blagosostoyaniye's $20 million payment for Kislin's portion of TRI's Solid-Podmoskovny shares. This Court credits Dikker's testimony that Solid-Management required that the $4 million be paid to satisfy Kislin and Dikker's debt arising from their decision in 2006 to stop paying the 14% dividend promised to the investors who purchased TRI's Boyarkino-Invest shares. This Court further concludes that Kislin was aware that the $4 million would be deducted from Blagosostoyaniye's $20 million payment and paid over to Solid-Management, and that he consented to receiving only $16 million for his portion of TRI's interest in the Solid-Podmoskovny shares.

20.    As a result of the $4 million paid to a company controlled by Solid-Management, Kislin received only $16 million from the sale of his portion of TRI's interest in

8

the Solid-Podmoskovny shares. (Tr. 68:19-69:5, 162:6-14, 166:16-167:2, 187:22-188:7) Once Kislin received the $16 million, he transferred his TRI shares to Dikker and Parilis, (Tr. 135:2-6, 173:20-22, 187:22-188:7), for a relatively nominal sum of one to two million rubles, or roughly $30,000 to $60,000. (Tr. 138:7-12, 139:13-17, 141:5-11, 142:19-25, 174:11-20) After the sale was completed and his TRI shares were transferred, however, Kislin demanded that Dikker pay him $4 million. (Tr. 184:10-20, 187:22-188:3, 188:13-20, 194:12-21, 204:20-25)

21. Over the next five years, Dikker and Kislin signed several documents in which Dikker agreed to attempt to sell TRI's remaining shares of Boyarkino-Invest, Solid Podmoskovny, and Russokyc Polye – another real estate fund – to generate $4 million for Kislin. (DX F (Dikker Decl.) ¶¶ 5-6, 9; Tr. 196:19-25; PX 3, 4) Kislin contends that these agreements substantiate his claim that Dikker owes him $4 million, and Kislin claims that he relied on these documents in not suing Dikker over the buyout. (See PX 11 (Kislin Aff.) ¶¶ 30-31, 33-35, 40) Dikker contends, however, that the agreements cited by Kislin are non-binding memoranda of understanding. (DX F (Dikker Decl.) ¶¶ 46, 48) Ultimately, Dikker was not able to sell TRI's shares in these real estate funds due to, inter alia, the worldwide financial crisis which began in 2008. (Id. ¶¶ 9, 52)

## C. Post-Buy-Out Activity Between Kislin and Dikker

22. Dikker testified that in about April or May 2008, he and Kislin signed a document providing that TRI would sell 254,556 shares of Boyarkino-Invest stock and split the proceeds with Kislin until Kislin received $4 million. According to Dikker, these shares were "appropriated" by Solid-Management to cover margin calls before TRI could sell them. (DX F (Dikker Decl.) ¶ 5; see Tr. 196:7-25; 200:11-16; 201:25-202:6; 209:21-211:16) Accordingly, Dikker and Kislin signed a second document between November 2008 and January 2009, which mirrored the first document except that it substituted shares of Solid-Podmoskovny for shares of

Boyarkino-Invest. (See Tr. 196:7-25; 200:11-20; see also DX F (Dikker Decl.) ¶ 6) Dikker testified that he was also unable to sell the Solid-Podmoskovny shares, initially because of a financial crisis in the Russian real estate market. (DX F (Dikker Decl.) ¶ 6; see also PX 11 (Kislin Aff.) ¶ 32) Later, in the middle of 2009, Blagosostoyaniye – which controlled the distribution of Solid-Podmoskovny shares by virtue of its control of the fund's management company following the purchase of Kislin's shares – froze the distribution of shares of Solid-Podmoskovny. (Tr. 218:22-219:2; 220:10-16; PX 7 (June 26, 2015 Dikker Dep.) at 89:9-90:1) Neither of these agreements was introduced into evidence at trial.

        23.    Kislin testified on direct that Dikker had admitted owing Kislin $4 million in connection with the sale of Kislin's interest in TRI, and had orally promised to give Kislin $4 million worth of Solid-Podmoskovny shares that Dikker personally owned, in exchange for Kislin's agreement to refrain from suing Dikker in Russia. (PX 11 (Kislin Aff.) ¶ 31) At deposition, however, Kislin admitted that he was not sure whether Dikker personally owned shares in Solid-Podmoskovny shares. (DX H (June 23, 2015 Kislin Dep.) at 110:2–10) And on cross-examination at trial, Kislin testified that he could not remember Dikker's alleged promise to transfer $4 million in Solid-Podmoskovny shares. (Tr. 55:17–56:1) While Dikker testified that "TRI offered to Kislin to take possession of [TRI's] [s]hares [of Solid-Podmoskovny]" on unspecified terms, Dikker stated that Kislin rejected this offer. (DX F (Dikker Decl.) ¶ 6) Given that Kislin did not demonstrate at trial that Dikker ever agreed to pay Kislin $20 million for Kislin's interest in TRI, there was no reason for Dikker to promise to pay Kislin $4 million. In sum, this Court rejects as not credible Kislin's testimony that Dikker promised to give Dikker's own shares of Solid-Podmoskovny to Kislin in order to avoid a lawsuit.

24.     Because of the freeze on sales of Solid-Podmoskovny shares, Dikker and Kislin executed a third document on November 12, 2009 (the "2009 Agreement"). (PX 3)  In the 2009 Agreement, Kislin and Dikker agreed that Dikker would exchange 254,556 shares of Solid-Podmoskovny stock for shares of Russokye Polye – another Russian real estate fund – by December 31, 2009. (PX 3 ¶¶ 1–2)  The Russokye Polye shares would then be sold, with the proceeds split between Kislin and Dikker until either Kislin received $4 million or all the shares were sold. (Id. ¶¶ 4, 6)

25.     In a document signed on September 18, 2012, Kislin and Dikker extended the deadline for the exchange of Solid-Podmoskovny stock for Russokye Polye stock to May 1, 2013 (the "2012 Agreement"). (PX 4 ¶ 2)

26.     Neither the 2009 Agreement nor the 2012 Agreement makes any reference to the alleged $4 million debt Dikker supposedly owed to Kislin. (See PX 3, 4; Tr. 91:12-93:6, 95:5-12 (showing Kislin's inability to identify any clause in the 2009 Agreement or the 2012 Agreement requiring Dikker to pay Kislin $4 million))  Moreover, neither the 2009 Agreement nor the 2012 Agreement recites the consideration Dikker has or will receive in connection with entering into the agreement, such as a promise by Kislin to forego suit. (See PX 3, 4)  These agreements likewise do not address any consequences Dikker will suffer if he is unable to complete the proposed exchange of Solid-Podmoskovny stock for Russokye Polye shares. (See id.)

27.     Dikker testified that, at the time, he believed that he could accomplish the exchange of TRI's shares of Solid-Podmoskovny for shares of Russokye Polye within the time periods set forth in the two agreements, but that he was ultimately unable to do so because Trinfko – the management company of Russokye Polye – would not allow the shares of

11

Russkoye Polye to be distributed until the land owned by that fund was developed. (DX F (Dikker Decl.) ¶¶ 9, 52; Tr. 212:20-213:4, 214:7-12, 217:19-218:1, 220:20-221:24)

28. In July 2013, Dikker left Russia for the United States after the police raided TRI's office and seized most of its documents as part of a tax investigation. (PX 11 (Kislin Aff.) ¶¶ 43-45; PX 8 (May 22, 2014 Dikker Dep.) at 71:13-72:21) At that point, Russokye Polye shares remained frozen. (Tr. 221:21-24)

## IV. THE PARTIES' CONTENTIONS AT TRIAL

29. At trial, Kislin sought to prove that Dikker had agreed to personally buy out Kislin's interest in TRI for $20 million, and that Dikker had only solicited Blagosostoyaniye's involvement in the transaction because Dikker did not have sufficient funds to complete the transaction on his own. (Joint Pretrial Order (Dkt. No. 69) ¶ 4(a)) Kislin further claimed that (1) Dikker diverted the $4 million to Solid-Management to pay a personal debt he owed to Semernin; and (2) Kislin had never agreed to that diversion. (Id.; Pltf. Post-Trial Br. (Dkt. No. 88) at 4[5]) Kislin further contended that, after the $4 million diversion, he threatened to sue Dikker. According to Kislin, Dikker stated that he intended to honor the original agreement for $20 million and promised to sell other assets to pay Kislin the remaining $4 million. (PX 11 (Kislin Aff.) ¶¶ 30-31, 40) Dikker never fulfilled those promises, however. (Joint Pretrial Order (Dkt. No. 69) ¶ 4(a))

30. Dikker argued that he had never promised to pay $20 million to Kislin for his portion of TRI's interest in the Solid-Podmoskovny shares. According to Dikker, he had only agreed to find a buyer that would pay $20 million for Kislin's interest. (Tr. 191:23-192:4, 228:2-25) Dikker also maintained that Semernin and Solid-Management demanded the $4

---

[5] The page numbers of documents referenced in this Order correspond to the page numbers designated by this District's Electronic Case Filing system.

12

million to satisfy claims arising out of TRI's agreement to pay a 14% dividend on Boyarkino-Invest shares TRI had sold to investors in 2006. (Tr. 169:2-20, 170:22-171:3) TRI had sold the shares of Boyarkino-Invest to private investors solicited by Solid-Management, and Solid-Management – as the company in control of the Boyarkino-Invest management company – was responsible for distributing the dividends to the investors. (DX F (Dikker Decl.) ¶¶ 21, 25; Tr. 170:9-14, 171:7-11; PX 7 (June 26, 2015 Dikker Dep.) at 90:12-91:18) According to Dikker, Kislin had agreed that $4 million could be diverted from Blagosostoyaniye's payment to satisfy this obligation. (Joint Pretrial Order (Dkt. No. 69) ¶ 4(b); Def. Post-Trial Br. (Dkt. No. 90) at 27).

31.     Dikker further contends that he never acknowledged owing Kislin $4 million, and only agreed to <u>attempt</u> to raise the $4 million through sales of shares that TRI held in other real estate funds. (DX F (Dikker Decl.) ¶ 46) Dikker states that he never guaranteed that these sales would take place or that the $4 million would be raised. (Joint Pretrial Order (Dkt. No. 69) ¶ 4(b); <u>see</u> Tr. 195:4-20) Dikker further explains that he was not able to raise the funds due to external market factors. (DX F (Dikker Decl.) ¶¶ 5-10) When asked why he agreed to try to sell assets in order to raise $4 million for Kislin, Dikker explained that – while he did not believe he owed Kislin $4 million – he "felt that this whole business [TRI] was successful because of Mr. Kislin's contribution. And so [Dikker] felt that it would be improper to just disregard [Kislin's] concerns." (Tr. 203:19-22)

## V.    CREDIBILITY OF WITNESSES AT TRIAL

32.     The only witnesses at trial were Kislin and Dikker. Consistent with this Court's individual rules for bench trials, both men's direct testimony was received by affidavit or declaration. Each man was cross-examined in the courtroom, however, giving this Court ample opportunity to determine credibility. Given that Kislin's claims turn on an alleged oral

13

agreement to sell Dikker his interest in TRI for $20 million, (see PX 11 (Kislin Aff.) ¶¶ 25; Tr. 90), as well as alleged oral fraudulent misrepresentations by Dikker, (see PX 11 (Kislin Aff.) ¶ 31; Tr. 55), witness credibility was critical to this Court's resolution of the parties' dispute.

33. The parties gave conflicting testimony concerning the key events. Having considered the consistency of the respective accounts, the reasonableness of those accounts considered in light of all the evidence, and each witness's demeanor on cross-examination, the Court concludes that Kislin was not a credible witness, and that Dikker was a credible witness.

34. Kislin's account at trial – that a $20 million transaction was entered into based solely on an oral agreement – is not credible. (See PX 11 (Kislin Aff.) ¶ 25 ("Mr. Dikker and I had no reason to put our agreement for his buy-out of my TRI shares in writing . . . ."); Tr. 55:17-22, 81:2-15, 90:5-91:2 (Kislin testimony: "[W]e mostly just had verbal handshake agreements.")) Moreover, while he testified at trial this he had merely an oral agreement with Dikker, at deposition Kislin testified that he could not recall whether the buyout agreement was in writing. (See DX H (June 23, 2015 Kislin Dep.) at 60, 62-63) Equally implausible were Kislin's claims that he conducted the transaction without legal review, and that he transferred his interest in TRI without verifying that he had been paid by Blagosostoyaniye. (See DX G (Apr. 29, 2014 Kislin Dep.) at 26 (Kislin testimony stating he received no advice from counsel concerning the buyout); PX 11 (Kislin Aff.) ¶ 26 (Kislin assertion that he transferred his TRI shares to Dikker and Parilis without having verified that Blagosostoyaniye had made its $20 million payment)) Kislin's testimony that there are no documents reflecting the $16 million he allegedly received from Blagosostoyaniye was likewise not credible, given that it appears likely that bank records would exist for a transaction of this magnitude. (Tr. 104:1-9 ("Q. And there are no documents that show when you received that money? A. Yes."); see also Tr. 69:15-70:10

14

(Kislin stating that Kominelli – his company in Cyprus that received the $16 million payment – had a bank account but that he "did not request any documents from the bank" regarding the transfer))

35.     Given Kislin's purported distrust of Dikker's management of TRI, his alleged failure to arrange for legal review, and to document his alleged oral agreement with Dikker, strains belief. (See, e.g., PX 11 (Kislin Aff.) ¶¶ 15-17 ("Sometime in 2007, I began raising questions regarding Mr. Dikker's operation of TRI and, in particular, whether he had been misusing or misappropriating company funds. . . . [T]he more complicated and elaborate Mr. Dikker's hierarchy of companies became, the more suspicious I became over his handling of overall finances . . . .")) Indeed, Kislin testified that – less than a year before the buyout – he had his attorney prepare written agreements for Dikker and another TRI employee in which they agreed not to make large monetary or property transfers without Kislin's approval. (PX 11 (Kislin Aff.) ¶¶ 17-18; see PX 1, 2) Given Kislin's alleged distrust of Dikker and his desire – less than a year earlier – to restrict Dikker's discretion at TRI through a written contract drafted by Kislin's attorney, it is inconceivable that he would not insist on a written agreement concerning the alleged $20 million buyout of his interest, and not use a lawyer in connection with that critical transaction.

36.     When cross-examined by defense counsel or questioned by the Court about fundamental issues in this case, Kislin was often evasive. For example, in the Complaint, Kislin asserted that, pursuant to the 2009 Agreement (PX 3), and the 2012 Agreement (PX 4), Dikker was obligated to pay Kislin the remaining $4 million for Kislin's interest in TRI. (See Cmplt. (Dkt. No. 1) ¶ 30 ("[P]laintiff and Dikker entered into a written agreement, dated November 12, 2009 (the '2009 Agreement'), pursuant to which Dikker promised to fund the

payment of his $4 million obligation to plaintiff . . . ."); id. ¶ 32 ("By subsequent written

agreement, dated September 18, 2012 (the '2012 Agreement') . . . Dikker renewed his promise to

satisfy his $4 million obligation to plaintiff . . . .")) When asked at trial to identify the language

in these agreements that obligates Dikker to pay him another $4 million, however, Kislin

repeatedly failed to respond to the question:

> Q. With respect to Plaintiff's Exhibit 3, the document dated November 12, 2009, is there anything in this document that requires Mr. Dikker to pay you $4 million?
>
> A. I don't see what he wrote here, but I see that he signed this document where he personally promised me to either pay me $4 million or to transfer to me 258,000 shares that at that time were worth money and could have been sold at that time.
>
> Q. What provision, what paragraph or provision of this document states in your view that Mr. Dikker personally owes you $4 million?
>
> A. Mr. Dikker controlled this whole business, and he could have resolved this issue within one or two days.
>
> MR. BERKOVICH: Your Honor, I will request the Court's assistance because the witness is not responding to my question. . . .
>
> THE COURT: You have to listen to the question. Listen to the question, make sure your answer responds to the question.
>
> So the question here is quite clear. It asks you what provision in Plaintiff's Exhibit 3 do you contend obligated Dikker to pay you $4 million?
>
> THE WITNESS: So in paragraph one of this agreement it says that I am side one or party one, and that Mr. Dikker over there are accusing of not paying me $4 million is a party to. And it's signed by both of us, so it's right there.
>
> THE COURT: Let me try one more time. The question is: What provision in this agreement, Plaintiff's Exhibit 3, obligates Dikker to pay you $4 million?
>
> THE WITNESS: I think what obligates him is the fact that we're identified at the top of this document, myself as party one and him as party two. And that obligates him to fulfill this document and to pay me the $4 million that's in this document.
>
> THE COURT: You're not understanding the question. The paragraph that you're talking about doesn't say anything about $4 million. The term $4 million doesn't appear in the paragraph that you're referring to. So what I'm asking you – I've asked you several times already, I'll ask you again – is tell me specifically what

paragraph in this agreement that you contend obligates Dikker to pay you $4 million?

THE WITNESS: I can't respond to that question. I can't respond to that question, but I think that my attorney could help me.

(Tr. 91:12-93:6)

37.     Kislin's testimony concerning the 2012 Agreement with Dikker, (PX 4), was equally confused and unclear:

Q.     .... Would you point to the specific provision of this Exhibit 4 under which Mr. Dikker is obligated to pay you $4 million? Please review it and tell me.

A.     I will answer the same way I answered the previous one. I don't know which point, which paragraph it is. That's a question to my attorney. He could help me identify it. But if I were an attorney, I would have written it differently. But I don't know exactly which paragraph.

(Tr. 95:5-12)

38.     When asked more broadly whether there was any written document reflecting the alleged oral agreement for Kislin to sell his interest in TRI to Dikker for $20 million, Kislin initially evaded the question, (Tr. 90), but ultimately conceded that "there was nothing written, nothing signed, nothing," (Tr. 91).

39.     At trial, Kislin's theory was that Dikker had diverted to Semernin – allegedly one of Dikker's creditors – the last $4 million Dikker owed to Kislin. (PX 11 (Kislin Aff.) ¶ 27) Accordingly, Dikker's lawyer cross-examined Kislin about the debt Dikker allegedly owed Semernin. Once again, Kislin initially refused to respond to the question, but ultimately was forced to admit that there were no documents supporting his allegation:

Q.     Are there any documents demonstrating Mr. Dikker's debt to Mr. Semernin just as – referred to in your last response?

A.     I don't understand.

Q.     To the best of your knowledge, are there any documents demonstrating that Mr. Dikker owed any money to Mr. Semernin ... ?

A. Mr. Dikker personally confessed to me and told me that he personally owed Mr. Semernin $4 million.

THE COURT: That wasn't the question. And you're still not listening to the question, nor are you making any effort to answer the question.

So, again, I have to instruct you: Listen carefully to the question. If you don't understand it, tell the lawyer you don't understand it. But you need to answer the lawyer's question; not some other question, the lawyer's question.

Ask the question again.

Mr. BERKOVICH: Sure

Q. To the best of your knowledge, are there any documents that demonstrate that Mr. Dikker owed Mr. Semernin – personally owed . . . Mr. Sermernin, $4 million.

A. I didn't see them.

(Tr. 103:3-25)

40. Kislin's deposition, direct, and cross-examination testimony were inconsistent on many points. For example, in his affidavit, Kislin states that, "For many years beginning in 2002 or 2003, Mr. Dikker and I, along with a third individual, named Sergey Parilis . . . owned and operated [TRI] . . . ." (PX 11 (Kislin Aff.) ¶ 8) On cross-examination, however, Kislin testified that "with Mr. Parilis, I never had any kind of interaction" and "I don't know that Parilis." (Tr. 47:24-50:17; see also DX H (June 23, 2015 Kislin Dep.) at 25:12-13 ("Mr. Parilis was never my partner.")) Similarly, at deposition, Kislin acknowledged that Semernin was a director of Solid-Management. (DX H (June 23, 2015 Kislin Dep.) at 65:6-22) At trial, however, Kislin denied on cross-examination that Semernin was "a principal of the management company that managed [the] Solid fund." (Tr. 72:16-22)

41. Dikker was, by contrast, a credible witness who answered both Plaintiff's counsel's questions and the Court's questions. His answers were detailed, consistent, and made sense in the context of the parties' relationship and business dealings. (See, e.g., Tr. 147-49

18

(explaining the various international nominee holding companies used to facilitate the buyout); id. at 159-61 (clarifying that Blagosostoyaniye's purchase of shares of Solid-Podmoskovny was done through Blagosostoyaniye's own Cyprus subsidiary); id. at 176-77 (describing and explaining various component transactions of the buyout of Kislin)) Dikker also cogently described all of the funds at issue, including Boyarkino-Invest, (Tr. 170:2-13), Solid-Podmoskovny, (Tr. 148:16-149:17, 157:4-6, 167:8-20), and Russokye Polye, (Tr. 212:24-216:25).

      42.     The Court accepts Dikker's testimony that he never agreed to purchase Kislin's interest in TRI for $20 million, (Tr. 134:22-135:13), and that instead he merely agreed to help Kislin find a buyer willing to pay $20 million for Kislin's interest in TRI. (Tr. 157:23-158:18, 228:2-25) The Court also accepts Dikker's account that he was not involved in the final negotiations over price, (Tr. 182:22-184:20), and that Kislin only transferred his TRI shares to Dikker and Parilis after he had confirmed the $16 million transfer to Kislin from Blagosostoyaniye, (Tr. 185:1-6, 187:22-188:1). Dikker's explanation of why Kislin received $16 million, rather than the $20 million agreed to by Blagosostoyaniye, (Tr. 165:1-171:21), also makes sense given (1) the personal guarantee Kislin and Dikker had given regarding the 14% dividend; (2) their failure to pay the dividend; and (3) the leverage Solid-Management enjoyed over Kislin as a result of its control over the Solid-Podmoskovny shares that Kislin wished to transfer. (Tr. 169:2-20, 170:22-171:3)

      43.     As would be expected in a transaction of this magnitude, Dikker testified that all of the significant business transactions were documented. (Tr. 142:19-143:3, 174:21-175:7, 176:10-24, 182:8-21, 189:12-23) Although none of these documents were produced in court – for reasons adequately explained by Dikker – Dikker testified about these numerous

complicated written agreements from memory, and he was never challenged by Plaintiff's counsel as to these details. (See, e.g., Tr. 139-40 (explaining companies involved in transaction with Blagosostoyaniye); id. at 141-43 (describing mechanics of transfer of Kislin's TRI shares))

## CONCLUSIONS OF LAW

## I.      BREACH OF CONTRACT      .

44.      Plaintiff argues that Kislin and Dikker orally agreed that Dikker would pay Kislin $20 million in exchange for Kislin's interest in TRI. (Pltf. Post-trial Br. (Dkt. No. 88) at 26)

45.      The elements of a breach of contract claim in New York are: "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." Eternity Glob. Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 177 (2d Cir. 2004) (quoting Harsco Corp. v. Segui, 91 F.3d 337, 348 (2d Cir. 1996)).

46.      The Court finds that although Kislin and Dikker reached an agreement that Kislin's interest in TRI would be valued at $20 million, Dikker never agreed to pay Kislin $20 million. (Tr. 187:7-11) Instead, Dikker only agreed to find a buyer at that price. Dikker did in fact locate a buyer – Blagosostoyaniye – that was willing to pay the $20 million Kislin demanded for his interest in TRI. (Tr. 166-67)

47.      Because Kislin has not demonstrated by a preponderance of the evidence that an agreement existed between Kislin and Dikker in which Dikker agreed to pay Kislin $20 million for his interest in TRI, Dikker is entitled to judgment on Kislin's breach of contract claim.

## II.    FRAUDULENT MISREPRESENTATION

48.    "Under New York law, a plaintiff asserting fraud must establish that '(1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance.'" Helios Int'l S.A.R.L. v. Cantamessa USA, Inc., No. 12 Civ. 8205, 2013 WL 3943267, at *10 (S.D.N.Y. July 31, 2013) (quoting Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98 F.3d 13, 19 (2d Cir. 1996)).

49.    "'Under New York law, each element of a fraud claim must be proven by clear and convincing evidence.'" Newbro v. Freed, 409 F. Supp. 2d 386, 400 (S.D.N.Y. 2006) (quoting Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 784-85 (2d Cir. 2003) (citing Hutt v. Lumbermens Mut. Cas. Co., 95 A.D.2d 255, 256–57 (2d Dep't 1983))), aff'd, No. 06-1722-CV, 2007 WL 642941 (2d Cir. Feb. 27, 2007).

### A.    Alleged Oral Promise to Transfer Solid-Podmoskovny Shares

50.    Kislin claims that Dikker orally "represented to Plaintiff that he would transfer to Plaintiff 254,556 shares in the Solid-Podmoskovny fund, which the parties agreed had a value of $4 million." Dikker never transferred these shares to Kislin. (Pltf. Proposed Findings of Fact (Dkt. No. 89) ¶ 51 (citing PX 11 (Kislin Aff.) ¶ 31))

51.    Kislin has not produced clear and convincing evidence that Dikker ever made this alleged oral misrepresentation. Given Kislin's lack of credibility, his claim of an alleged oral promise by Dikker carries little weight. Moreover, on cross-examination, Kislin could not recall this alleged promise when questioned by defense counsel. (Tr. 55:17–56:1) Nor would an oral promise concerning a transaction of this magnitude have been consistent with the parties' course of dealing. (See PX 1-4; see also Tr. 142:19-143:3, 174:21-175:7, 176:10-24, 182:8-21, 189:12-23)

## B. Written Agreements to Exchange Solid-Podmoskovny Shares

52.     Kislin alleges that Dikker "represented in the 2009 Agreement that he would arrange for an exchange of those shares [in the Solid-Podmoskovny fund] to shares in the Russkoye Polye fund, which would then be used to generate $4 million for Plaintiff." (Pltf. Post-trial Proposed Findings of Fact (Dkt. No. 89) ¶ 52)

53.     Kislin further alleges that Dikker "again represented in the 2012 Agreement that he would arrange for such an exchange of shares, which would then be used to generate $4 million for Plaintiff." (Id. ¶ 53)

54.     The 2009 Agreement and 2012 Agreement contain such statements, but there is no evidence – much less "clear and convincing evidence" – that Dikker knew these statements were false at the time they were made, or that he intended to defraud Kislin at the time he entered into the 2009 Agreement and the 2012 Agreement. The evidence demonstrates, instead, that Dikker was unable to accomplish the exchanges because of the Russian real estate market crash in 2008, and because the management company of the Russkoye Polye fund would not allow fund shares to be distributed. Kislin has not offered any evidence demonstrating that these explanations on Dikker's part are false.

## C. Fraud Damages

55.     Even assuming reasonable reliance by Kislin, he has not demonstrated that he suffered damages as a result of the alleged misrepresentations. Kislin argues that, "[b]ut for Plaintiff's reliance upon Defendant's representations, Plaintiff is likely to have recovered the sum of $4 million" in a lawsuit against Dikker. (Id. ¶ 59) The 2009 Agreement and 2012 Agreement do not constitute enforceable contracts obligating Dikker to pay Kislin $4 million, however. As noted above, these agreements do not even mention that Dikker owes Kislin $4 million. Nor do these agreements provide any consideration to Dikker in exchange for his

22

promise to attempt to raise $4 million through the sale of shares. For example, in the 2009 Agreement and the 2012 Agreement, Kislin does not agree to forego a lawsuit against Dikker. Because Kislin did not have an enforceable contract with Dikker that obligated Dikker to pay Kislin $4 million, Kislin's alleged decision to forego a lawsuit against Dikker did not cause Kislin to suffer any damages.

56.     Accordingly, Dikker is entitled to judgment on Kislin's fraudulent misrepresentation claim.

## CONCLUSION

For the reasons stated above, Plaintiff has not proven that Defendant is liable for breach of contract or fraudulent misrepresentation. The Clerk of Court is directed to enter judgment for Defendant.

Dated: New York, New York          SO ORDERED.
       August 5, 2017

Paul G. Gardephe
United States District Judge

23